**2022-1994**

# United States Court of Appeals for the Federal Circuit

CITY OF FRESNO, ARVIN-EDISON WATER STORAGE DISTRICT, CHOWCHILLA WATER DISTRICT, DELANO-EARLIMART IRRIGATION DISTRICT, EXETER IRRIGATION DISTRICT, IVANHOE IRRIGATION DISTRICT, LINDMORE IRRIGATION DISTRICT, LINDSAY-STRATHMORE IRRIGATION DISTRICT, LOWER TULE RIVER IRRIGATION DISTRICT, ORANGE COVE IRRIGATION DISTRICT, PORTERVILLE IRRIGATION DISTRICT, SHAFTER-WASCO IRRIGATION DISTRICT, SOUTHERN SAN JOAQUIN MUNICIPAL UTILITY DISTRICT, STONE CORRAL IRRIGATION DISTRICT, TEA POT DOME WATER DISTRICT, TULARE IRRIGATION DISTRICT, LOREN BOOTH LLC, MATTHEW J. FISHER, JULIA K. FISHER, HRONIS INC., CLIFFORD R. LOEFFLER, MAUREEN LOEFFLER, DOUGLAS PHILLIPS, CARALEE PHILLIPS, SAUCELITO IRRIGATION DISTRICT, TERRA BELLA IRRIGATION DISTRICT,

*Plaintiffs-Appellants,*

*(For Continuation of Caption See Inside Cover)*

*On Appeal from the United States Court of Federal Claims in No. 1:16-cv-01276-AOB, Armando O. Bonilla, Judge*

## BRIEF FOR PLAINTIFFS-APPELLANTS

Nancie G. Marzulla
Roger J. Marzulla
Marzulla Law, LLC
1150 Connecticut Avenue, NW,
  Suite 1050
Washington, DC 20036
(202) 822-6760
nancie@marzulla.com
roger@marzulla.com

*Counsel for Plaintiffs-Appellants*

October 21, 2022

– v. –

UNITED STATES, SAN LUIS & DELTA-MENDOTA WATER AUTHORITY,
SANTA CLARA VALLEY WATER DISTRICT, SAN LUIS WATER
DISTRICT, WESTLANDS WATER DISTRICT, GRASSLAND WATER
DISTRICT, JAMES IRRIGATION DISTRICT, BYRON BETHANY
IRRIGATION DISTRICT, DEL PUERTO WATER DISTRICT, SAN JOAQUIN
RIVER EXCHANGE CONTRACTORS WATER AUTHORITY, CENTRAL
CALIFORNIA IRRIGATION DISTRICT, FIREBAUGH CANAL WATER
DISTRICT, SAN LUIS CANAL COMPANY, COLUMBIA CANAL
COMPANY,

*Defendants-Appellees.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2022-1994 |
| **Short Case Caption** | City of Fresno v. United States |
| **Filing Party/Entity** | City of Fresno, et al. |

> **Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/22/2022

Signature:     s/ Nancie G. Marzulla

Name:          Nancie G. Marzulla

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| City of Fresno, CA | | |
| Arvin-Edison Water Storage District | | |
| Chowchilla Water District | | |
| Delano-Earlimart Irrigation District | | |
| Exeter Irrigation District | | |
| Ivanhoe Irrigation District | | |
| Lindmore Irrigation District | | |
| Lindsay-Strathmore Irrigation District | | |
| Lower Tule River Irrigation District | | |
| Orange Cove Irrigation District | | |
| Porterville Irrigation District | | |
| Shafter-Wasco Irrigation District | | |

☑    Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| Roger J. Marzulla, Marzulla Law, LLC | | |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| Cty. of Fresno v. US, 1: 21-cv-00375-AOB (Fed. Cl.) | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Southern San Joaquin Municipal Utility District | | |
| Stone Corral Irrigation District | | |
| Tea Pot Dome Water District | | |
| Tulare Irrigation District | | |
| Terra Bella Irrigation District | | |
| Saucelito Irrigation District | | |
| Loren Booth LLC | | |
| Matthew J. Fisher | | |
| Julia K. Fisher | | |
| Hronis Inc. | | |
| Clifford R. Loeffler | | |
| Maureen Loeffler | | |
| Douglas Phillips | | |
| Caralee Phillips | | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................iv

STATEMENT OF RELATED CASES ..................................................1

JURISDICTIONAL STATEMENT .........................................................1

INTRODUCTION ...................................................................................2

STATEMENT OF THE ISSUES.............................................................3

STATEMENT OF THE CASE.................................................................4

    I.    Factual Background..................................................................4

        A.    Congress Authorizes the Central Valley Project to
Redistribute Water from the Sacramento and San
Joaquin Rivers........................................................4

        B.    Reclamation Acquired the Miller & Lux San Joaquin
River Water Rights for the Friant Division in Exchange
for a Substitute Supply of Water from the Sacramento
River ......................................................................6

            1.    The United States Purchased Most of Miller &
Lux's San Joaquin River Water Rights ...........7

            2.    The United States Acquired the Right to Use the
Reserved Waters ..............................................7

        C.    The United States Entered into the Friant Contracts,
Which Became Permanent Contracts Prior to This
Litigation................................................................8

        D.    In 2014, Reclamation Decided for the First Time to
Give All Available San Joaquin River Water to the
Exchange Contractors ............................................9

        E.    The Friant Contractors and Their Growers Suffered
Devastating Losses...............................................11

    II.    Procedural Background.........................................................12

SUMMARY OF THE ARGUMENT .....................................................13

i

ARGUMENT ...................................................................................17

I.    Standard of Review ...........................................................17

II.   Breach of Contract: The Trial Court's Ruling was Legal Error
      Because It Contradicts the Plain Language and Intent of Both
      the Friant and Exchange Contracts ......................................19

      A.   The United States Promised Not to Deliver Waters of
           the San Joaquin River to the Exchange Contractors
           Unless Required by the Exchange Contract .............................19

      B.   The Exchange Contract Contains Only One Applicable
           Term Requiring the United States to Deliver San
           Joaquin River Water to The Exchange Contractors in
           2014....................................................................21

      C.   San Joaquin River Water is Available for Use by the
           Friant Contractors When the United States Is Providing
           Substitute Water in Conformity with the Exchange
           Contract................................................................22

      D.   San Joaquin River Water Cannot Be Considered
           Substitute Water........................................................24

      E.   Article 4(b) of the Exchange Contract (Temporary
           Interruption in Delivery) Governed in 2014.............................27

      F.   The United States Over-Delivered San Joaquin River
           Water to the Exchange Contractors .....................................32

      G.   Reclamation Was Not Required to Store San Joaquin
           River Water in Millerton Lake for a Future Delivery to
           the Exchange Contractors ..............................................34

      H.   Friant Contractors' Rights Are Not Subordinate to the
           Exchange Contractors' Rights ..........................................36

      I.   Reclamation is Not Immune from Liability for its 2014
           Breach of the Friant Contracts ........................................40

           1.   The Drought Provision Does Not Provide
                Immunity for the Government........................................41

           2.   A Reasonable Breach Is Still a Breach..............................43

III.  Taking Claim: The Trial Court Erred as a Matter of Law in Holding that the Friant Growers, and Friant Contractors in their Representative Capacity, Do Not Have Standing to Bring Their Taking Claims ...................................................45

    A.  Under State and Federal Law, the Friant Contractors and Their Growers Have Protected Property Interests in Friant Division Water ..............................................46

    B.  The Reclamation Act Provides Friant Growers a Right to the Use of Friant Division Water Appurtenant to Their Land.................................................47

    C.  The Trial Court's Failure to Follow the Binding Federal Circuit and the Supreme Court Decisions was Reversible Legal Error .............................................51

    D.  The Growers' Property Rights in San Joaquin River Water Are Constitutionally Protected Property Rights ...........53

    E.  The Trial Court Erred as a Matter of Law in Holding that the Districts Could Not Represent Their Growers in the Taking Case....................................................55

CONCLUSION .............................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Allen v. Hussey,*
    101 Cal. App. 2d 457 (1950) ........................................................55

*Armstrong v. United States,*
    364 U.S. 40 (1960) ......................................................................46

*Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.,*
    180 F.3d 518 (3d Cir. 1999) ........................................................19

*Baley v. United States,*
    134 Fed. Cl. 619 (2017) ..............................................................43

*C. J. Betters Corp. v. United States,*
    25 Cl. Ct. 674 (1992) ..................................................................41

*California v. United States,*
    438 U.S. 645 (1978) ...............................................................48, 49

*Clay Tower Apartments v. Kemp,*
    978 F.2d 478 (9th Cir. 1992) .......................................................18

*Coachella Valley County Water District v. Stevens,*
    206 Cal. 400 (1929) .....................................................................17

*Dairyland Power Co-op. v. United States,*
    645 F.3d 1363 (Fed. Cir. 2011) ...................................................17

*Folden v. United States,*
    379 F.3d 1344 (Fed. Cir. 2004) ...................................................18

*Gustine Land & Cattle Co. v. United States,*
    174 Ct. Cl. 556 (1966) ..................................................................5

*H.F. Allen Orchards v. United States,*
    749 F.2d 1571 (Fed. Cir. 1984) ..............................................52, 53

*Hoffman v. Stone,*
    7 Cal. 46 (1857) ..........................................................................54

*Ickes v. Fox,*
    300 U.S. 82 (1937) .............................................................47, 51, 52

*Kennewick Irrigation District v. United States,*
    880 F.2d 1018 (9th Cir. 1989) .....................................................18

*Kidd v. Laird,*
    15 Cal. 161 (1860) .........................................................................54

*Klamath Irr. Dist. v. United States,*
    635 F.3d 505 (Fed. Cir. 2011) ..................................................47, 53

*L.A. Cty. Flood Control Dist. v. Abbot,*
    24 Cal. App. 2d 728 (1938) ....................................................49, 54

*Madera Irr. Dist. v. Hancock,*
    985 F.2d 1397 (9th Cir. 1993) .......................................................49

*Nebraska v. Wyoming,*
    325 U.S. 589 (1945).............................................................47, 50, 52

*Nevada v. United States,*
    463 U.S. 110 (1983).............................................................47, 48, 52

*Orange Cnty. Water Dist. v. City of Riverside,*
    173 Cal. App. 2d 137 (1959) ........................................................17

*Orange Cnty. Water Dist. v. City of Riverside,*
    188 Cal. App. 2d 566 (1961) ........................................................55

*Peterson v. United States Dept. of the Interior,*
    899 F.2d 799 (9th Cir. 1990), *cert. denied*, 498 U.S. 1003 (1990) ...............18

*San Luis Unit Food Producers v. United States,*
    772 F. Supp. 2d 1210 (E.D. Cal. 2011), *aff'd*, 709 F.3d 798
    (9th Cir. 2013) .............................................................................46

*Shakey's Inc. v. Covalt,*
    704 F.2d 426 (9th Cir. 1983) ...................................................18, 19

*Stockton E. Water Dist. v. United States,*
    583 F.3d 1344 (Fed. Cir. 2009) ..................................15, 41, 42, 45

*Stockton E. Water Dist. v. United States,*
    638 F.3d 781 (Fed. Cir. 2011) ........................................15, 16, 45

*United States v. Gerlach Live Stock Co.,*
    339 U.S. 725 (1950).................................................................5, 6

*United States v. Seckinger,*
    397 U.S. 203 (1970).....................................................................18

*United States v. State Water Res. Control Bd.,*
    182 Cal. App. 3d 82 (1986) ............................................49, 53, 54

*Washoe Cty. v. United States*,
　319 F.3d 1320 (Fed. Cir. 2003) ......................................................54

*Westlands Water Dist. v. Patterson*,
　864 F. Supp. 1536 (E.D. Cal. 1994) .......................................12, 18

*Winstar Corp. v. United States*,
　64 F.3d 1531 (Fed. Cir. 1995) .....................................................18

*Wolfsen v. United States*,
　162 F. Supp. 403 (Ct. Cl. 1958)...........................................*passim*

## Statutes & Other Authorities:

28 U.S.C. § 1295(a)(3)....................................................................2

28 U.S.C. § 1491(a) .......................................................................1

43 U.S.C. § 372 ...........................................................................47

43 U.S.C. § 383 ...........................................................................48

43 U.S.C. § 389 .............................................................................6

43 U.S.C. § 485h-1(4)......................................................................9

Cal. Water Code § 1201 ................................................................49

Cal. Water Code § 1225 ................................................................49

Cal. Water Code § 22654............................................................4, 55

Cal. Water Code § 35408 ..............................................................17

DAVID IGLER, INDUSTRIAL COWBOYS: MILLER & LUX AND THE
　TRANSFORMATION OF THE FAR WEST (Berkeley: University of
　California Press 2005) ..................................................................6

Fed. Cir. R. 47.5 ............................................................................1

H.R. Rep. No. 794, 57th Cong., 1st Sess. (1902) .........................48

*New Lexicon Webster's Dictionary of English Language* (1988) ....................26, 27

Robert Autobee, *Friant Division Central Valley Project*, Bureau of
　Reclamation (1994) .....................................................................9

U.S. Geological Survey, *California's Central Valley* ..............................5

Wells A. Hutchins, *The California Law of Water Rights* (1956) ............................54

vi

**STATEMENT OF RELATED CASES**

Counsel for Appellants are aware of one related case according to Fed. Cir. R. 47.5; that case is currently pending in the U.S. Court of Federal Claims—*City of Fresno v. United States*, 1:21-cv-00375-AOB (Fed. Cl.).

**JURISDICTIONAL STATEMENT**

Appellants, City of Fresno *et al.* (Friant Contractors), sued the United States in *City of Fresno v. United States*,[1] in the United States Court of Federal Claims, seeking damages arising from the United States'[2] breach of the Friant Contractors' permanent contracts and just compensation for the physical taking of water to which Friant Contractors' water users (Growers) were entitled in 2014. The Court of Federal Claims had jurisdiction over both claims under 28 U.S.C. § 1491(a).

The trial court dismissed the taking claims on March 25, 2020, holding that none of the Appellants had standing because none possessed a constitutionally protected property right in Friant Division water.[3] On June 6, 2022, the trial court also entered summary judgment against Appellants on their contract claims, holding that the United States had not breached their permanent water supply contracts by providing San Joaquin River water to the Exchange Contractors in excess of what was

---

[1] *See* Appx1-20, Appx21-44.
[2] All contracts at issue in this appeal are administered by officials of the Department of the Interior, Bureau of Reclamation ("Reclamation").
[3] *See* Appx1-20.

required by the terms of the Exchange Contract, rather than delivering that water to

Appellants as required by the Friant Contracts.[4] The Court of Federal Claims entered

final judgment on June 7, 2022.[5] Appellants appeal this final judgment.

Appellants timely filed a notice of appeal on July 5, 2022,[6] which was

amended on August 3, 2022,[7] adding two additional Appellants. This Court has

exclusive jurisdiction over this appeal under 28 U.S.C. § 1295(a)(3).

**INTRODUCTION**

This appeal arises from Reclamation's failure to honor long-standing rights

under contracts originally entered into with the Friant Contractors over 60 years

ago. The issues here do not turn on the fact that there was a drought in 2014

because it is undisputed that there was water available for delivery to the Friant

Contractors. But Reclamation delivered Friant Division (San Joaquin River) water

to the Exchange Contractors in excess of what the Exchange Contract required,

which breached Articles 3(n) and 3(a) of the Friant Contracts.

Had the trial court decided these issues on the basis of the contract language,

it would have concluded that Reclamation breached the Friant Contracts in 2014

by over-delivering San Joaquin River water to the Exchange Contractors that

---

[4] Appx21-44.

[5] Appx45, *see also* Appx1-20 (granting Motion to Dismiss), Appx21-44 (entering summary judgment).

[6] *See* Appx971-973.

[7] Order (Aug. 3, 2022), ECF No. 23.

should have been delivered to the Friant Contractors. Instead, the trial court erroneously concluded that the Friant contract rights were "subordinate" at "all times" to the rights of the Exchange Contractors, without regard to the terms of the contracts.

The trial court also erred as a matter of law in dismissing Appellants' taking claims for lack of standing. The Growers that depend upon and put to use Friant Division water possess vested, constitutionally protected property rights in Friant Division water, defined by state law consistent with the federal Reclamation Act. And under the California Water Code, the Friant Contractors have standing to assert those claims in a representative capacity. Yet the trial court erroneously held that these Growers possessed no constitutionally protected property rights and therefore had no standing to bring a taking claim.

## STATEMENT OF THE ISSUES

1. Article 3(n) of the Friant Contracts prohibits the United States from delivering San Joaquin River water to the Exchange Contractors unless and until "required" to do so by the terms of the Exchange Contract. Did the United States breach Articles 3(n) and 3(a) of the Friant Contracts in 2014 by delivering nearly all the available waters of the San Joaquin River to the Exchange Contractors, and almost none to the Friant Contractors?

2. The Growers who put Friant Division water to beneficial use on their land have a constitutionally protected property right in Friant water, consistent with the federal Reclamation Act (which requires that the right to Project water be appurtenant to the land irrigated), California law, and decisions of this Court. Did the trial court err as a matter of law in holding that Growers lack standing to bring their taking claims?

3. The Friant Contractor water districts are state agencies created to contract for and distribute Friant Division water, levy charges against Growers, and pay Reclamation the costs of facility construction, operation, maintenance, and replacement. They are authorized by state law to sue to protect "the use of water"[8] that is "a benefit to any land"[9] within the district. Did the trial court err as a matter of law in holding that the water districts could not bring these takings claims on behalf of their Growers?

## STATEMENT OF THE CASE

### I.    Factual Background

#### A.    Congress Authorizes the Central Valley Project to Redistribute Water from the Sacramento and San Joaquin Rivers

In 1935, Congress authorized construction of the Central Valley Project (CVP) as a "gigantic undertaking to redistribute principal fresh-water resources of

---

[8] Cal. Water Code § 22654.
[9] *Id.*

California,"[10] by damming and redirecting the waters of the San Joaquin and Sacramento Rivers to irrigate lands that otherwise "are deficient in rainfall and must remain generally arid and unfruitful."[11] Before construction of the CVP, California's arid Central Valley had an abundance of water from two large rivers, the Sacramento River and the San Joaquin River, but that water was not distributed uniformly.[12] The CVP redistributed that water in a more efficient manner.[13] As a result, California's Central Valley is the most productive agricultural region in the nation today.[14]

A primary feature of the CVP design was the construction of the Friant Division, which includes the Friant Dam and Reservoir (Millerton Lake) on the east side of the Central Valley, thereby "permitting the entire flow of the San Joaquin River to be regulated in [Millerton Lake] … and to be utilized in the [eastern and] southern San Joaquin Valley where local supplies are deficient."[15]

From Millerton Lake, the captured waters of the San Joaquin River are "diverted north [Madera Canal] and south [Friant-Kern Canal] through a system of

---

[10] *United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 728 (1950).
[11] *Id.*
[12] *Gustine Land & Cattle Co. v. United States*, 174 Ct. Cl. 556, 557 (1966).
[13] *Id*. at 571.
[14] *See* U.S. Geological Survey, *California's Central Valley*, https://ca.water.usgs.gov/projects/central-valley/about-central-valley.html (last visited Sept. 23, 2022).
[15] *Wolfsen v. United States*, 162 F. Supp. 403, 430 (Ct. Cl. 1958).

canals and sold to irrigate more than a million acres of land"[16]—served by Friant

Contractors, including municipal supplies for California's fifth largest city, Fresno.

### B. Reclamation Acquired the Miller & Lux San Joaquin River Water Rights for the Friant Division in Exchange for a Substitute Supply of Water from the Sacramento River

Because construction of the Friant Dam across the San Joaquin River would

cut off all flows downstream (except in very wet years), thereby depriving

downstream users, including Miller & Lux (Miller & Lux), of their water rights to

those flows,[17] the Friant Division facilities could not be built until the United States

could acquire rights to the use of all San Joaquin River water to be impounded by

Friant Dam.[18]

In order to make the Friant Division viable, Reclamation utilized its

authority to enter into "contracts for exchange or replacement of water [and] water

rights, … or for the adjustment of water rights…"[19] to acquire by purchase and

exchange substantially all of Miller & Lux's rights to use San Joaquin River water.

Reclamation completed this acquisition on July 27, 1939, when it entered into two

---

[16] *Gerlach Live Stock Co.*, 339 U.S. at 729.

[17] *See generally* DAVID IGLER, INDUSTRIAL COWBOYS: MILLER & LUX AND THE TRANSFORMATION OF THE FAR WEST, 1850-1920 (Berkeley: University of California Press 2005).

[18] *Wolfsen*, 162 F. Supp. at 396.

[19] 43 U.S.C. § 389.

interlocking contracts with Miller & Lux, which "constituted a single transaction."[20]

### 1. The United States Purchased Most of Miller & Lux's San Joaquin River Water Rights

Under the first agreement, known as the Purchase Contract,[21] the United States paid Miller & Lux $2.45 million for "all their rights to the use of the water of the San Joaquin River, except and in excess of specified rates of flow"[22] tabulated in Schedule 1 of the Purchase Contract and identified as their "reserved waters."[23]

### 2. The United States Acquired the Right to Use the Reserved Waters

Simultaneously, the parties entered into the "Contract for Exchange of Waters" (Exchange Contract), whereby Miller & Lux agreed to give the United States "the right to store, divert, dispose of, and otherwise use"[24] the tabulated Schedule 1 reserved waters "for beneficial use by *others than* the [Exchange Contractors]," namely, the Friant Contractors.[25] In exchange, the United States would deliver to Miller & Lux a permanent, substitute water supply from the

---

[20] *See* Appx313.
[21] Appx232-283.
[22] *Wolfsen*, 162 F. Supp. at 417.
[23] *See* Appx232-283, *see also* Appx314.
[24] *See* Appx315-316.
[25] Appx316 (emphasis added).

Sacramento River and Sacramento-San Joaquin River Delta through the later constructed Delta-Mendota Canal on the west side of the Central Valley.[26] The Exchange Contractors, successors in interest to Miller & Lux, have amended the Exchange Contract twice.[27] The 1968 Second Amended Contract for Exchange of Waters (i.e., Exchange Contract) is the operative contract.[28]

### C.    The United States Entered into the Friant Contracts, Which Became Permanent Contracts Prior to This Litigation

Having acquired the right to use the waters of the San Joaquin River to supply water within the Friant Division, the United States entered into water delivery contracts with the Friant Contractors (Friant Contracts),[29] agreeing to "make available for delivery" to each Contractor a specified quantity of Class 1 water each year, subject to certain conditions.[30] Class 1 water is defined as "that supply of water stored in or flowing through Millerton Lake," and is described "as a dependable water supply during each [y]ear. . . ."[31]

Under the Reclamation Act and the Friant Contracts, Friant Contractors were required to repay the United States their share of the costs of constructing the CVP,

---

[26] *See* Appx284-308, Appx232-283.
[27] *See* Appx1087-1117, Appx309-344.
[28] Appx37, *see* Appx309-344.
[29] Appx540 (Each District is allocated a different quantity of water, as noted in Appx540).
[30] Appx362.
[31] Appx354.

including the Friant Division facilities. [32] Friant Contractors have fully repaid Reclamation hundreds of millions of dollars for their share of those capital costs and continue to pay their share of operation, maintenance, and replacement costs for the Friant Division facilities and certain other CVP facilities necessary to deliver substitute water to the Exchange Contractors through the Delta-Mendota Canal. As a result of their fulfillment of these various repayment obligations, all Friant Contractors now hold a permanent right to Friant Division water.[33]

### D. In 2014, Reclamation Decided for the First Time to Give All Available San Joaquin River Water to the Exchange Contractors

From the completion of the San Luis Unit facilities that deliver substitute water from the Sacramento River and Sacramento-San Joaquin River Delta to the Exchange Contractors until 2014, Reclamation had never delivered San Joaquin River water, aside from flood flows, to the Exchange Contractors under the Exchange Contract. Although there was a severe drought in 2014, there was water available in Millerton Lake at the start of the growing season and additional inflows to the Lake from the San Joaquin River during the summer of 2014.[34] But rather than provide this water to the Friant Contractors, Reclamation stored and released almost all available water to the Exchange Contractors, and thus nearly

---

[32] Robert Autobee, *Friant Division Central Valley Project*, Bureau of Reclamation (1994), https://www.usbr.gov/projects/pdf.php?id=103.
[33] Appx355, 43 U.S.C. § 485h-1(4).
[34] Appx27.

none to the Friant Contractors.[35] This was despite the fact that Reclamation now admits that it did not rely on Article 4 of the Exchange Contract for its delivery of San Joaquin River water to the Exchange Contractors.[36]

As of May 14, 2014, there was a substantial quantity of San Joaquin River water stored in Millerton Lake.[37] As the snowpack continued to melt and flow into the upper San Joaquin River watershed, additional water supplies became available behind Friant Dam. However, Reclamation rejected the Friant Contractors'

### Timeline of Events (2014)



**Feb. 21, 2014**:

Reclamation announces zero allocation of water to Friant Contractors.

**March 1, 2014 – May 14, 2014**:

Water stored in Millerton Lake at 279,605 acre-feet on May 14.

**May 13, 2014**:

Reclamation announces for the first time ever that Reclamation will begin releasing San Joaquin water from Friant Dam to the Exchange Contractors.

**May 15, 2014 – Sept. 27, 2014**:

Reclamation delivers 278,400 acre-feet of San Joaquin River water to Exchange Contractors, and no water to Friant Contractors.

---

[35] Appx559-562, Appx1-20, Appx21-44.
[36] Appx567.
[37] Appx563.

repeated requests that this water be released to them, and steadfastly enforced its zero allocation for the Friant Contractors during the irrigation season—and ultimately released nearly all available water, including that stored water, from Millerton Lake for delivery to the Exchange Contractors instead.[38]

Throughout the summer of 2014, Reclamation also continued to provide the Exchange Contractors with a substitute water supply from the Sacramento River and Sacramento-San Joaquin Delta.[39] Instead of limiting delivery of San Joaquin River water to the quantities and rates for reserved waters in Article 4(b) of the Exchange Contract,[40] Reclamation stored and delivered substantially more San Joaquin River water based on the quantity which governs delivery of substitute water under Article 8 of the Exchange Contract.[41]

### E.     The Friant Contractors and Their Growers Suffered Devastating Losses

Reclamation's decision to allocate zero water to the Friant Contractors in 2014 devastated those who relied on this water. The Growers saw their crops and orchards wither and die without water.[42] Faced with the prospect of losing their permanent crops, Friant Contractors spent millions of dollars on behalf of their

---

[38] Appx28-29, Appx555, *see generally* Appx568-569.
[39] *See* Appx619, *see also* Appx1146.
[40] Appx316.
[41] Appx326-329.
[42] Appx681-768

Growers to buy back some of their San Joaquin River water from the Exchange Contractors at inflated, dry-year prices,[43] and to obtain emergency water supplies.[44] But even that was not enough to save the Friant Contractors and the Growers from suffering devastating losses.[45]

The Growers paid millions of dollars to replant their dead trees and vines, which take years to mature and produce a crop.[46] The Friant Contractors suffered losses of groundwater, shortages, and rationing.[47] The lack of water forced the City of Fresno to reduce the water supply for homes and businesses.[48]

## II.     Procedural Background

The Second Amended Complaint states two causes of action: (1) breach of contract and (2) taking of property rights in water. The Court of Federal Claims granted Defendants-Appellees' motions to dismiss the taking claims, holding that Appellants do not possess a constitutionally protected property right in the water they receive and beneficially use from the Friant Division and therefore lack

---

[43] Appx696.
[44] Appx692.
[45] *See Westlands Water Dist. v. Patterson*, 864 F. Supp. 1536, 1549 (E.D. Cal. 1994) (giving all available Friant Division water to Exchange Contractors would be "devastating" to the Growers).
[46] Appx139.
[47] Appx222, Appx127-133, Appx134-139, Appx140-145, Appx146-151, Appx152-196.
[48] Appx157.

standing.[49] Subsequently, the Court of Federal Claims denied summary judgment to the Friant Contractors on their contract claim, granting Defendants-Appellees' cross-motions for summary judgment, holding that, despite Article 3(n) of the Friant Contracts, the United States could deliver San Joaquin River water to the Exchange Contractors even when not required to do so by the terms of the Exchange Contract.[50] The Appellants appeal both rulings and the trial court's entry of final judgment against them.[51]

## SUMMARY OF THE ARGUMENT

This appeal arises from the breach by the United States of its agreements with the Friant Contractors to deliver available water from the San Joaquin River to the Friant Contractors and their Growers. In the Friant Contracts, the United States agreed to deliver the available San Joaquin River water stored in or flowing through Millerton Lake to the Friant Contractors, who have repaid their share of the costs of construction of the CVP and who have assumed their allocated share of ongoing operation, maintenance, and replacement costs for certain CVP facilities. In the Friant Contracts, the United States agreed that unless legally required *by the terms* of the Exchange Contract, it would not deliver any San Joaquin River water to the Exchange Contractors. In 2014, the United States breached the Friant

---

[49] Appx1-20.
[50] Appx36.
[51] *See* Appx971-973, Appx45.

Contracts by delivering more San Joaquin River water to the Exchange Contractors than required by the Exchange Contract and nearly no water to the Friant Contractors.

Only two terms in the Exchange Contract require waters of the San Joaquin River to be delivered to the Exchange Contractors: Article 4(b), which governs temporary interruptions in the delivery of substitute water, and Article 4(c), which governs a permanent failure of delivery of substitute water, and which the parties agree was not applicable in 2014. The United States admits that when it delivered San Joaquin River water to the Exchange Contractors in 2014 it did not apply Article 4(b) and as a result failed to limit its delivery of San Joaquin River water to the quantities and rates specified in that article of the Exchange Contract. Instead, it delivered a greater amount of water based on the quantities set forth in Article 8 of the Exchange Contract, which governs delivery of substitute water but, crucially, does not require the delivery of water *from the San Joaquin River*.

This constituted a voluntary exceedance of the United States' obligations under the Exchange Contract, precisely what the United States promised it would not do in Article 3(n) of the Friant Contracts. In summary, in 2014, the United States gave the Exchange Contractors more San Joaquin River water than they were entitled to under the terms of their contract and thus gave the Friant Contractors less water than they were entitled to.

14

On cross-motions for summary adjudication, the trial court held that the United States did not breach the Friant Contracts, thus granting summary judgment to the United States and denying summary judgment to the Friant Contractors. Instead, the trial court should have held that the delivery of San Joaquin River water by the United States when not required by the Exchange Contract breached Articles 3(n) and 3(a) of the Friant Contracts and granted the Friant Contractors' motion. There are two independent grounds for reversing the trial court's contract decision:

First, the trial court failed to apply basic tenets of contractual interpretation including that a written agreement must be read as a whole and interpreted to give "reasonable meaning" to all contract provisions. The plain meaning of the Friant Contracts and the Exchange Contract prohibits the United States' delivery of more San Joaquin River water to the Exchange Contractors than required by the Exchange Contract.

Second, contrary to the trial court's ruling, the "reasonableness" of the United States' actions in 2014 is irrelevant. This Court has expressly held "a 'reasonable breach' of a contract is still a breach."[52] As this Court has explained,

---

[52] *See Stockton E. Water Dist. v. United States*, 638 F.3d 781, 785 (Fed. Cir. 2011) (quoting *Stockton E. Water Dist. v. United States*, 583 F.3d 1344, 1365 (Fed. Cir. 2009)).

even if operational decisions can be regarded as "reasonable," those decisions are actionable if they violate contractual obligations.[53]

The trial court also erred in dismissing the Growers for lack of standing, holding that the Growers do not maintain a constitutionally protected property right in Friant water. However, the Growers have a permanent right to their proportional share of Friant Division water, which they put to beneficial use on their land to grow crops.[54] Under state law, their beneficial use of Friant water is a well-established, recognized property right.[55] There are two independent grounds for reversing the trial court's dismissal of the taking claims:

First, this Court, following United States Supreme Court precedent, has firmly established that water users who put water developed by Federal Reclamation projects to beneficial use on their land possess a beneficial interest in that water, which is a compensable property interest. The trial court's decision contradicts those holdings.

---

[53] *Stockton E. Water Dist. v. United States*, 638 F.3d at 785 ("[T]he issue under the [contractual immunity provision] defense is not the reasonableness of the Government's operation of the water resources, or its careful (or not) planning thereof. . . [t]he only relevant issue regarding the Government's defense under the drought-type [contractual immunity] provision. . . relates to the availability of the water and to whom it was allocated.").

[54] *See* Appx974-1086 (stating that, as required by California law, "the right to receive water appropriated under the permits and licenses is permanent and appurtenant to the lands upon which the water is used.").

[55] *See* Appx974-1086.

Second, the trial court's decision that the Friant Contractor water districts could not bring these taking claims in a representative capacity on behalf of their Growers directly contravenes established California law. Under the California Water Code, a water district "may commence, maintain, intervene in, compromise, and assume the costs of any action or proceeding involving or affecting the ownership or use of waters or water rights within the district used or useful for any purpose of the district or a benefit to any land."[56] Accordingly, California courts have held that water districts can represent individual landowners who beneficially use water through contracts with the water district.[57]

## ARGUMENT

### I.    Standard of Review

The trial court's errors, with regard to both the contract and taking claims, are legal errors. There are no factual errors presented for review. This Court reviews a trial court's legal determinations without deference.[58] Whether the

---

[56] Cal. Water Code § 35408 (West).

[57] *See Orange Cnty. Water Dist. v. City of Riverside*, 173 Cal. App. 2d 137, 172 (1959) (holding that California water district could maintain an action on landowners' behalf "to prevent interference with water or water rights used or useful to lands within the [d]istrict"); *Coachella Valley County Water District v. Stevens*, 206 Cal. 400, 410 (1929) ("The fact that the district as such does not assert title in itself to any of such rights is of no consequence, if it has the power to proceed in a representative capacity to protect the rights of all of the land owners and other users of water in the district.").

[58] *E.g.*, *Dairyland Power Co-op. v. United States*, 645 F.3d 1363, 1369 (Fed. Cir. 2011).

United States breached a contract, and its interpretation of contracts, are legal issues reviewed *de novo*.[59] Jurisdictional rulings and determinations of whether Plaintiffs possess constitutionally protected property rights are also legal issues reviewed *de novo*.[60]

Federal law controls the interpretation of a contract where the United States is a party.[61] "Although traditionally, an implementing agency is granted deference in its interpretation of statutes and regulations, where the rights at issue arise under contract the rule of agency deference is inapplicable."[62] And "governmental contracts should be interpreted against the backdrop of the legislative scheme that authorized them, and [the] interpretation of ambiguous terms or implied covenants can only be made in light of the policies underlying the controlling legislation."[63] "A written contract must be read as a whole and every part interpreted with reference to the whole."[64] When interpreting a contract under federal law, "[p]reference must be given to reasonable interpretations as opposed to those that

---

[59] *Winstar Corp. v. United States*, 64 F.3d 1531, 1539-40 (Fed. Cir. 1995).

[60] *Folden v. United States*, 379 F.3d 1344, 1354 (Fed. Cir. 2004).

[61] *See United States v. Seckinger*, 397 U.S. 203, 209 (1970); *Kennewick Irrigation District v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989); *Westlands Water Dist.*, 864 F. Supp. at 1542.

[62] *Westlands Water Dist.*, 864 F. Supp. at 1542 (citing *Clay Tower Apartments v. Kemp*, 978 F.2d 478, 480 (9th Cir. 1992)).

[63] *Id.*, quoting *Peterson v. United States Dept. of the Interior*, 899 F.2d 799, 807 (9th Cir. 1990), *cert. denied*, 498 U.S. 1003 (1990).

[64] *Kennewick*, 880 F.2d at 1032 (quoting *Shakey's Inc. v. Covalt*, 704 F.2d 426, 434 (9th Cir. 1983)).

are unreasonable, or that would make the contract illusory."[65] When the meaning of contract language is at issue, courts will "affirm a grant of summary judgment only if the contract language is unambiguous and the moving party is entitled to judgment as a matter of law."[66] "To affirm a grant of summary judgment on an issue of contract interpretation, [this Court] must conclude that the contractual language is subject to only one reasonable interpretation."[67]

## II.     Breach of Contract: The Trial Court's Ruling was Legal Error Because It Contradicts the Plain Language and Intent of Both the Friant and Exchange Contracts

As acknowledged by the trial court, the Friant Contracts "prohibited Reclamation from delivering San Joaquin River water to the Exchange Contractors 'unless and until required by the terms of [the Exchange Contract].'"[68] The United States breached this provision in 2014, and the trial court's holding that it did not was wrong as a matter of law and should be reversed.

### A.     The United States Promised Not to Deliver Waters of the San Joaquin River to the Exchange Contractors Unless Required by the Exchange Contract

In the Exchange Contract, the United States agreed that in any contract with third parties (i.e., Friant Contractors) respecting "use of water of the San Joaquin

---

[65] *Id.*

[66] *Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.*, 180 F.3d 518, 521 (3d Cir. 1999)

[67] *Id*.

[68] Appx37.

River," that the "rights reserved to" the Exchange Contractors from the San Joaquin River would be specifically recognized.[69] Accordingly, Article 3(n) of the Friant Contracts plainly states that the Friant Contracts are "subject to the *terms*" of the Exchange Contract, as amended. However, this recognition is qualified by the next sentence in Article 3(n), which provides that "[t]he United States agrees it will *not* deliver to the Exchange Contractors. . . waters of the San Joaquin River unless and until *required* by the *terms* of said contract. . . ."[70]

By the terms of Article 3(n), the United States promised Friant Contractors that it would not deliver to the Exchange Contractors waters of the San Joaquin River—at any time, in any amount—*unless* and *until* legally obligated by the *terms* of the Exchange Contract. That promise is vital to the Friant Contracts because, under Article 3(a), the United States agreed to deliver to the Friant Contractors the waters available from the San Joaquin River not legally obligated to the Exchange Contractors.[71] Any amount of San Joaquin River water delivered by the United States that exceeds its legal obligations to the Exchange Contractors results in a breach of Article 3(n) of the Friant Contracts because it reduces the amount of San Joaquin River water available and contractually obligated to be delivered to the

---

[69] Appx317.
[70] Appx368 (emphasis added).
[71] Appx362.

Friant Contractors under Article 3(a), and therefore constitutes a breach of that article as well.

### B.    The Exchange Contract Contains Only One Applicable Term Requiring the United States to Deliver San Joaquin River Water to The Exchange Contractors in 2014

The United States is only ever *required* to deliver *waters of the San Joaquin River* to the Exchange Contractors under Article 4, which governs in the case of an interruption of the delivery of substitute water under Article 8. When there is a temporary interruption,[72] Article 4(b) provides as follows:

> Whenever the United States is temporarily unable for any reason or for any cause to deliver to the Contracting Entities substitute water from the Delta-Mendota Canal or other sources, *water will be delivered from the San Joaquin River* as follows:
>
> (1) During this period, for the first 7 consecutive days, in the quantities and rates as specified in Article 8 of this contract.
>
> (2) For the balance of the period, in quantities and rates as reserved in the Purchase Contract. . . .[73]

The United States admits that in 2014, when it delivered waters of the San Joaquin River to the Exchange Contractors, it did not apply Article 4(b).[74] There is no other term in the Exchange Contract that *requires* delivery of San Joaquin River

---

[72] As noted above, all parties agree that Article 4(c), which governs a permanent interruption of substitute water, was not applicable in 2014.

[73] Appx316 (emphasis added).

[74] Appx1146, Appx587-589.

water to the Exchange Contractors. Other provisions requiring delivery of water do *not* require San Joaquin River water. For example, in Article 8 (Quantity of Substitute Water) it specifies the quantity and schedule for delivery of *substitute water*, but it makes no mention of waters of the San Joaquin River.[75]

### C.    San Joaquin River Water is Available for Use by the Friant Contractors When the United States Is Providing Substitute Water in Conformity with the Exchange Contract

The Exchange Contract implements a permanent exchange of water supplies between the United States and the Exchange Contractors.[76] Specifically, the Exchange Contract implements a substitution of water "from the Sacramento River, the Sacramento-San Joaquin Delta and other sources through the Delta-Mendota Canal. . . and by other means" for the reserved waters of the San Joaquin River (Schedule 1 in the Purchase Contract).[77] This "exchange of waters" is effectuated by the following term:

> The United States may hereafter, either in whole or in part, store, divert, dispose of and otherwise use … the aforesaid *reserved waters* of said river [the San Joaquin River] for beneficial *use by others than the [Exchange Contractors]* [Friant Contractors] so long as, and only so

---

[75] Appx326-329 (Other terms in the Exchange Contract reference, but none *require*, the United States to deliver waters of the San Joaquin River to the Exchange Contractors).

[76] Appx315.

[77] Appx314.

long as, the United States does deliver to the [Exchange Contractors] . . . *substitute water* in conformity with this contract.[78]

Importantly, this term makes clear that so long as the United States delivers substitute water in conformity with the Exchange Contract then *all* the reserved waters of the San Joaquin River are expressly stated to be available for beneficial use only by "*others than*" the Exchange Contractors—that is, the Friant Contractors.[79] This plain language provides that only *when* substitute water is <u>not</u> delivered "in conformity with" the Exchange Contract are the Exchange Contractors entitled to use any "reserved waters" of the San Joaquin River.[80]

The premise of the Exchange Contract was summarized by the Court of Claims in *Wolfsen*: "This contract granted [the United States] the right to continue to store, divert, dispose of, and otherwise use the San Joaquin waters theretofore reserved so long as substitute water is delivered in conformity with the contract."[81] The agreement for an exchange of waters assured the United States a water supply from the San Joaquin River and likewise provided the Exchange Contractors with a new substitute water supply from the Sacramento River and Sacramento-San

---

[78] *See* Appx315-316 (Article 8 (Quantity of Substitute Water), which provides in part that for a drought year such as 2014 "defined as critical, the United States *shall* deliver for use an annual *substitute* supply of not to exceed 650,000 acre-feet in accordance with the following *maximum monthly entitlements. . .* " (emphasis added)).

[79] Appx316.

[80] *Id*.

[81] *Wolfsen*, 162 F. Supp. at 405.

Joaquin River Delta that was "far better than the supply prior to the construction of the Central Valley Project."[82] This exchange of waters was an essential feature of the plan for the Central Valley Project:

> These waters of the Sacramento River were substituted in consideration of the diversion of the San Joaquin waters. Their substitution was a part of the whole plan proposed by the Secretary of Interior, approved by the President, and authorized by Congress. The diversion of San Joaquin waters was authorized only because of the commitment to substitute water from the Sacramento River.[83]

### D.    San Joaquin River Water Cannot Be Considered Substitute Water

For the first time, in 2014 Reclamation chose to deliver nearly all the San Joaquin River water to the Exchange Contractors as purported "substitute water," while also delivering Sacramento River and Sacramento-San Joaquin Delta substitute water to them from the Delta-Mendota Canal.[84] Such actions violated the Friant Contract's prohibition against delivery of San Joaquin River water to the Exchange Contractors "unless and until required by the terms of [the Exchange Contract]."[85]

---

[82] *Id.*

[83] *Id.* at 406.

[84] *See* Appx27 ("In a May 13, 2014 update letter to the Exchange Contractors, Reclamation announced that '[d]ue to continued drought and unique hydrology, Reclamation will for the first time provide water from both Delta and San Joaquin River sources[.]'"), *see also* Appx559-562.

[85] Appx368.

Contrary to the contentions of the United States, now reflected in the trial court's ruling on the contract claim,[86] the words of the Exchange Contract cannot be read to mean that "substitute water" includes the "reserved waters" of the San Joaquin River because such waters are expressly stated to be beneficially used only by "*others than*" the Exchange Contractors.[87] This interpretation is supported by the Exchange Contract recital affirming the parties' course of performance between 1951 to 1968:[88]

> [S]ince approximately July 16, 1951, the United States has been and is storing and diverting the *reserved waters* of the San Joaquin River for use. . . *by others than* the [Exchange Contractors], [specifically the Friant Contractors,] and has been and is supplying the [Exchange Contractors] *in lieu* of such waters with substitute waters from the Sacramento River, the Sacramento-San Joaquin Delta and other sources through the Delta-Mendota Canal. . . and by other means[.]"[89]

---

[86] Appx38.

[87] Appx316.

[88] This same course of performance continued consistently until 2014, when, for the first time since 1939, the United States asserted that the reserved waters of the San Joaquin River are required to be delivered as a source of substitute water to be used by the Exchange Contractors without regard to Article 4 of the Exchange Contract.

[89] Appx314 (emphasis added), Appx317 (The record of the parties' course of performance is consistent with the parties' declared mutual intent that "[i]t is anticipated that most if not all of the substitute water provided the Contracting Entities (Exchange Contractors) hereunder will be delivered to them via the . . . Delta-Mendota Canal[.]"), s*ee also* Appx788-791, Appx1264 showing that the Delta-Mendota Canal is many miles downstream from the upper reach of the San Joaquin River, Friant Dam, Millerton Lake, and the Friant-Kern and Madera Canals that serve Friant Contractors.

This recital confirms that all "substitute water" delivered by the United States to the Exchange Contractors from the Sacramento River, Delta, and other sources through the Delta-Mendota Canal, and by other means, is provided "*in lieu* of such waters", that is, *to take the place of* the "reserved waters of the San Joaquin River" being stored, diverted and used "by *others*" (Friant Contractors). This interpretation of the Exchange Contract is likewise supported by Article 20 stating that the Exchange Contractors conferred upon the United States the right to "substitute water from the Delta and elsewhere *for water from* the San Joaquin River."[90]

It is antithetical to the parties' agreement for an "exchange of waters" ("Permanent Substitution of Water Supply") that the reserved waters of the San Joaquin River can simultaneously be both the supply exchanged to the United States and also the supply substituted and delivered by the United States. While the Exchange Contract does broadly define the term "substitute water" to be "regardless of source," this definition fails to evidence an intent different than the plain meaning of the terms "exchange of water," "substitution of water supply," and "substitute water."[91] To the contrary, Article 3 (Substitute Water Defined), just

---

[90] Appx342 (emphasis added).

[91] The word "exchange" is defined to mean, "to make an exchange; engage in bartering, replacing, or substituting one thing in return for another." *New Lexicon Webster's Dictionary of English Language*, at 330 (1988). The words "substitute" or "substitution" are defined to mean, "to take the place of; replace" or "take the

like Article 8 (Quantity of Substitute Water), makes no mention of the San Joaquin River or that the United States is *required* to deliver any waters of the San Joaquin River as substitute water to the Exchange Contractors.[92] Furthermore, it is incoherent for San Joaquin River water to be a source of substitute water, because in the event the United States is permanently unable to deliver substitute water it is required to deliver reserved waters of the San Joaquin River under Article 4.[93] If the Government's interpretation were correct, there could never be an interruption in substitute water unless the entire supply of San Joaquin River water had first been exhausted.

###    E.    Article 4(b) of the Exchange Contract (Temporary Interruption in Delivery) Governed in 2014

Article 4(b) of the Exchange Contract specifies when and how much water of the San Joaquin River is required to be delivered to the Exchange Contractors when "the United States is temporarily unable *for any reason or for any cause* to deliver to the [Exchange Contractors] substitute water from the Delta-Mendota Canal or other sources. . . ."[94] The drought conditions in 2014 resulting in critical year conditions at Shasta Lake were both the reason and the cause of the shortfall

_____

place of another person or thing." *New Lexicon Webster's Dictionary of English Language*, at 987 (1988).

[92] Appx315.

[93] Appx315-316.

[94] Appx316 (emphasis added).

of substitute water from the Sacramento River and Sacramento-San Joaquin Delta. The resulting interruption in substitute water supplies triggered Article 4(b), which in turn limits, in three important ways, the amount of San Joaquin River water that is *required* to be delivered to the Exchange Contractors.

First, the Exchange Contract defines precisely *when* the United States is *required* to deliver waters from the San Joaquin River to the Exchange Contractors. Article 4(b) states in part: "*Whenever* the United States is temporarily *unable for any reason or for any cause* to deliver to the Contracting Entities (Exchange Contractors) *substitute water* from the Delta-Mendota Canal or other sources, *water will be delivered from the San Joaquin River as follows*. . . ."[95]

Second, subparagraphs (1) and (2) of Article 4(b) define, by day, the exact *quantities and rates* of San Joaquin River water that are *required* to be delivered:

> *[W]ater will be delivered from the San Joaquin River* as follows:
>
> (1) During this period, for the first 7 consecutive days, in the *quantities and rates* as specified in *Article 8*. . .
>
> (2) For the balance of this period, in *quantities and rates* as reserved in the *Purchase Contract*. . .[96]

---

[95] Appx316 (emphasis added).

[96] Appx316 (In a critical year such as 2014, the quantities and rates are specified in the maximum monthly value table detailing the monthly limits of substitute water that the United States is required to deliver.), Appx235-236 (In contrast to Article 8 (Quantity of Substitute Water) in the Exchange Contract, the Purchase Contract (Schedule One) provides a maximum "Mean-24 Hour Flow in Cubic Feet Per Second" rate of flow by month for its schedule).

Finally, Article 4(b) prescribes objective conditions for *when* and in what *amount* that the United States is *required* to deliver to the Exchange Contractors San Joaquin River water available in storage from Millerton Lake. Specifically, Article 4(b) provides that:

> [T]he United States further agrees that *if the resulting delivery of water would be less than seventy-two per centum* (72%) of Schedule One. . . then the United States *shall make up such quantities by releases of available storage* from Millerton Lake, provided, however, the United States *shall in no event be required to draw the storage* in Millerton Lake below Elevation 464 or . . . to *retain* water in storage in Millerton Lake *in anticipation* of the possible future need for such releases.[97]

The strict limitations on the use of storage by the Exchange Contractors deserves further explanation. Normally, all water in storage in Millerton Lake is available for delivery to the Friant Contractors. Limiting the Exchange Contractors' delivery of stored water assures that all water remaining in storage is available for delivery to the Friant Contractors. Conversely, retaining water in storage in anticipation of future needs of the Exchange Contractors (instead of releasing water to the Friant Contractors), or delivering more water out of storage

---

[97] Appx316 (emphasis added) (This term *requires* "releases of available storage from Millerton Lake" only "if the resulting delivery of water would be less than. . . 72% of Schedule One" flows. It follows that when the United States is able to deliver to the Exchange Contractors San Joaquin River flows at Schedule One rates (or higher), then no San Joaquin River water in storage is *required* to be released by the United States).

than is required under Article 4(b), reduces the supply of San Joaquin River water otherwise available for delivery to Friant Contractors.

Further, it makes sense that the Exchange Contractors revert to their reserved waters under Schedule 1 if they are not receiving substitute water, either temporarily or permanently. These are the water rights they owned before the exchange, and if the exchange were interrupted, they ought to return to their pre-CVP circumstance before the 1939 Exchange Contract. It is the use of these reserved waters, whose monthly quantities and flows are tabulated in Schedule 1 of the Purchase Contract,[98] that the Exchange Contractors exchanged to the United States for a substitute supply of water from the Sacramento River and Sacramento-San Joaquin Delta. Unsurprisingly, then, the Exchange Contract provides that the Exchange Contractors will revert to their Schedule 1 reserved waters of the San Joaquin River if "for any reason or for any cause" the United States is unable to deliver the promised substitute water in conformity with the Exchange Contract.[99] Prior to the construction of the Friant Division, there was no Millerton Lake to provide storage. Because the Exchange Contractors are not entitled to storage, deliveries of San Joaquin River water to the Exchange Contractors are necessarily limited to no more than the actual unimpaired flow of the San Joaquin River on

---

[98] Appx235-236.
[99] Appx316.

any given day, up to the amount of their reserved waters as set forth in Schedule 1 of the Purchase Contract.

As the expert report of Dr. Tormey shows, in 2014 "Reclamation delivered San Joaquin River water to the Exchange Contractors in quantities and flows that exceeded the amounts required by the terms of the Exchange and Purchase Contracts"[100]—the United States stored San Joaquin River water in anticipation of a shortage of substitute supply, which it is never required to do, and then delivered more than was contractually required to be delivered to the Exchange Contractors.[101] Withholding San Joaquin River water and then draining Millerton Lake of almost all available water caused the zero allocation for Friant Contractors.

In ruling against the Friant Contractors, the trial court ignored Article 4(b) of the Exchange Contract which specifies the precise quantities and rates of reserved waters required to be delivered from the San Joaquin River according to Schedule 1. Instead, the trial court adopted the United States' position that in 2014, it was Article 8 (Quantity of Substitute Water) that controlled and required the United States to deliver the available water from the Sacramento River, Sacramento-San Joaquin Delta, and the San Joaquin River, all as "substitute water," but without any limitations under Article 4(b). As noted above, no provision of Article 8 *requires*

---

[100] Appx611.
[101] Appx610.

the delivery of San Joaquin River water. Such a result cannot be supported by the terms of Friant and Exchange Contracts and is legal error that must be reversed.

### F. The United States Over-Delivered San Joaquin River Water to the Exchange Contractors

Reclamation's water supply records for 2014 demonstrate that the water supplies available from the Sacramento River, Sacramento-San Joaquin Delta, and other sources through the Delta-Mendota Canal and by other means were not sufficient[102] for the United States to deliver to the Exchange Contractors a substitute water supply in conformity with the 650,000 acre-feet "critical year" quantity stated in Article 8 of the Exchange Contract.[103] Likewise, total deliveries made by the United States in 2014 from these substitute water sources[104] were less than the substitute water quantities specified in Article 8. According to the terms of the Exchange Contract, whenever such conditions exist the United States is required to deliver to the Exchange Contractors water from the San Joaquin River *according to* the quantities and rates specified in Article 4(b).[105] However, the United States failed to apply the terms from Article 4(b), and it instead determined

---

[102] Appx517, Appx566, Appx544 (The Exchange Contractors received a total of 540,078 acre-feet of water in 2014—209,000 acre-feet from waters of the San Joaquin River from Millerton Lake (released through Friant Dam) and 331,078 acre-feet of substitute water from the Sacramento River and Sacramento-San Joaquin Delta).

[103] Appx326.

[104] Appx316, Appx566, Appx543.

[105] Appx316.

that it was required to deliver to the Exchange Contractors all San Joaquin River water—as a "substitute water" source—in an effort to satisfy the larger quantity stated in Article 8.[106]

As a result of the United States' failure to apply Article 4(b) of the Exchange Contract, Reclamation over-delivered San Joaquin River water to the Exchange Contractors in three ways: 1) It retained water in storage in Millerton Lake in anticipation of making future releases[107] and deliveries of San Joaquin River water to the Exchange Contractors; 2) it failed to limit its delivery to the quantities and rates specified in Article 4(b) and instead delivered larger amounts according to the quantities and rates stated in Article 8 of the Exchange Contract;[108] and 3) it delivered to the Exchange Contractors San Joaquin River water available in storage in Millerton Lake in excess of prescribed limits.[109]

This over-delivery by the United States in 2014 deprived Friant Contractors of more than 100,000 acre-feet of available San Joaquin River water in breach of its obligation to deliver such water according to its Friant Contracts.[110]

---

[106] Appx567-590.
[107] Appx563-564.
[108] *See* Appx610.
[109] Appx563-564.
[110] Appx610.

### G.    Reclamation Was Not Required to Store San Joaquin River Water in Millerton Lake for a Future Delivery to the Exchange Contractors

The Exchange Contract explicitly provides in Article 4(b) that "the United States shall in no event be *required*. . . to retain water in storage in Millerton Lake in anticipation of the possible future need for such releases" to the Exchange Contractors.[111] This provision accurately reflects the physical fact that the Exchange Contractors' reserved waters in Schedule 1 of the Purchase Contract originate from a free-flowing San Joaquin River before Friant Dam was constructed. Friant Contractors have repaid the United States for their full share of the construction costs for the CVP, including the Friant Division facilities, and continue to pay all of the annual costs of the operation, maintenance, and replacement of the Friant Division facilities.[112] While it was understood that the Exchange Contractors would pay nothing towards the construction or operation of the CVP, this provision reflects that the Exchange Contractors would not and have not acquired any right to use Friant Dam to store water in Millerton Lake for a possible future need and release.

But, despite having no Exchange Contract obligation to do so, the United States admits that in early 2014, Reclamation began to "store[] San Joaquin River

---

[111] Appx316 (emphasis added).
[112] Appx425-491.

water in Millerton Lake" for delivery under the Exchange Contract."[113] As a result, Friant Contractors were deprived of a substantial amount of San Joaquin River water retained at Friant Dam that they would have received if Reclamation had not delivered this water to the Exchange Contractors instead.[114]

The trial court excused Reclamation's actions and adopted its legal argument that "simply because a contract does not *require* a certain action, it does not necessarily follow that the contract *forbids* that action."[115] But elsewhere, the trial court correctly acknowledged that the Friant Contracts "prohibited Reclamation from delivering San Joaquin River water to the Exchange Contractors 'unless and until required by the terms of [the Exchange Contract].'"[116] Because Reclamation was expressly *not* required by Article 4(b) of the Exchange Contract to store water in Millerton Lake for future delivery to the Exchange Contractors, Reclamation's election to voluntarily do this prohibited act breached Article 3(n) of the Friant Contracts and the United States' contradictory interpretation of the Friant Contracts (as adopted by the trial court) cannot be sustained.

---

[113] Appx36 (quoting Government's response to request for admissions).
[114] Appx610.
[115] Appx36.
[116] Appx37.

### H.    Friant Contractors' Rights Are Not Subordinate to the Exchange Contractors' Rights

The trial court found a subordination provision where none exists in the Friant Contracts. The trial court concluded that "the contractual rights of the Friant Contractors are subordinate to those of the Exchange Contractors,"[117] and therefore, "at all times, the Exchange Contractors have a superior claim to CVP water than do the Friant Contractors."[118] This notion is not supported by any provision in either the Friant Contracts or the Exchange Contract, and is derived instead from misreading the text and ignoring the over-arching purpose and intent of these contracts. The Exchange Contractors are entitled to what is promised in the terms of the Exchange Contract, and the Friant Contractors are entitled to what is promised in the Friant Contracts.

The trial court failed to explain how Friant Contractors' rights can be subordinate when the Exchange Contract clearly gives the United States the right to "store, divert, dispose of and otherwise use" all of the Exchange Contractors' reserved waters "for use by others," which Reclamation in turn contractually promised to deliver to the Friant Contractors.[119] The trial court's misinterpretation of the Friant Contract traces directly to its failure to appreciate that in 1939 the

---

[117] Appx32.

[118] *Id.*

[119] Appx315-316.

Exchange Contractors *exchanged their reserved waters* of the San Joaquin River to the United States (hence the name "Exchange Contractors") *for use by others* (the Friant Contractors). The trial court conflated the underlying rights to reserved/ exchanged waters with the Exchange Contractors' current contractual rights, concluding that the Exchange Contractors possessed extra-contractual or superior rights to the Friant Contractors.

Having strayed from the actual contract language, the trial court reached the wholly unsupported conclusion that the Friant Contract rights were subordinate to the Exchange Contractors' contractual rights. Based on this unsupported analysis—the Friant Contract does not even contain the word "subordinate"—the trial court incorrectly held that Reclamation did not breach the Friant Contracts in 2014. In support of this erroneous "subordination" concept, the trial court made two interpretive missteps.

First, the trial court asserted that the "subject to" clause in Article 12(a) "subordinates the Friant Contractors' contractual rights to, inter alia, 'the obligations of the United States under existing contracts[.]'"[120] However, as previously explained, the trial court failed to correctly determine the obligations the United States owed to Friant Contractors under its Friant Contracts and to the Exchange Contractors under the Exchange Contract. The "subject to" clause does

---

[120] Appx31 (quoting Appx467).

not "subordinate" the Friant Contracts to all demands of the Exchange Contractors, it only acknowledges that the United States will honor *the terms* of the Exchange Contract.

Second, the trial court quoted a part of Article 3(n) of the Friant Contracts that states "[t]he rights of the Contractor under this Contract are subject to the terms of the [Exchange Contract of 1939], as amended."[121] This provision simply carries out Reclamation's promise that it will notify subsequent contractors of the Exchange Contractors' reserved rights "or will specifically provide for the recognition [] of such rights in such contract[s]."[122] But it does not expand those reserved rights beyond the terms of the Exchange Contract itself. If the United States is unable to provide substitute water in conformity with the Exchange Contract, the contract allows for the delivery of their reserved waters of the San Joaquin River, temporarily or permanently, in the quantities and rates specified. What this "subject to" clause in the Friant Contracts cannot be reasonably construed to mean is "at all times, the Exchange Contractors have a superior claim to Central Valley Project water,"[123] as the trial court erroneously ruled.

Although the trial court correctly acknowledged that the Exchange Contractors did not permanently relinquish their San Joaquin water rights—they

---

[121] Appx368.

[122] Appx317.

[123] Appx32.

retained rights to reserved waters—it failed to appreciate the critical fact that in exchange for the supply of substitute water, the Exchange Contract gives the United States the right to "store, divert, dispose of, and otherwise use" [124] the waters of the San Joaquin River. And the United States' use of these reserved waters is now contractually obligated to the Friant Contractors. The Exchange Contractors' right to water from the Sacramento River and Delta (as substitute water) is therefore defined by their contract:

> The rights hereby conferred by the [Exchange Contractors] on the United States to substitute water from the Delta and elsewhere for water from the San Joaquin River, and the right to impound or divert said San Joaquin River water, as provided herein, shall constitute easements and covenants running with and against the lands, water rights and canals, of the [Exchange Contractors]. . . .[125]

The trial court further failed to appreciate that the Friant and Exchange Contracts are mutually beneficial by the very nature of the Exchange of Waters. Reclamation, to benefit the Friant Contractors, is entitled to use the Exchange Contractors' reserved waters of the San Joaquin River by storing and distributing San Joaquin River water for beneficial use through the Friant Division facilities. The Exchange Contractors, in turn, benefit from their entitlement to receive a

---

[124] Appx315-316.
[125] Appx342.

permanent, superior substitute water supply from the Sacramento River and Delta through the Delta-Mendota Canal.[126]

The trial court's ruling that the Exchange Contractors' rights are at all times superior—regardless of what the contracts provide—is contrary to the express contract terms. In short, it is the terms of the contracts themselves that define the parties' rights and obligations in this breach-of-contract case. Had the trial court applied the terms of the contracts themselves, and focused on how the two contracts operate together, it would have been compelled to find that the United States breached the Friant Contracts in 2014.

## I.     Reclamation is Not Immune from Liability for its 2014 Breach of the Friant Contracts

This appeal concerns Reclamation's misinterpretations of the Friant Contracts and Exchange Contract, resulting in the over-delivery of available water from Millerton Lake in 2014 to the Exchange Contractors—and a zero allocation to the Friant Contractors. It is not about the drought conditions at the time, and it is not about whether Reclamation's actions were arbitrary, capricious, or unreasonable. The trial court's ruling that Article 13(b) of the Friant Contracts immunizes the Government from liability for breach-of-contract is contradicted by

---

[126] *See* Appx316.

both the plain language of Article 13(b) and this Court's decisions, and should therefore be reversed.

Article 13(b) of the Friant Contracts is a classic *force majeure* provision,[127] relieving the Government of liability in two defined circumstances:

1. "[D]rought, other physical causes beyond the control of the Contracting Officer" or

2. "[A]ctions taken by the Contracting Officer to meet legal obligations, … except as provided in subdivision (a) of Article 19 of this Contract …."[128]

The Government bears the burden of proving its asserted Article 13 affirmative defense.[129] Established precedent holds that the Government is not immune from liability under a *force majeure* clause for its voluntary actions: "The rule in this Circuit, then, is that the efficacy of a limitation of liability clause does not extend to those situations where the breach, whether total or partial, arises out of events within the Government's control."[130]

### 1.    The Drought Provision Does Not Provide Immunity for the Government

Had there been no water in 2014 due to drought, the Government might have a *force majeure* defense. But it is undisputed that there was a substantial quantity of water available stored in and flowing through Millerton Lake in 2014, all of

---

[127] *Stockton E. Water Dist.*, 583 F.3d at 1360.

[128] Appx394.

[129] *Stockton E. Water Dist.*, 583 F.3d at 1360.

[130] *C. J. Betters Corp. v. United States*, 25 Cl. Ct. 674, 677 (1992).

which Reclamation delivered to the Exchange Contractors, giving them an entire growing-season supply—and leaving nearly none for Friant Contractors.[131] As Reclamation official Ronald Milligan testified in his 2014 district court declaration, water deliveries to Friant Contractors were well within the Government's control: "The current storage in Millerton Lake [as of May 2014] is approximately 294,000 acre-feet … [and] Reclamation could make water from Friant available to Plaintiffs [Friant Contractors]."[132]

The Government wisely chose not to rely on drought as an affirmative defense in this case.[133] This Court has rejected the argument that the mere existence of a drought excuses the Government from liability when it breaches a Central Valley Project water supply contract:

> [T]he plain meaning of the critical part of the phrase at issue, "because of drought, or other causes which . . . are beyond the control of the United States," on its face excludes anything that is within the control of the United States. Examples of causes beyond the control of the United States, in addition to a drought, might be earthquakes, sabotage (assuming the Government had taken proper precautions), an internal failure of the dam, and other such causes. By contrast, changes in law, or changes in government policy, or changes in management practices brought about by the Government's changes in law or policy, are all causes within the control of the United States.[134]

---

[131] Appx564-1145.

[132] Appx606.

[133] *See* Appx1135 ("Contrary to plaintiffs' argument, we are not arguing 'that the mere existence of a drought' immunized Reclamation from liability in 2014").

[134] *Stockton E. Water Dist.*, 583 F.3d at 1361-62.

Because San Joaquin River water was available for the Friant Contractors in 2014, and Reclamation instead over-delivered that water to the Exchange Contractors, the Government remains liable for breach of the Friant Contractors' water supply contracts.[135]

### 2.    A Reasonable Breach Is Still a Breach

The trial court's holding that the Government is immune from liability because it acted reasonably is wrong for two reasons. First, that is not what the contract provides. Second, it is the terms of the contract, not the reasonableness or unreasonableness of the Government's motivation, which define its legal obligations and whether a party has breached those obligations.

First, Article 13(b) of the Friant Contracts provides an exception to Government immunity, "except as provided in subdivision (a) of Article 19 of this Contract, no liability shall accrue against the United States. . . ,"[136] so Article 19 is an exception to the Government's nonliability. And Article 19 forecloses immunity whenever Government actions are "predicated upon arbitrary, capricious, or unreasonable opinions or determinations."[137] Read together, Articles 13(b)[138] and

---

[135] *Accord Baley v. United States*, 134 Fed. Cl. 619, 657 (2017): "Although 2001 was a dry year, the Bureau of Reclamation's statements in 2001 make clear that the reason the Bureau refused to supply water to the plaintiffs in 2001 was not because of drought."

[136] Appx394.

[137] Appx402.

[138] Appx469.

19[139] thus provide Government immunity for specified actions *unless* those actions are based on arbitrary, capricious, or unreasonable determinations or opinions (prohibited by Article 19).[140] Actions violating the Government's legal obligations were acknowledged by the trial court at the hearing to be unreasonable *per se*.[141]

The trial court, dropping the critical phrase "except as provided in subdivision A of Article 19," misconstrues Article 19 as a plenary immunity provision that swallows all of Article 13(b)—and the rest of the Friant Contract. According to the trial court, the Government is never liable for breach of contract unless it acts unreasonably, so there is no purpose to providing immunity for shortages caused by drought, failure of structures, contractual or statutory obligations, or other causes beyond the Government's control—the court need merely ask whether the Government's failure to perform its contractual obligations was "reasonable."

Second, the trial court's holding that Article 19 of the Friant Contract immunizes the Government from this breach-of-contract claim—on the rationale that the water allocation decisions and actions of the Contracting Officer were not arbitrary, capricious, or unreasonable—completely misstates the law. As this Court

---

[139] Appx475-476.
[140] Appx394-402.
[141] Appx1156-1263.

succinctly states, "a 'reasonable' breach of a contract is nonetheless a breach."[142]

This is because the parties to government contracts are always expected to act

reasonably, not arbitrarily—that principal is the foundation for the covenant of

good faith and fair dealing implied in every government contract.[143] The issue

under the Article 19(a) defense is not whether the Government's operation of the

water resources was reasonable, or whether Reclamation engaged in careful

planning for allocation of water resources: "The only relevant issue regarding the

Government's defense under the drought-type provision of Article [1]9(a) relates

to the availability of the water and to whom it was allocated."[144] And "that is a

question of available water supplies, not operational decisions."[145]

## III.   Taking Claim: The Trial Court Erred as a Matter of Law in Holding that the Friant Growers, and Friant Contractors in their Representative Capacity, Do Not Have Standing to Bring Their Taking Claims

The trial court ignored the binding authority of this Court and erred in

dismissing the Growers' taking claims, wrongly holding that none of the Growers

had standing because none possessed a constitutionally protected property right in

Friant Division water. But under California law, the Growers possess an equitable

---

[142] *Stockton E. Water Dist.*, 583 F.3d at 1365.

[143] *Id*. at 1365 ("A covenant of good faith and fair dealing is implied [in] all contracts. The covenant imposes on a party. . . the duty. . . to do everything that the contract presupposes should be done by a party to accomplish the contract's purpose.").

[144] *Stockton E. Water Dist.*, 638 F.3d at 785.

[145] *Id*.

and beneficial interest in Project water "appurtenant to the land on which said water [is] applied," which "continue[s] in perpetuity."[146] The Growers therefore have standing to assert their taking claims. Further, as California courts have held, "each farmer is a legal user of the water involved."[147] The trial court's conclusion that these Friant Growers have no property rights and no standing to pursue their taking claims allows Reclamation to achieve what the Fifth Amendment bars, "forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."[148]

### A.    Under State and Federal Law, the Friant Contractors and Their Growers Have Protected Property Interests in Friant Division Water

The Friant Growers have a statutory "right to the use of water acquired under the provisions of [the Reclamation] Act"[149] that "shall be appurtenant to the land irrigated."[150] Yet, the trial court refused to follow the binding authority of this Court and the Supreme Court that this right "is the property of the landowners, wholly distinct from the property right of the government in the irrigation

---

[146] Appx1084.

[147] *San Luis Unit Food Producers v. United States*, 772 F. Supp. 2d 1210, 1249 (E.D. Cal. 2011), *aff'd*, 709 F.3d 798 (9th Cir. 2013).

[148] *See Armstrong v. United States*, 364 U.S. 40, 49 (1960).

[149] *San Luis Unit Food Producers*, 772 F. Supp. 2d at 1248.

[150] *Id.*

46

works."[151] The trial court's ruling that Friant Growers have no property right in Friant Division water they put to beneficial use on their land was legal error, requiring reversal.

### B.    The Reclamation Act Provides Friant Growers a Right to the Use of Friant Division Water Appurtenant to Their Land

In passing the Reclamation Act, Congress mandated that "the right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated,"[152] vesting farmers within the Friant Division with "a property right"[153] that became "by express provision of the Reclamation Act. . . part and parcel of the land upon which it is applied."[154] In a case involving another Reclamation Act project, the Supreme Court rejected the Government's argument that, because it held title to the state-granted water right, it could reallocate project water to a different use, stating that "the Government is completely mistaken if it believes the water rights confirmed to it. . . were like so many bushels of wheat, to be bartered, sold, or shifted about as the Government might see fit."[155]

---

[151] *See Ickes v. Fox*, 300 U.S. 82, 95 (1937) ("Appropriation was made . . . under the Reclamation Act, for the use of the landowners; and by the terms of the law . . . the water rights became the property of the landowners, wholly distinct from the property right of the government in the irrigation works."); *see also Nevada v. United States*, 463 U.S. 110, 123 (1983); *Nebraska v. Wyoming*, 325 U.S. 589, 614 (1945); *Klamath Irr. Dist. v. United States*, 635 F.3d 505, 517 (Fed. Cir. 2011).
[152] 43 U.S.C. § 372.
[153] *Ickes*, 300 U.S. at 95-96.
[154] *Id*.
[155] *Nevada*, 463 U.S. at 126.

47

Instead, the Government's allocation of water acquired for the Reclamation Act project is constrained by the appurtenant right of the landowners within that project who beneficially use the project's water to irrigate their crops. "[T]he Government's 'ownership' of the water rights was at most nominal; the beneficial interest in the rights confirmed to the Government resided in the owners of the land. . . to which these rights became appurtenant upon application of the Project water to the land."[156] Yet, the trial court's ruling neither cites nor discusses this fundamental provision of the Reclamation Act—an oversight fatal to the trial court's analysis. For "Congress provided in § 8 itself that the water right must be appurtenant to the land irrigated,"[157] and without this appurtenant right, "the Secretary of the Interior would not be authorized to begin construction of works for the irrigation of lands"[158] in the Friant Division.

All federal reclamation projects are subject to the requirements of the Reclamation Act of 1902, including the core principle that the government must "proceed in conformity with [state water rights] laws."[159] Thus, state law, not federal law, creates and defines water rights in a federal Reclamation project

---

[156] *Id.*

[157] *California v. United States*, 438 U.S. 645, 668 n.21 (1978) (quoting H.R. Rep. No. 794, 57th Cong., 1st Sess., 6 (1902)).

[158] *Id.* (quoting H.R. Rep. No. 794, 57th Cong., 1st Sess., 6 (1902)).

[159] 43 U.S.C. § 383.

(unless inconsistent with a specific congressional directive).[160] Under California law, all water within the state is the property of the people, but the right to put that water to beneficial use may be acquired by permit from the State Water Resources Control Board (SWRCB).[161] Once acquired, water rights become vested property rights under California law.[162]

Thus, in compliance with California law, the United States applied to the SWRCB and received permits for the diversion and storage of essentially all of the waters of the San Joaquin River at Friant Dam, for diversion into the Madera and Friant-Kern Canals, and ultimately to the Friant Contractors for beneficial use by their Growers. The United States' applications were granted in Decision D-935 (D-935), on June 2, 1959, and permits were issued consistent with the decision in D-935. Although the permits were issued in the name of the United States, the permit conditions confirm that the *users* of the water would, *by their use*, acquire a "right to the beneficial use" of that water "appurtenant to the land on which said

---

[160] *California*, 438 U.S. at 678.

[161] Cal. Water Code §§ 1201, 1225; *see also California*, 438 U.S. at 652 n.7.

[162] *See, e.g.*, *United States v. State Water Res. Control Bd.*, 182 Cal. App. 3d 82, 101 (1986) ("It is equally axiomatic that once rights to use water are acquired, they become vested property rights. As such, they cannot be infringed by others or taken by governmental action without due process and just compensation."); *see also L.A. Cty. Flood Control Dist. v. Abbot*, 24 Cal. App. 2d 728, 736 (1938) (the right to receive water is "a valuable property right" that could not be taken without just compensation); *Madera Irr. Dist. v. Hancock*, 985 F.2d 1397, 1401 (9th Cir. 1993) (stating that "a valid contract right [to receive water] of an irrigation district against the United States is property protected by the Fifth Amendment.").

49

water shall be applied," which would "continue in perpetuity."[163] The Friant

Contractors and their users' application of water to beneficial use was essential to

the perfection of the water rights. Under the law of the arid western states,

including California, "The water right is acquired by perfecting an appropriation,

i.e., by an actual diversion followed by an application within a reasonable time of

the water to a beneficial use."[164]

Recognizing this, several Friant Contractors had responded to the United

States' application for the San Joaquin River rights by requesting that the State

Board, among other things, issue the permits for these water rights in the name of

the contracting entities. In D-935, the SWRCB declined to do so, but for the reason

that naming the contracting entities was unnecessary. The SWRCB explained that

"Under our permit and license system the right to the use of water by appropriation

does not vest by virtue of application, permit or license, [but] by application of the

water to beneficial use upon the land. . . ."[165] For this reason, under California law

the beneficial user acquires a property interest in the permitted or licensed water

rights even if the permit or license is in the name of the federal government, as

described in the SWRCB's Decision 935 granting the permits for the Friant

Division:

---

[163] Appx1084.

[164] *Nebraska*, 325 U.S. at 614.

[165] Appx1074.

It is therefore clear that when any entity is an applicant for a water right for irrigation which has no intention to itself use the water, and when such use is made by others, direct proof of such use must be made by the water users. Under such circumstances when the required use and proof thereof has been made, even though formal title to the use is held of record by the permittee or licensee, the right by use is vested in those by whom the use has been made, as a matter of law. . . *It therefore matters little whether the formal license is issued to the water user organizations or to the United States.*[166]

In short, both federal reclamation law and California water rights law, as reflected in the permits for the Friant Division, expressly recognize the *users* of project water as the beneficial owners of the water right, which is a protected property interest.

### C.    The Trial Court's Failure to Follow the Binding Federal Circuit and the Supreme Court Decisions was Reversible Legal Error

The United States Supreme Court has consistently held that the landowners who put federal Reclamation Project water to beneficial use on their land have a constitutionally protected property right in federal Reclamation Act water.[167] The trial court misconstrued and failed to apply these authorities holding that Growers in a federal Reclamation Act project have property rights:

---

[166] Appx1075-1076 (emphasis added).
[167] *Ickes*, 300 U.S. at 94-95.

| Trial Court's Mischaracterization of Supreme Court Precedent Holding | What the Supreme Court Actually Said |
|---|---|
| The trial court erroneously concluded that the *Ickes v. Fox* landowners had constitutionally protected property (water) rights because they were required by their Reclamation contracts to obtain water rights permits under state law.[168] | The Supreme Court actually stated that the landowners had property rights in the project water because their water was appropriated under state law by the United States consistent with "the Reclamation Act, for the use of the landowners. . . ."[169] |
| The trial court erroneously concluded that the *Ickes v. Fox* landowners had constitutionally protected property rights because their water rights were "appropriative" and "secured by permits."[170] | The Supreme Court does not mention the word "permit." The appropriative rights were secured under state law and the Reclamation Act.[171] |
| The trial court erroneously concluded that in *Nebraska v. Wyoming* and in *Nevada v. United States* the landowners possessed property rights because they would obtain a permit under state law or "would possess a contractual right to a fixed volume of water."[172] | The Supreme Court's decision actually turned on the fact that landowners applied the water to their lands and under state law and the Reclamation Act "the water rights became the property of the landowners. . . ."[173] |

This Court has relied on these Supreme Court rulings that the trial court rejected in other taking cases involving water rights. In *H.F. Allen Orchards*,[174] for

---

[168] Appx18.

[169] *Ickes*, 300 U.S. at 95.

[170] Appx18.

[171] *Ickes*, 300 U.S. at 95-96.

[172] Appx19.

[173] *Ickes*, 300 U.S. at 95.

[174] *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1576 (Fed. Cir. 1984).

instance, the Court held that landowners were the correct parties to sue under the consent decree because it "is undisputed that appellants have a property right in the water to the extent of their beneficial use thereof."[175]

Likewise, in *Klamath Irr. Dist. v. United States*,[176] the Court reversed the CFC's dismissal for lack of a property right and squarely held that the farmers in a Reclamation Act project, covering irrigated farmland in both California and Oregon, had a property right in the use of Klamath Project water and standing to assert a taking claim.[177] Although the Government may try to distinguish this case by arguing that it relied on Oregon law, the Klamath Project straddles the border between Oregon and California, and the holding applied to owners of irrigated farmland in both Oregon and California—so the Reclamation Act's requirements apply uniformly in both states.

### D.    The Growers' Property Rights in San Joaquin River Water Are Constitutionally Protected Property Rights

California courts have uniformly held that it is "axiomatic that once rights to use water are acquired, they become vested property rights. As such, they cannot be infringed by others or taken by governmental action without due process and just compensation,"[178] and that the right to receive water is "a valuable property

---

[175] *Id.*

[176] *Klamath Irr. Dist.*, 635 F.3d 505.

[177] *Id.* at 519.

[178] *State Water Res. Control Bd.*, 182 Cal. App. 3d at 101.

right" that could not be taken without just compensation.[179] In fact, from the earliest days of its statehood, California recognized that an appropriative water right is a private property right, subject to ownership and disposition by the owner as in the case of other private property.[180] "The right that one may acquire with respect to water flowing in a stream is a right to its use, which will be regarded and protected as property."[181] The right to the use of water is "regarded and protected as property"[182] and is "substantive and valuable property."[183]

Since a right to beneficially use water is property under California law, California courts have held that the holder of a California water right may bring a judicial action for inverse condemnation when the government infringes that water right.[184]

The Federal Circuit has also long recognized that water rights are property protected by the just compensation clause of the Fifth Amendment:

> In the context of water rights, courts have recognized a physical taking where the government has physically diverted water for its own consumptive use or decreased the amount of water accessible by the owner of the water rights.[185]

---

[179] *L.A. Cty. Flood Control Dist. v. Abbot*, 24 Cal. App. 2d at 736.
[180] Wells A. Hutchins, *The California Law of Water Rights* 120-121 (1956).
[181] *The California Law of Water Rights* 37.
[182] *The California Law of Water Rights* 121 (citing *Hoffman v. Stone*, 7 Cal. 46, 49 (1857); *Kidd v. Laird*, 15 Cal. 161, 162 (1860).
[183] *Id.*
[184] *State Water Res. Control Bd.*, 182 Cal. App. 3d at 104 (citations omitted).
[185] *Washoe Cty. v. United States*, 319 F.3d 1320, 1326 (Fed. Cir. 2003).

**E.  The Trial Court Erred as a Matter of Law in Holding that the Districts Could Not Represent Their Growers in the Taking Case**

The trial court also erred in holding that the Districts could not represent the Growers within their district boundaries with regard to their taking claims. California courts recognize the authority for districts to sue on behalf of landowners within their district.[186] Under California law, water districts "may commence, maintain, intervene in, compromise, and assume the costs of any action or proceeding involving or affecting the ownership or use of waters or water rights within the district used or useful for any purpose of the district or of benefit to any land."[187] The trial court's legal ruling is contrary to California law which allows Districts to maintain actions on behalf of their Growers, and should be reversed on this Court's *de novo* review.[188]

**CONCLUSION**

For all these reasons, Plaintiffs-Appellants ask this Court to reverse the trial court's dismissal of the taking claims, granting of Defendants-Appellees' cross-

---

[186] *See, e.g.*, *Orange Cnty. Water Dist. v. City of Riverside*, 188 Cal. App. 2d 566, 585 (1961) ("We freely concede that the District has from the beginning been representing, in this action, not only the overlying landowners but all water users within the District having any water rights to be represented.").
[187] Cal. Water Code § 22654.
[188] *See Allen v. Hussey*, 101 Cal. App. 2d 457, 467 (1950) ("The owners of the property within the district are beneficiaries of the trust and their interests are to be protected along with those of the bondholders and general creditors.").

motion for summary judgment, and entry of judgment against Plaintiffs-Appellants.

Respectfully submitted,

/s/ Nancie G. Marzulla
Nancie G. Marzulla
Roger J. Marzulla
MARZULLA LAW, LLC
1150 Connecticut Avenue NW
Suite 1050
Washington, DC 20036
(202) 822-6760
nancie@marzulla.com
roger@marzulla.com

October 21, 2022

Counsel for Plaintiffs-Appellants

ADDENDUM

# In the United States Court of Federal Claims

No. 16-1276L
(Filed: March 25, 2020)

|  |  |  |
|---|---|---|
| CITY OF FRESNO, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Keywords: Takings Clause; Fifth |
| | ) | Amendment; Breach of Contract; Water |
| v. | ) | Rights; Bureau of Reclamation; Motion to |
| | ) | Dismiss; Subject-Matter Jurisdiction; |
| THE UNITED STATES OF AMERICA, | ) | Failure to State a Claim |
| | ) | |
| Defendant, | ) | |
| and | ) | |
| | ) | |
| SAN LUIS & DELTA-MENDOTA WATER | ) | |
| AUTHORITY, *et al.*, and CENTRAL CALIFORNIA | ) | |
| IRRIGATION DISTRICT, *et al.* | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
| | ) | |

*Nancie G. Marzulla* and *Roger J. Marzulla*, Marzulla Law, LLC, Washington, DC, for Plaintiffs. *Craig Parton* and *Timothy E. Metzinger*, Price, Postel & Parma LLP, Santa Barbara, CA, Of Counsel.

*Lucinda J. Bach*, Environment and Natural Resources Division, and *Geoffrey M. Long*, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, Washington, DC, with whom was *Jean E. Williams*, Deputy Assistant Attorney General, Washington, DC, for Defendant. *Amy Aufdemberge*, Assistant Regional Solicitor, Office of the Solicitor, U.S. Department of Interior, Sacramento, CA, Of Counsel.

*Paul R. Minasian*, *Andrew J. McClure*, and *Jackson A. Minasian*, Minasian, Meith, Soares, Sexton & Cooper, LLP, Oroville, CA, for Defendant-Intervenor San Joaquin River Exchange Contractors Water Authority.
*Daniel J. O'Hanlon*, Kronick, Moskovitz, Tiedemann & Girard, Sacramento, CA, for Defendant-Intervenor San Luis & Delta-Mendota Water Authority.

*David T. Ralston*, Foley & Lardner LLP, Washington, DC, for Defendant-Intervenors Byron Bethany Irrigation District and Del Puerto Water District. *Frank S. Murray* and *Micah Zomer*, Foley & Lardner LLP, Washington, DC, Of Counsel.

*Jon D. Rubin*, General Counsel, Westlands Water District, Sacramento, CA, for Defendant-Intervenor Westlands Water District.

*Ellen L. Wehr*, Grassland Water District, Los Banos, CA, for Defendant-Intervenor Grassland Water District.

*Thomas M. Berliner*, Duane Morris LLP, San Francisco, CA, for Defendant-Intervenor San Luis Water District.

*Steven Stadler*, James Irrigation District, San Joaquin, CA, for Defendant-Intervenor James Irrigation District.

*Anthony T. Fulcher*, Santa Clara Valley Water District, San Jose, CA, for Defendant-Intervenor Santa Clara Valley Water District. *Stanly Yamamoto*, Santa Clara Valley Water District, San Jose, CA, Of Counsel.

## OPINION AND ORDER

**KAPLAN, Judge.**

Plaintiffs in this action include the City of Fresno, California, seventeen irrigation districts in California that have entered contracts with the Bureau of Reclamation to receive water supplied by the Friant Division of the Central Valley Project ("CVP") (hereinafter the District Plaintiffs),[1] and eight individual landowners who rely upon water supplied to them by the irrigation districts for agricultural purposes (hereinafter the Individual Plaintiffs).[2] The Individual Plaintiffs purport to sue on behalf of themselves and similarly-situated property owners served by the CVP.

Plaintiffs allege that in 2014, in the wake of water shortages caused by a severe drought, Reclamation provided the City and the District Plaintiffs with only a fraction of the water to which they claim entitlement under their contracts. According to Plaintiffs, Reclamation instead "appropriated all of the water of the Friant Division of the [CVP] to satisfy what it determined to be a contractual requirement to provide this water as substitute water under a 1939 Contract . . . to a group of water users referred to as the Exchange Contractors." 2d Am. Compl. ¶ 32. As a result Plaintiffs allege, the City and the District Plaintiffs, as well as their water users, including the Individual Plaintiff landowners, "suffered huge losses of annual and permanent crops, loss of

---

[1] The "District Plaintiffs" are: Arvin-Edison Water Storage District, Chowchilla Water District, Delano-Earlimart Irrigation District, Exeter Irrigation District, Ivanhoe Irrigation District, Lindmore Irrigation District, Lindsay-Strathmore Irrigation District, Lower Tule River Irrigation District, Orange Cove Irrigation District, Porterville Irrigation District, Saucelito Irrigation District, Shafter-Wasco Irrigation District, Southern-San Joaquin Municipal Utility District, Stone Corral Irrigation District, Tea Pot Dome Water District, Terra Bella Irrigation District, and Tulare Irrigation District. 2d Am. Compl. For Taking of Water Rights Without Just Compensation & for Breach of Contract ("2d Am. Compl.") ¶¶ 4–18, ECF No. 128-1.

[2] The "Individual Plaintiffs" are: Loren Booth LLC, Matthew J. Fisher, Julia K. Fisher, Hronis Inc., Clifford R. Loeffler, Maureen Loeffler, Douglas Phillips, and Caralee Phillips. 2d Am. Compl. ¶¶ 21–25.

Appx2

groundwater reserves, water shortages and rationing, and incurred millions of dollars to purchase emergency water supplies." Id. ¶ 33.

Plaintiffs contend that Reclamation breached its contract with the City and the District Plaintiffs "by failing to make available to them the quantities required by Article 3 of their contracts." Id. ¶ 46. They also allege that "[t]he water and water rights of the Friant Division appropriated by the United States in 2014 were the property of Plaintiffs, and their landowners and water users, each of which are the beneficial owners of the water rights." Id. ¶ 34. According to Plaintiffs, when Reclamation provided the water to the Exchange Contractors, rather than the City and the District Plaintiffs, it effected a taking of their property without just compensation, in violation of the Fifth Amendment. Id. ¶ 35.

Presently before the Court are motions to dismiss filed by the United States and the Defendant Intervenors[3] pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"). The government contends that the City and District Plaintiffs lack standing to pursue Fifth Amendment takings claims because under California law they do not have property interests in the water supplied to them by Reclamation. According to the government, whatever rights the City and the District Plaintiffs possess arise exclusively under their water-supply contracts with Reclamation.

The United States further argues that the City and the District Plaintiffs have failed to state a claim for breach of the water-supply contracts because those contracts immunize the United States from any liability in cases of shortages caused by actions Reclamation took to meet its obligations under the exchange contracts. Further, the government contends that the Individual Plaintiffs also have no water rights under California law; nor are they third-party beneficiaries to the water-supply contracts between Reclamation and the City or Reclamation and the District Plaintiffs.[4]

The Intervenor Exchange Contractors make similar arguments, but offer additional grounds for dismissal. They contend that Plaintiffs' claims seek declaratory relief that is beyond the Court's power to grant. They also argue that Plaintiffs' Second Amended Complaint fails to allege that the United States' determination of the condition of shortage was arbitrary and capricious, as required by the shortage provisions in the water-supply contracts. For the reasons

---

[3] There are two sets of defendant intervenors: 1) San Luis & Delta-Mendota Water Authority along with its member districts—Westlands Water District, Santa Clara Valley Water District, Grassland Water District, San Luis Water District, James Irrigation District, Byron Bethany Irrigation District, and Del Puerto Water District—(collectively the District Intervenors); and 2) Central California Irrigation District, San Luis Canal Company, Firebaugh Canal Water District, Columbia Canal Company, the San Joaquin River Exchange Contractors Water Authority—(collectively the Exchange Contractor Intervenors).

[4] The District Intervenors make similar arguments in seeking to dismiss the Individual Plaintiffs' contract claims for lack of standing. They also argue that if the Court dismisses the City and District Plaintiffs' contract claims, then it should also dismiss the City and District Plaintiffs' takings claims.

set forth below, the motions to dismiss are **GRANTED-IN-PART** and **DENIED-IN-PART**. The City and the District Plaintiffs have adequately pleaded a breach of contract and, thus, the motions are **DENIED** as to those claims. The motions are **GRANTED** as to all remaining claims, including those presented by the Individual Plaintiffs as third-party beneficiaries of the water-supply contracts.

## BACKGROUND[5]

### I.     The Central Valley Project

"The Central Valley Project is the largest federal water management project in the United States." Stockton E. Water Dist. v. United States, 583 F.3d 1344, 1349 (Fed. Cir. 2009). It consists of a massive set of dams, reservoirs, hydropower generating stations, canals, electrical transmission lines, and other infrastructure. United States v. Gerlach Live Stock Co., 339 U.S. 725, 728 (1950). The CVP "was built to serve the water needs in California's Central Valley Basin," Stockton E. Water Dist., 583 F.3d at 1349, which has been characterized as "the most agriculturally-productive region in the world," Westlands Water Dist. v. United States (Westlands Water Dist. I), 153 F. Supp. 2d 1133, 1138 (E.D. Cal. 2001), aff'd, 337 F.3d 1092 (9th Cir. 2003). The CVP was originally conceived by the State of California, but "was taken over by the United States in 1935 and has since been a federal enterprise." Gerlach Live Stock Co., 339 U.S. at 728. It is operated by the Bureau of Reclamation, a division of the Department of the Interior. Stockton E. Water Dist., 583 F.3d at 1349.

The CVP's purposes were to "improv[e] navigation, regulat[e] the flow of the San Joaquin River and the Sacramento River . . . [to store and deliver] waters thereof, for the reclamation of arid and semiarid lands . . . and other beneficial uses." Westlands Water Dist. v. United States (Westlands Water Dist. II), 337 F.3d 1092, 1095 (9th Cir. 2003) (quoting Act of August 26, 1937, Pub. L. No. 75-392, 50 Stat. 844, 850). The CVP achieved these purposes by "re-engineer[ing] [the] natural water distribution" of California's Central Valley. Gerlach Live Stock Co., 339 U.S. at 728.

As the government observes, "[a]s originally conceived, the CVP developed a water supply from two rivers: the Sacramento and the San Joaquin." Corrected Resp. of the U.S. to Show Cause Order at 4, ECF No. 113. The Sacramento River generates a "surplus of water because of heavier rainfall in the northern region but has little available tillable soil." Westlands Water Dist. I, 153 F. Supp. 2d at 1146 (quoting Cty. of San Joaquin v. State Water Res. Control Bd., 63 Cal. Rptr. 2d 277, 279 (Cal. Ct. App. 1997)) (alterations omitted). The San Joaquin River, by contrast, cannot supply sufficient water for irrigation and other beneficial uses in the San Joaquin Valley. Id.

---

[5] The facts in this section are drawn from the parties' pleadings and their filings on the motions to dismiss.

The claims before the Court in this case arise out of the Project's Friant Division, 2d Am. Compl. ¶ 29,[6] where the Friant Dam impounds all of the waters of the San Joaquin River and stores them in Millerton Lake. The waters stored in Millerton Lake are distributed via the Madera and Friant-Kern Canals to water and irrigation districts like the District Plaintiffs that hold contracts with Reclamation. See Dugan v. Rank, 372 U.S. 609, 613 (1963); Westlands Water Dist. II, 337 F.3d at 1096; United States v. State Water Res. Control Bd. ("SWRCB"), 227 Cal. Rptr. 161, 167 (Cal. Ct. App. 1986).

## II.    Reclamation's Water Rights

Congress passed the Reclamation Act of 1902 to facilitate federal management of limited water resources in the western states. See California v. United States, 438 U.S. 645, 649 (1978). Under the act, funds reserved from the sale of public lands in several western states, including California, are deposited into a "reclamation fund," controlled by the Treasury, which is used for "the construction and maintenance of irrigation works for the storage, diversion, and development of waters for . . . [these] arid and semiarid lands." Reclamation Act of 1902, Pub. L. 57-161, § 1, 32 Stat. 388 (1902).

To "facilitate water distribution" and "provide a reliable and stable water supply," the United States had to "obtain, by purchase or otherwise, rights (both appropriative and riparian) from water-rights holders in strategic areas." Westlands Water Dist. I, 153 F. Supp. 2d at 1143; see also Gerlach Live Stock Co., 339 U.S. at 734 (observing that "[b]y its command that the provisions of the reclamation law should govern the construction, operation, and maintenance of the several construction projects, Congress directed the Secretary of the Interior to proceed in conformity with state laws, giving full recognition to every right vested under those laws"). Reclamation used three methods to secure the water rights it needed to operate the CVP.

First, in 1939, Reclamation entered purchase agreements with downstream holders of riparian rights on the San Joaquin River (the Exchange Contractors). See 2d Am. Compl. Ex. 1, ECF No. 128-2 (Contract for Purchase of Miller and Lux Water Rights—hereinafter the "purchase contract"). Under these agreements, the Exchange Contractors "sold all of their San Joaquin River water rights to the United States, except for 'reserved water'" to which they held vested rights. Westland Water Dist. II, 337 F.3d at 1097.

Second, Reclamation and the Exchange Contractors entered "Contract[s] for the Exchange of Waters" under which Reclamation was given authority to exercise the contractors' remaining (reserved) rights to San Joaquin River waters in exchange for the agreement of the Bureau to provide them with "substitute water." Westlands Water Dist. v. Firebaugh Canal, 10 F.3d 667, 669 (9th Cir. 1993); see also 2d. Am. Compl. Ex. 2 (Contract for Exchange of Waters

---

[6] The Friant Division encompasses one of the nine distinct geographic areas, known as "divisions," that make up the CVP. Westlands Water Dist. I, 153 F. Supp. 2d at 1138 (E.D. Cal. 2001). It consists of the Friant Dam, Millerton Lake, the Friant-Kern Canal, the Madera Canal, and the John A. Franchi Diversion Dam. Id. at 1142.

Appx5

(July 27, 1939)), ECF No. 128-3; id. Ex. 3 (Second Amended Contract for Exchange of Waters (February 14, 1968) —hereinafter the "exchange contract"), ECF No. 128-4. The exchange contracts further provided that Reclamation's rights to exercise the reserved rights of the Exchange Contractors were conditional. They would last "so long as, and only so long as, the United States does deliver to [the Exchange Contractors] by means of the [Central Valley] Project or otherwise substitute waters in conformity with this contract." Id. Ex. 3, at 8 (Article 4 of Second Amended Exchange Contract). [7]

Reclamation secured the remaining water rights it needed to operate the CVP from the California State Water Resources Control Board ("SWRCB"). See generally California v. United States, 438 U.S. 645 (1978). Specifically, on June 2, 1959, the SWRCB issued Decision No. D-935, which authorized and issued permits to allow Reclamation to impound and divert the entire flow of the San Joaquin River at Friant Dam, and to store and release the water for re-diversion into the Friant-Kern and Madera Canals. See Cal. SWRCB Decision No. D-935 (June 2, 1959), https://www.waterboards.ca.gov/waterrights/board_decisions/adopted_orders/decisions/d0900_d 0949/wrd935.pdf.

In short, "[t]he United States . . . acquired, by exchange, purchase, exercise of eminent domain, and appropriation, riparian and appropriative rights to all water within the CVP." Westlands Water Dist. I, 153 F. Supp. 2d at 1144 (citing 43 U.S.C. § 511 (2001)). As a result, "[a]ccess to CVP water is only by contract with the United States." Id.

### III.    The Water-Supply Contracts

Reclamation has entered water-supply contracts with the City and each of the District Plaintiffs. See, e.g., 2d Am. Compl. Ex. 5 (Arvin-Edison water-supply contract), ECF No. 128-6. The water-supply contracts provide at Article 3(a) that "[d]uring each year, consistent with all applicable State water rights, permits, and licenses, Federal law . . . and subject to the provisions set forth in Articles 12 and 13 of this Contract, the Contracting Officer shall make available for delivery" specified amounts of Class 1 and Class 2 water. Id. at 18.

Article 3(n) of the water-supply contracts makes the rights of the Districts "subject to the terms of [the exchange contracts]." Id. at 24. It states, however, that "[t]he United States agrees that it will not deliver to the Exchange Contractors thereunder the water of the San Joaquin River unless and until required by the terms of said contract." Id. Article 3(n) also states that the United States further agreed not to "voluntarily and knowingly determine itself unable to deliver to the Exchange Contractors entitled thereto from water that is available or that may become available to it from the Sacramento River and its tributaries or the Sacramento-San Joaquin Delta those quantities required to satisfy the obligations of the United States under" the exchange and purchase contracts. Id.

---

[7] Citations to the exhibits appended to the second amended complaint refer to the pagination assigned by the court's electronic filing system.

Article 12 of the water-supply contracts provides in pertinent part that Reclamation will "make all reasonable efforts to optimize delivery of the Contract Total subject to . . . [inter alia] the obligations of the United States under existing contracts, or renewals thereof, providing for water deliveries from the Project." Id. at 123. In Article 13, Reclamation agrees that "the Contracting Officer will use all reasonable means to guard against a Condition of Shortage." Id. at 124. Article 13(b) further provides that "[i]f there is a Condition of Shortage because of . . . actions taken by the Contracting Officer to meet legal obligations . . . then, except as provided in subdivision (a) of Article 19 of this Contract, no liability shall accrue against the United States . . . for any damage, direct or indirect, arising therefrom." Id. at 125. Article 19(a) provides, in turn, that "[w]here the terms of this Contract provide for actions to be based upon the opinion or determination of either party to this Contract, said terms shall not be construed as permitting such action to be predicated upon arbitrary, capricious, or unreasonable opinions or determinations." Id. at 131–32.

## IV.   Plaintiffs' Legal Claims in this Case Regarding Water Year 2014

### A.   Breach of Water-Supply Contracts

In 2014, California was in the second year of a multi-year severe drought. See Friant Water Auth. v. Jewell, 23 F. Supp. 3d 1130, 1140 (E.D. Cal. 2014). Plaintiffs allege that in that year, "the United States breached Plaintiffs' water-supply contracts by failing to make available to them the quantities required by Article 3 of their contracts." 2d Am. Compl. ¶ 46. They assert that during that year "there was a substantial quantity of San Joaquin River water available to the United States, stored and otherwise existing within the Friant Division, even though precipitation had been low during the winter." Id. According to Plaintiffs, "in breach of their permanent contracts, the United States failed and refused to make that water available to Plaintiffs (with the minor exception of small quantities of 'health and safety' and 'carry over water'), determining instead to release and deliver that water to the Exchange Contractors." Id. They seek an award of damages to compensate them for "the cost of purchasing replacement water for the quantities not made available by Reclamation, management and operations costs for 2014 (including the cost of delivering the water to the Exchange Contractors)," and other related costs "plus other damages as yet unascertained." Id. ¶ 50.

### B.   Fifth Amendment Taking

In addition to their breach of contract claim, Plaintiffs assert that the actions Reclamation took in 2014 resulted in a taking of their property without just compensation, in violation of the Fifth Amendment. They allege that "[e]ach municipal, industrial, and agricultural water user within Fresno and Plaintiff water agencies holds a property right in the beneficial use of the water and water rights of the San Joaquin River" and that the United States acquired such rights "to benefit the landowners and water users within the Friant Division of the Central Valley Project." Id. ¶ 31. Therefore, they allege, the United States' decision in 2014 to "appropriat[e] all of the water of the Friant Division of the [CVP] to satisfy what it determined to be a contractual requirement to provide th[e] water as substitute water" under the exchange contracts, Id. ¶ 32, resulted in a Fifth Amendment taking of their property, id. ¶ 34. "As a direct and proximate result of the United States' failure to pay just compensation for the water and water rights of the Friant Division it appropriated in 2014," Plaintiffs contend, they "have been damaged equal to

7

Appx7

the fair market value of the property appropriated, including compound interest from the date of taking, in an amount that will be proved at trial." Id. ¶ 36.

## V.    Previous District Court Suit

In 2014, thirteen of the plaintiffs in this litigation filed suit in the United States District Court for the Eastern District of California. See Compl., Friant Water Auth. v. Jewell, 23 F. Supp. 3d 1130 (E.D. Cal. 2014) (No. 1:14-cv-765); 1st Am. Compl., Friant Water Auth. v. Jewell, 23 F. Supp. 3d 1130 (E.D. Cal. 2014) (No. 1:14-cv-765).[8] In that case (as relevant here), the plaintiffs also alleged that Reclamation's 2014 water allocation decisions breached their water-supply contracts and violated the Fifth Amendment's Takings Clause. Id. ¶¶ 99–112. In addition, they claimed that Reclamation's water allocation decisions violated the Administrative Procedure Act. Id. ¶ 98.

On December 1, 2014, the district court denied the plaintiffs' motion to transfer the case to the Court of Federal Claims. It reasoned that it possessed jurisdiction over the breach of contract claims "to the extent [plaintiffs] request equitable relief available under the APA." Friant Water Auth. v. Jewell, No. 1:14-cv-765, 2014 WL 6774019, at *12 (E.D. Cal. Dec. 1, 2014) (denying request to transfer but striking the request for damages). It declined to transfer the takings claim because it found that claim as presented to it "frivolous." It so found because the taking claim was "premised upon the underlying allegation that Reclamation failed to correctly implement provisions in the [Central Valley Project Improvement Act]," and, as the court noted, clear Federal Circuit precedent "bars takings claims premised upon the United States' violation of a statute." Id. (citing Lion Raisins Inc. v. United States, 416 F.3d 1356, 1370 (Fed. Cir. 2005)) (noting also that, "in a takings case, [the court] assume[s] that the underlying governmental action was lawful"). Thus, the district concluded that transferring the case to the Court of Federal Claims would "not be in the interests of justice." Id.

On December 18, 2014, plaintiffs voluntarily dismissed their claims in the district court pursuant to Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure. Notice of Voluntary Dismissal, Friant Water Auth., No. 1:14-cv-765 (E.D. Cal. Dec. 18, 2014); see also Mem. Dec. & Order Re Pls.' Mot. to Transfer to Ct. of Federal Claims, Friant Water Auth., No. 1:14-cv-765 (E.D. Cal. Jan. 5, 2015) (ordering that "all remaining claims against all remaining parties [be] dismissed without prejudice" and that the case be closed).

## VI.    The Present Suit

Plaintiffs filed the present action on October 5, 2016. The case was assigned to then-Judge (now Senior Judge) Mary Ellen Coster Williams. The original complaint was brought only

---

[8] Plaintiffs that also participated in the earlier district court case are Arvin-Edison Water Storage District, Delano-Earlimart Irrigation District, Lindmore Irrigation District, Lindsay-Strathmore Irrigation District, Lower Tule River Irrigation District, Orange Cove Irrigation District, Porterville Irrigation District, Saucelito Irrigation District, Shafter-Wasco Irrigation District, Stone Corral Irrigation District, Tea Pot Dome Water District, Terra Bella Irrigation District, and Tulare Irrigation District.

by the City and the District Plaintiffs and it alleged a Fifth Amendment taking as the only cause of action. ECF No. 1. The government moved to dismiss the complaint pursuant to RCFC 12(b)(1) and (6). It contended that the plaintiffs lacked standing to pursue a Fifth Amendment Takings claim because they lacked the requisite property interest in the water they contended the government had appropriated, and because they failed to otherwise adequately plead a takings claim. ECF No. 7.

Several months later, the District Intervenors and the Exchange Contractor Intervenors sought to intervene in the case on the side of the government. ECF Nos. 10, 25. Plaintiffs objected to the motions to intervene. ECF No. 40. The Court initially deferred a ruling on the motions to intervene pending its decision on the government's first motion to dismiss, see ECF No. 52, but subsequently granted the motion during a hearing held on November 6, 2018, Tr. of Show Cause Hr'g Held on Nov. 6, 2018, at 105:21–23, ECF No. 123.

The Court held oral argument on the government's first motion to dismiss on December 11, 2017. During that hearing the Court stated its intent to "defer ruling on the standing issue" and to deny the 12(b)(6) motion for the purpose of allowing further development of the record. Tr. of Oral Arg. Held on Dec. 11, 2017 at 110:17–20, ECF No. 58; see also Order at 1, ECF No. 56 (memorializing the ruling announced during oral argument).

On January 30, 2018, Plaintiffs filed an amended complaint with leave of the court, ECF No. 65, to which the government filed an answer on February 26, 2018, ECF No. 66. On May 31, 2018, the Court issued a show cause order directing Plaintiffs to demonstrate: 1) "[w]hy the water rights at issue are not exclusively derived from contract as a matter of law"; and 2) "[w]hat, if any, property rights exist independently of contractual rights." Order, ECF No. 76. After receiving responses from the parties, the Court held a show cause hearing on November 6, 2018 during which it directed the parties to submit a proposal for further proceedings in the case. Tr. of Show Cause Hr'g Held on Nov. 6, 2018, at 105:24–106:15.

After receiving a proposal from all parties (who could not agree on a path forward), the Court granted the government's request to stay discovery and issued a scheduling order to govern future proceedings. ECF No. 124. In accordance with the Court's order, Plaintiffs filed a second amended complaint on December 18, 2018, in which they added a claim for breach of contract. See 2d Am. Compl. ¶¶ 38–50.

The government and Defendant-Intervenors filed the motions to dismiss presently before the Court on May 15, 2019. The motions were fully briefed as of July 1, 2019. ECF Nos. 144–146. Oral argument was initially scheduled for November 18, 2019, but was rescheduled at the request of the government until January 9, 2020. ECF No. 154.

When the parties convened for oral argument, Senior Judge Coster Williams announced her recusal on the basis of a recently developed conflict. See ECF Nos. 157, 160. The case was transferred to the undersigned on January 22, 2020. ECF No. 158. A status conference was held on February 3, 2020, ECF No. 161. An oral argument on the pending motions was scheduled, ECF No. 162, and held on March 5, 2020.

## DISCUSSION

### I.    Contract Claims

#### A.    Motions to Dismiss for Lack of Subject-Matter Jurisdiction

As noted, Plaintiffs allege that in 2014 the government breached the water-supply contracts by not making available to the City and the District Plaintiffs the quantities of water required under Article 3(a). The Intervenor Exchange Contractors have moved to dismiss Plaintiffs' contract claims under RCFC 12(b)(1) on the theory that Plaintiffs seek declaratory relief that lies beyond the Court's jurisdiction. Mem. of Points & Auths. in Support of Def.-Intervenor San Joaquin River Exchange Contractors Water Auths.' Mot. to Dismiss ("Intervenor Exchange Contractors' Mem."), ECF No. 137-1. The District Intervenors have moved to dismiss the claims of the Individual Plaintiffs for lack of jurisdiction for another reason—they argue that the Individual Plaintiffs are not in privity of contract with the government and are not third-party beneficiaries to any contract. See Mot. to Dismiss & Mem. in Support of Mot. By San Luis & Delta-Mendota Water Auth. et al. ("District Intervenor's Mem.") at 1–2, ECF No. 138.

For the reasons set forth below, the Court concludes that the jurisdictional objection posed by the Intervenor Exchange Contractors lacks merit. On the other hand, and also for reasons set forth below, the Court finds persuasive the arguments of the government and the District Intervenors that the Individual Plaintiffs lack standing to pursue their breach of contract claims because they are not third-party beneficiaries of the water-supply contracts.

#### 1.    The Motion of the Intervenor Exchange Contractors

When ruling on a motion to dismiss for lack of subject-matter jurisdiction, the Court "consider[s] the facts alleged in the complaint to be true and correct." Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). "If a motion to dismiss for lack of subject-matter jurisdiction, however, challenges the truth of the jurisdictional facts alleged in the complaint, the [court] may consider relevant evidence in order to resolve the factual dispute." Id.

Under the Tucker Act, 28 U.S.C. § 1491(a)(1), this Court has jurisdiction "to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." Plaintiffs' claims seeking damages for the alleged breach of the water-supply contracts, fall squarely within this grant of jurisdiction. Nonetheless, the Intervenor Exchange Contractors contend that this Court lacks jurisdiction to decide those claims because doing so would require the Court to issue a declaratory judgment regarding the appropriate interpretation of the exchange contracts, and the scope of the Exchange Contractors' rights under those agreements. Intervenor Exchange Contractors' Mem. at 16–22. As the Intervenor Exchange Contractors point out, this Court lacks general jurisdiction to issue declaratory judgments. See Nat'l Air Traffic Controllers Ass'n v. United States, 160 F.3d 714, 716–17 (Fed. Cir. 1998).

The Intervenor Exchange Contractors' contentions lack merit. Plaintiffs do not request a declaratory judgment regarding the proper interpretation of the exchange contracts. They seek an

10

award of damages for breach of the water-supply contracts, to which the City and the District Plaintiffs are parties. The fact that the Court may be required to interpret the exchange contracts in the course of adjudicating Plaintiffs' claims that the water-supply contracts have been breached, does not change the fundamental character of this action. The Intervenor Exchange Contractors' motion to dismiss under RCFC 12(b)(1) is therefore denied.

## 2.    The Motions of the Government and the District Intervenors

As noted, the District Intervenors have also filed a motion to dismiss under RCFC 12(b)(1). They contend that the breach of contract claims brought by the Individual Plaintiffs must be dismissed because the Individual Plaintiffs are not parties to any contract with the government and are not third-party beneficiaries of any such agreement. The government makes the same argument in seeking to dismiss the claims of the Individual Plaintiffs pursuant to RCFC 12(b)(6) for failure to state a claim. See Def.'s Mot. at 32–35. The Court agrees that the Individual Plaintiffs lack standing to pursue breach of contract claims and therefore dismisses those claims for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1).

"A plaintiff must be in privity with the United States to have standing to sue the sovereign on a contract claim." Sullivan v. United States, 625 F.3d 1378, 1379–80 (Fed. Cir. 2010) (citing Anderson v. United States, 344 F.3d 1343, 1351 (Fed. Cir. 2003)). This requirement notwithstanding, the Federal Circuit has recognized "limited exceptions to that general rule when a party standing outside of privity 'stands in the shoes of a party within privity.'" Id. at 1380 (quoting First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1289 (Fed. Cir. 1999)). "A nonparty becomes legally entitled to a benefit promised in a contract . . . only if the contracting parties so intend." G4S Tech. LLC v. United States, 779 F.3d 1337, 1340 (Fed. Cir. 2015) (quoting Astra USA, Inc. v. Santa Clara Cty., 563 U.S. 110, 117 (2011). Such intent may be either express or implied. Id. (citing Glass v. United States, 258 F.3d 1349, 1354 (Fed. Cir. 2001)). In order to confer third-party beneficiary status, the benefit to the third party must be "direct." Id.; see also Pac. Gas & Elec. Co. v. United States, 838 F.3d 1341, 1361 (Fed. Cir. 2016) (quoting Flexfab, L.L.C. v. United States, 424 F.3d 1254, 1259 (Fed. Cir. 2005)) ("To demonstrate third-party beneficiary status [] a party must prove that 'the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly.'").

It is undisputed that the Individual Plaintiffs are not parties to any agreement with Reclamation. While the Individual Plaintiffs certainly benefit from the water-supply contracts between Reclamation and the District Plaintiffs, "[t]hird-party beneficiary status is not established 'merely because [a] contract would benefit [a party].'" Pac. Gas & Elec. Co. v. United States, 838 F.3d at 1361 (quoting Fed. Deposit Ins. Corp. v. United States, 342 F.3d 1313, 1319 (Fed. Cir. 2003)); see also Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d 1206, 1211 (9th Cir. 1999), opinion amended on denial of reh'g, 203 F.3d 1175 (9th Cir. 2000) (citing Restatement (Second) of Contracts § 313 (Am. Law Inst. 1981)) ("Parties that benefit from a government contract are generally assumed to be incidental beneficiaries, and may not enforce the contract absent a clear intent to the contrary."); Restatement (Second) of Contracts § 313 cmt. a ("Government contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested.").

11

 Plaintiffs identify no language in the water-supply contracts that evinces—either expressly or implicitly—an intent to confer third-party beneficiary status on the Individual Plaintiffs, much less a clear one. Here, as in Klamath Water Users, "[a]lthough the Contract operates to the Irrigators' benefit by impounding irrigation water, and was undoubtedly entered into with the Irrigators in mind, to allow them intended third-party beneficiary status would open the door to all users . . . achieving similar status, a result not intended by the Contract." 204 F.3d at 1212; see also Smith v. Cent. Ariz. Water Conserv. Dist., 418 F.3d 1028, 1034 (9th Cir. 2005) (finding that landowners were not third-party beneficiaries to a reclamation contract); Orff v. United States, 358 F.3d 1137, 1144 (9th Cir. 2004), aff'd on other grounds, 545 U.S. 596 (2005) (same).

 Further, as the court of appeals has observed, "[f]or determination of contractual and beneficial intent when . . . the contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose." Roedler v. Dep't of Energy, 255 F.3d 1347, 1352 (Fed Cir. 2001). Here, "the governing statute restricts Reclamation's contracting authority to extend only to irrigation districts and other such entities organized under state law, not individual water users." Stockton E. Water Dist. v. United States, 75 Fed. Cl. 321, 350, modified in part, 76 Fed. Cl. 470 (2007) (citing 43 U.S.C. § 423e and also observing that the [cities that secure water from the water districts] should not be granted third-party beneficiary status, as the intent of Congress would appear to limit the power of Reclamation to enter into contracts with such entities").

 Further, in this case, as in Pacific Gas and Electric Co., "there is no identifiable benefit flowing from [Reclamation] to the particular [plaintiffs]." 838 F.3d at 1362. The contract between Reclamation and the Districts was not "intended to benefit them specifically, independent of all other market participants." Id.

 The Individual Plaintiffs' reliance on H.F. Allen Orchards v. United States, 749 F.2d 1571 (Fed. Cir. 1984) for a contrary proposition is unavailing. In that case, the appellants were members of the Yakima Project Irrigation District. Id. at 1573. They alleged that Reclamation breached an obligation to accurately forecast the amount of water it intended to supply to irrigation districts, which they claimed was imposed by contracts between Reclamation and the districts that were incorporated into a consent decree. The court of appeals affirmed the Claims Court's determination that Reclamation did not undertake such an obligation, but disagreed with its conclusion that the appellants could not sue as third-party beneficiaries to the district-Bureau contracts. Id. at 1572–73. It found the landowners entitled to assert third-party beneficiary status because, among other reasons, it was undisputed that they had a property right to the water under Fox v. Ickes, 137 F.2d 30 (D.C. Cir. 1943), so that "the Bureau was obligated to distribute the available water according to priorities established under State of Washington law." Id. at 1575.

 The court of appeals' observations regarding the appellants' third-party beneficiary status was arguably dicta. But in any event, the would-be third-party beneficiaries in H.F. Allen Orchards had property interests in the water itself. Thus, as the court of appeals observed in Pacific Gas and Electric Co., in H.F. Allen Orchards "a specific identifiable benefit flowed from the government to each farmer under the consent decree." Pacific Gas & Electric Co., 838 F.3d at 1362. For the reasons set forth below, the Individual Plaintiffs here do not have property

interests in the water that is the subject of the contracts between Reclamation and the District Plaintiffs or Reclamation and the City. H.F. Allen Orchards is therefore inapposite.

In short, third-party beneficiary status imparts an "exceptional privilege," which is why the court of appeals has "cautioned that the privilege of third-party beneficiary status 'should not be granted liberally.'" G4S Tech. LLC, 779 F.3d at 1340 (quoting Flexfab, L.L.C., 424 F.3d at 1259). The Court agrees with the government and District Intervenors that there is nothing in the water-supply contracts that vests the Individual Plaintiffs with the right to assert that exceptional privilege here. Their breach of contract claims must accordingly be dismissed based on lack of standing.

### B.     Motion to Dismiss for Failure to State a Claim

The government and the Exchange Contractor Intervenors have each filed motions to dismiss the remaining breach of contract claims (brought by the City and the District Plaintiffs) under RCFC 12(b)(6). For the reasons that follow, the Court concludes that those motions lack merit.

### 1.     Standards for Motion to Dismiss Under RCFC 12(b)(6)

A complaint may be dismissed under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002). When considering a motion to dismiss for failure to state a claim upon which relief may be granted, the Court "must accept as true all the factual allegations in the complaint, and must indulge all reasonable inferences in favor of the non-movant." Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations omitted). The Court, however, is not required to "accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)).

"To avoid dismissal" under RCFC 12(b)(6) "a party need only plead 'facts to state a claim to relief that is plausible on its face,' with facts sufficient to nudge 'claims across the line from conceivable to plausible.'" TrinCo Inv. Co. v. United States, 722 F.3d 1375, 1380 (Fed. Cir. 2013) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim is plausible on its face when 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662 (2009)).

### 2.     Contract Claims of the City and the District Plaintiffs

As noted, Plaintiffs allege that in 2014 the government breached the water-supply contracts by not making available to them the quantities of water specified in Article 3(a) of those contracts. They assert that—notwithstanding the drought—the federal government had a substantial quantity of San Joaquin River water available, stored, and otherwise existing in the Friant Division. 2d Am. Compl. ¶ 46. But instead of fulfilling its obligations to make that water available to Plaintiffs, they allege, Reclamation released and delivered the water to the Exchange Contractors. Id.

The government contends that the complaint nonetheless fails to state a claim for breach of contract because, in its view, Plaintiffs' allegations do not take sufficient account of Article 13(b) of the water delivery contracts, which the government contends "immunize[s] [it] from liability for conditions of shortage caused by efforts to meet legal obligations." Def.'s Mot. to Dismiss the 2d Am. Compl. ("Def.'s Mot.") at 28, ECF No. 136. In addition, the government contends that Plaintiffs have failed to put forth facts sufficient to support their breach claim. Id. at 29–30. The Intervenor Exchange Contractors further argue that Plaintiffs' complaint fails to state a claim because it does not allege that it was arbitrary and capricious for the agency to determine that its obligations under the exchange contracts precluded it from meeting its obligations under the water-supply contracts, as allegedly required to establish a breach of the latter. The Court finds these arguments unpersuasive.

Article 13 of the water-supply contracts is entitled "Constraints on the Availability of Water." Subsection (b) provides that "[i]f there is a Condition of Shortage because of . . . actions taken by the Contracting Officer to meet legal obligations . . . then, except as provided in subdivision (a) of Article 19 of this Contract, no liability shall accrue against the United States . . . for any damage, direct or indirect, arising therefrom." 2d Am. Compl. Ex. 5, at 125, ECF No. 128-6. Article 19(a) provides in turn that "[w]here the terms of this Contract provide for actions to be based upon the opinion or determination of either party to this Contract, said terms shall not be construed as permitting such action to be predicated upon arbitrary, capricious, or unreasonable opinions or determinations." Id. at 131–32.

For two independent reasons, the Court is not persuaded by the contentions of the government and the Exchange Contractor Intervenors that Plaintiffs have failed to state a claim for breach of contract because their complaint does not take sufficient account of the "immunity" provided to Reclamation under Article 13(b). For one thing, the court of appeals has characterized similar "immunity provisions" as establishing affirmative defenses for which the government bears the burden of proof. See Stockton E. Water Dist., 583 F.3d at 1360 (finding that the provision in a water-supply contract that permits the government to escape liability where the water shortage caused by drought or other reasons beyond the control of the contracting officer supplies an affirmative defense that must be proven by the government). Plaintiffs are not required to negate affirmative defenses in their complaints. ABB Turbo Sys. AG v. Turbousa, Inc., 774 F.3d 979, 985 (Fed. Cir. 2014) (citing La Grasta v. First Union Secs., Inc., 358 F.3d 840, 845–46 (11th Cir. 2004)).

Further, and in any event, the complaint does in fact take account of the provisions the government and the Intervenor Exchange Contractors cite, and contains sufficient factual allegations to survive a 12(b)(6) motion to dismiss. Thus, read together, Articles 13(b) and 19(a) shield the government from liability for failing to meet its obligations under Article 3 in cases where the contracting officer has reasonably determined that the water must instead be provided to the Exchange Contractors to meet Reclamation's obligations to them. While Plaintiffs do not use the words "arbitrary," "capricious," or "unreasonable," they do allege that "the San Joaquin River water that Reclamation released and delivered to the Exchange Contractors in 2014 was made at a time, in a manner, and in an amount substantially greater than what the Exchange

Contractors were entitled to under [Article 4 of] the Exchange contract." 2d Am. Compl. ¶ 48.[9]
They further allege that the United States "fail[ed] and refus[ed] to make Friant Division water
available to Plaintiffs, over and above the flows to which the Exchange Contractors were entitled
under the terms of the Exchange Contract." Id. ¶ 49.

 For purposes of ruling on a motion to dismiss under RCFC 12(b)(6), these allegations are
sufficient to address the immunity provisions, including the "arbitrary and capricious"
requirement. They also state claims for a breach of Article 3(n) of the water-supply contract,
which provides that "[t]he United States agrees that it will not deliver to the Exchange
Contractors thereunder the water of the San Joaquin River unless and until required by the terms
of said contract." 2d Am. Compl. Ex. 5, at 24; see also id. at 48 (providing in pertinent part that
Reclamation will "make all reasonable efforts to optimize delivery of the Contract Total subject
to . . . [inter alia] the obligations of the United States under existing contracts, or renewals
thereof, providing for water deliveries from the Project").

 In short, Plaintiffs have set forth sufficient facts to defeat the government's motion to
dismiss. While the allegations contain less specificity than the government would like, much of
the detail the government would require Plaintiffs to supply is in the exclusive possession of the
government and the Exchange Contractors. Therefore, the motions of the government and the
Exchange Contractor Intervenors to dismiss the City and the District Plaintiffs' breach of
contract claims under RCFC 12(b)(6) must be denied.

## II. Takings Claims

 The City, the District Plaintiffs, and the Individual Plaintiffs allege that they each "hold[]
a property right in the beneficial use of the water and water rights of the San Joaquin River
which the United States acquired to benefit the landowners and water users within the Friant
Division of the Central Valley Project." 2d Am. Compl. ¶ 31. When Reclamation decided to use
the water of the Friant Division of the Central Valley Project to provide "substitute water" to the
Exchange Contractors, Plaintiffs contend, it appropriated Plaintiffs' water rights thereby
effecting a Fifth Amendment taking of their property for which they are owed just compensation.
Id. ¶¶ 32, 34.

 The government and the Intervenor Exchange Contractors have moved to dismiss all of
Plaintiffs' takings claims for lack of standing under RCFC 12(b)(1). They contend that none of
the Plaintiffs possess extra-contractual water rights under state law based merely on their
application of CVP water to beneficial purposes. The District Intervenors point to certain
provisions of the California Water Code as an additional ground to dismiss the takings claims of
the Individual Plaintiffs.

---

[9] Article 4 of the exchange contracts applies "[w]henever the United States is temporarily unable
for any reason or any cause to deliver to the [Exchange Contractors] substitute water from the
Delta-Mendota Canal." 2d Am. Compl. Ex. 3, at 8. It specifies the quantities and rates of San
Joaquin River water that Reclamation is required to supply to the Exchange Contractors.

Appx15

For the reasons set forth below, the Court concludes that—as a matter of law—none of the Plaintiffs possesses a property interest in the water supplied to them by or through Reclamation. Their takings claims must therefore be dismissed for lack of standing.

The Fifth Amendment to the United States Constitution provides that "private property" shall not be "taken for public use, without just compensation." U.S. Const. amend. V. To establish entitlement to compensation under the Takings Clause, a plaintiff must show: 1) that he has "a property interest for purposes of the Fifth Amendment," Members of the Peanut Quota Holders Ass'n v. United States, 421 F.3d 1323, 1330 (Fed. Cir. 2005) (citing Conti v. United States, 291 F.3d 1334, 1339 (Fed. Cir. 2002)), and 2) that the government's actions "amounted to a compensable taking of that property interest." Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1372 (Fed. Cir. 2004).

The Federal Circuit has recognized that the government's physical appropriation of water to which a plaintiff has valid rights under state law may constitute a physical taking under the Fifth Amendment. See, e.g., Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1296 (Fed. Cir. 2008) (determining that a physical takings analysis was appropriate where the government "directly appropriate[s] . . . water for its own use—for the preservation of an endangered species"); Washoe Cty., Nev. v. United States, 319 F.3d 1320, 1326 (Fed. Cir. 2003) ("In the context of water rights, courts have recognized a physical taking where the government has physically diverted water for its own consumptive use or decreased the amount of water accessible by the owner of the water rights."). In such cases, state law "define[s] the dimensions of the requisite property rights for purposes of establishing a cognizable taking." Klamath Irr. Dist. v. United States, 635 F.3d 505, 511 (Fed. Cir. 2011).

California law recognizes both riparian and appropriative water rights. Riparian rights "are those that a person whose land is bounded or traversed by a natural stream has to the use of the stream or water." Westlands Water Dist. I, 153 F. Supp. 2d at 1142 n.10 (citing 62 Cal. Jur. 3d., Water § 65 at 101 (1981 & 2000 Supp.)). Plaintiffs do not contend that they possess riparian rights to the water provided to them by Reclamation.

An appropriative right "confers upon one who actually diverts and uses water the right to do so provided that water is used for reasonable and beneficial uses and is surplus to that used by riparians or earlier appropriators." SWRCB, 227 Cal. Rptr. at 168. As of 1914, the only way to acquire appropriative rights to water in California has been by invoking the administrative scheme established under California law. People v. Shirokow, 605 P.2d 859, 864 (Cal. 1980); SWRCB, 227 Cal. Rptr. at 168; see also Cal. Water Code §§ 1201, et. seq. Under that scheme, "an application for appropriative rights must now be made to the [SWRCB] for a permit authorizing construction of necessary water works and the taking and use of a specified quantity of water." SWRCB, 227 Cal. Rptr. at 168–69. If an appropriative water right is recognized, the permit holder may take and use the water subject to the terms of the permit. Id.

Plaintiffs, of course, have not sought or received permits to use the water to which they claim a right in their complaint. To the contrary, Reclamation is the owner of permits that allow it to draw upon the waters of the San Joaquin, subject to the vested priority rights of the Exchange Contractors. Plaintiffs argue, however, that Reclamation has only "nominal" title to the water, and that the water rights actually belong to the City and the District Plaintiffs, as well

as their customers, the Individual Plaintiffs, by virtue of their application of the project water to beneficial use. Pls.' Consolidated Resp. to Mot. to Dismiss ("Pls.' Resp.") at 44, ECF No. 141.

Plaintiffs find support for this theory in language contained in SWRCB Decision No. D-935, which granted Reclamation its permits to draw water from the San Joaquin River for CVP purposes. In fact, they contend that, under that decision, "[t]he City, the Districts, and the individual Plaintiffs within their District boundaries hold state-granted water rights in the beneficial use of Friant Division water." Id. at 7. They rely upon language in the decision stating that "the United States holds all water rights acquired for project purposes in trust for project beneficiaries who by use of the water on the land will become the true owners of the perpetual rights to continue such use, subject to noted exceptions." Id. at 8 (citing Cal. SWRCB Decision No. D-935 at 99). Further, Plaintiffs cite the board's statement that "[t]he right to the beneficial use of water for irrigation purposes, except where water is distributed to the general public by a private agency in charge of a public use, shall be appurtenant to the land on which said water shall be applied, subject to continued beneficial use." Id. at 50 (citing Cal. SWRCB Permit 11886 at 14–15 (June 2, 1959)).

While the Court agrees that this language is supportive of Plaintiffs' arguments, their reliance upon it is misplaced. Fourteen years ago, in SWRCB Decision D-1641 (March 15, 2000), aff'd, State Water Res. Control Bd. Cases, 39 Cal. Rptr. 3d 189 (Cal. Ct. App. 2006), the SWRCB rejected the theory that the United States is merely a trustee of the water rights it secured for project purposes, while the plaintiff in that proceeding (the Westlands Water District) as well as other consumers of the water were the true owners of those rights. It confirmed that "[t]itle to the water rights under the permits is held by [Reclamation]." Cal. SWRCB Decision No. D-1641 at 127 (Mar. 15, 2000), https://www.waterboards.ca.gov/waterrights/board_decisions/adopted_orders/decisions/d1600_d1649/wrd1641_1999dec29.pdf). Further, it explained that "even if water use is appurtenant to the enjoyment of a particular property, that does not mean that the owner of the property is the water right holder." Id. at 128. "[T]he permit language," the SWRCB observed, "does not dictate the quantity of water to be delivered to any end user." Id. "In effect," the Board found, "making the water right appurtenant to the land insofar as it is used for irrigation is a designation of a place of use of the water." Id.[10]

Further, as the SWRCB observed in No. D-1641, Plaintiffs' claimed ownership of water rights from use of irrigation water is not supported by federal law. Id. at 129 (citing Israel v. Morton, 549 F.2d 128, 132 (9th Cir. 1977)). To the contrary, Plaintiffs' theory—that the beneficial use of CVP project water by water districts and irrigators creates a property interest that exists independently of their contracts—has been repeatedly rejected by state and federal

---

[10] Plaintiffs contend that in State Water Resources Control Board Cases, the California court of appeals reversed this aspect of D-1641. Pls.' Resp. at 51–52 (citing 39 Cal. Rptr. 3d 189, 293 (Cal. Ct. App. 2006)). But the passage of the court's decision that they cite in support of this contention does not appear to address in any way the Board's rejection of the argument that irrigation districts, and not Reclamation, are the owners of water rights that arise out of their beneficial use of project water.

courts. The courts have also rejected the argument that Reclamation lacks any substantial interest in CVP water because it does not itself apply that water to beneficial use.

Thus, the courts have explained that project water is of a different legal character from water that users draw directly from streams or rivers such as the San Joaquin. It is different because project water has been diverted from the River and then stored, rediverted, and delivered through federal Reclamation facilities. As the Ninth Circuit observed in Israel v. Morton, 549 F.2d at 132, "[p]roject water . . . would not exist but for the fact that it has been developed by the United States." For that reason, "[i]t is not there for the taking (by the landowner subject to state law), but for the giving by the United States." Id. Further, "[t]he terms upon which it can be put to use, and the manner in which rights to continued use can be acquired are for the United States to fix." Id. at 132–33; see also Del Puerto Water Dist. v. U.S. Bureau of Reclamation, 271 F. Supp. 2d 1224, 1250 (E.D. Cal. 2003) (same); San Luis Unit Food Producers v. United States, 772 F. Supp. 2d 1210, 1244 (E.D. Cal. 2011), aff'd, 709 F.3d 798 (9th Cir. 2013) ("[C]ontracts for federal water service from Irrigation Districts do not create continuing 'water rights' that are enforceable, except in strict compliance with identified contracts."); Cty. of San Joaquin v. State Water Res. Control Bd., 63 Cal. Rptr. 2d 277, 285 n.12 (Cal. Ct. App. 1997) (characterizing as "highly misleading" the appellants' arguments that Reclamation "holds only legal title to the water' and 'has no substantial interest in the water'" ruling that it has "appropriative water rights in the Central Valley Project," that it "owns the CVP facilities, has operational control and responsibilities relating to flood control, water supply, power generation, and fish and wildlife mitigation," and that it "has substantial property rights in its water rights permits, whereby the Bureau diverts, transports, and stores water"); Ivanhoe Irr. Dist. v. All Parties and Persons, 350 P.2d 69, 75 (Cal. 1960) (recognizing that project water "belongs to or by appropriate action may be secured by the United States," and that "[i]n a very real sense it is or will become the property of the United States"); Westlands Water Dist. I, 153 F. Supp. 2d at 1149 (observing that "[t]he United States holds all water rights to CVP water" and that "[t]o access CVP water, water users such as [the plaintiff irrigation districts] must enter into water service contracts with the United States").

The cases upon which Plaintiffs rely to support their arguments are inapposite. A number of them involve takings claims in the context of a plaintiff's assertion of riparian rights. In Dugan v. Rank, 372 U.S. 609 (1963), for example, the taking was of plaintiff's right "to the continued flow in the San Joaquin [River] and to its use as it flows along the landowner's property." Id. at 625. In Gerlach Live Stock Co., 339 U.S. 725 (1950), the plaintiff also held riparian water rights that pre-dated the construction of the Friant Dam.

In other cases Plaintiffs cite, the landowners had appropriative rights secured by permits. In Ickes v. Fox, the landowners were required under their contracts with Reclamation to initiate the appropriation of water rights under Washington state law prior to the construction of the Yakima Project. 300 U.S. 82, 89–90 (1937). In Casitas Mun. Water District v. United States, 708 F.3d 1340, 1343 (Fed. Cir. 2013), the contract with the United States required the water district to secure appropriative rights by obtaining permits. Similarly, in H.F. Allen Orchards v. United States, it was undisputed that the plaintiff irrigators were the holders of the water rights and the focus of the court of appeals' decision was on their breach of contract claim. In none of these cases did the courts suggest that a plaintiff irrigation district or landowner could assert a property

18

right that arose exclusively out of their use of project water supplied through a contract with the federal government.

Plaintiffs' reliance on Nebraska v. Wyoming, 325 U.S. 589 (1945), and Nevada v. United States, 463 U.S. 110 (1983), is also unavailing. As the court explained in San Luis, 772 F. Supp. 2d at 1244, in both of those cases (as in Ickes) "the contracts between the United States and the landowners directly provided that the landowners either would take ownership of the water right itself, or at the very least would possess a contractual right to a fixed volume of water." Neither is true in this case. The Individual Plaintiffs are not parties to the contracts. And the contracts do not provide for the City or the District Plaintiffs to take any ownership of water rights; nor do they entitle them to a fixed volume of water. To the contrary, the contracts explicitly recognize that the contractual rights of the City and the District Plaintiffs are subordinate to the Exchange Contractors' vested water rights.

In short, none of these cases stands for the proposition that mere beneficial use of project water confers rights independent of those provided under contracts with Reclamation. Plaintiffs cannot assert property rights greater than those secured through their contracts, which give a priority to the Exchange Contractors. Indeed, as the district court observed in Westlands Water District I, "[t]he argument that a last-in-time taker of a benefit," like Plaintiffs, "can impair the rights of a first-in-time contributor who made the benefit possible," i.e., the Exchange Contractors, "defies logic and the fifty-year CVP history." 153 F. Supp. 2d at 1177.

The Court has carefully considered Plaintiffs' remaining arguments in support of their claimed water rights and finds them without merit. While the Court is not bound by the decisions of the Ninth Circuit or the district courts in California, it finds those decisions, but not Plaintiffs' efforts to distinguish them, persuasive. Therefore, it concludes that Plaintiffs have failed to establish their standing to pursue takings claims based on Reclamation's actions.[11]

## CONCLUSION

On the basis of the foregoing, the motions to dismiss of the government and the intervenors on its side are **GRANTED-IN-PART** and **DENIED-IN-PART**. The breach of contract claims of the Individual Plaintiffs (Loren Booth LLC, Matthew J. Fisher, Julia K. Fisher, Hronis Inc., Clifford R. Loeffler, Maureen Loeffler, Douglas Phillips, and Caralee Phillips) are **DISMISSED without prejudice** for lack of standing. The takings claims of all Plaintiffs are similarly **DISMISSED without prejudice** pursuant to RCFC 12(b)(1) for lack of standing.

The parties shall file a joint status report within thirty days, proposing a schedule for proceedings going forward, including discovery.

---

[11] Given the Court's determination that none of the Plaintiffs have established that they possess water rights under California law, the Court does not reach the issue of whether collateral estoppel applies to the takings claims brought by some of the District Plaintiffs. Nor does it address the arguments made by the District Intervenors concerning whether the takings claims of the Individual Plaintiffs are precluded by certain provisions of the California Water Code.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge

Appx20

# In the United States Court of Federal Claims

**FOR PUBLICATION**

No. 16-1276C
(Filed: June 6, 2022)

|  |  |  |
|---|---|---|
| **CITY OF FRESNO, *et al.*,** | ) | |
| *Plaintiffs,* | ) | |
| **v.** | ) | |
| **UNITED STATES,** | ) | Central Valley Project: |
| *Defendant,* | ) | Breach of Contract; |
| and | ) | Superior Water Rights |
| **SAN LUIS & DELTA-MENDOTA WATER AUTHORITY, *et al.*,** and **CENTRAL CALIFORNIA IRRIGATION DISTRICT, *et al.*,** | ) | |
| *Defendant-Intervenors.* | ) | |

*Nancie G. Marzulla* and *Roger J. Marzulla*, Marzulla Law, LLC, Washington, DC, for plaintiffs. With them on the briefs was *Cindy Lopez*, Marzulla Law, LLC, Washington, DC. *Craig A. Parton* and *Timothy E. Metzinger*, Price, Postel & Parma LLP, Santa Barbara, CA, Of Counsel.

*Matthew J. Carhart*, Trial Attorney, Commercial Litigation Branch, Civil Division U.S. Department of Justice, Washington, DC, for defendant. With him on the briefs were *Michael D. Granston*, Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, *Elizabeth M. Hosford*, Assistant Director, and *Vincent D. Phillips, Jr.*, Senior Trial Counsel, Commercial Litigation Branch, U.S. Department of Justice, Washington, DC. *Amy L. Aufdemberge*, Office of the Solicitor, U.S. Department of Interior, Washington, DC, Of Counsel.

*Daniel J. O'Hanlon*, Kronick, Moskovitz, Tiedemann & Girard, Sacramento, CA, for defendant-intervenor San Luis & Delta-Mendota Water Authority. *Rebecca R. Akroyd*, San Luis & Delta-Mendota Water Authority, Sacramento, CA, Of Counsel.

*Andrew E. Shipley*, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, for defendant-intervenor Westlands Water District. *Daniel S. Volchok*, *Philip E. Beshara*, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, *Jon D. Rubin*, Westlands Water District, Fresno, CA, Of Counsel.

*Anthony Fulcher*, Santa Clara Valley Water District, San Jose, CA, for defendant-intervenor Santa Clara Valley Water District.

*Thomas M. Berliner*, Duane Morris LLP, San Francisco, CA, for defendant-intervenor San Luis Water District.

*Paul R. Minasian*, Minasian, Meith, Soares, Sexton & Cooper, LLP, Oroville, CA, for defendant-intervenors San Luis Canal Company, Central California Irrigation District, Firebaugh Canal Water District, Columbia Canal Company, and San Joaquin River Exchange Contractors Water Authority.

*Ellen L. Wehr*, Grassland Water District, Los Banos, CA, for defendant-intervenor Grassland Water District.

*David T. Ralston, Jr.*, Foley & Lardner LLP, Washington, DC, for defendant-intervenors Byron Bethany Irrigation District, Del Puerto Water District and James Irrigation District. *Frank S. Murray*, *Anna S. Ross*, *Micah Zomer*, *Julia Di Vito*, Foley & Lardner LLP, Washington, DC, Of Counsel.

## OPINION AND ORDER

**BONILLA, Judge.**

Between 2012 and 2017, the State of California experienced a historic drought, prompting the Governor to declare a Drought State of Emergency from January 17, 2014, through April 7, 2017.[1]  This case arises out of the difficult decisions made by the United States Bureau of Reclamation (Reclamation) in 2014 in managing and allocating the limited supply of water regulated through the Central Valley Project (CVP); more specifically, the allocation of San Joaquin River water between and among parties with competing contractual rights while complying with federal, state, and local environmental laws and regulations.[2]

Plaintiffs, including the City of Fresno and seventeen irrigation districts in California, filed this action claiming that the decisions made by Reclamation in 2014 effected a taking of their property (in the form of water and water rights) in violation of the Fifth Amendment to the

---

[1] *See* https://www.ca.gov/archive/gov39/2014/01/17/news18368/index.html (Governor Brown Declares Drought State of Emergency) (last viewed June 2, 2022); https://www.ca.gov/archive/gov39/2017/04/07/news19748/index.html (Governor Brown Lifts Drought Emergency, Retains Prohibition on Wasteful Practices) (last viewed June 2, 2022).

[2] On January 8, 2021, plaintiffs filed a nearly identical case challenging Reclamation's *2015* water allocations. *See City of Fresno v. United States*, No. 21-375 (Fed. Cl.).  That matter is stayed pending the entry of final judgment in this case.

Appx22

United States Constitution as well as a breach of contract.[3]  ECF 128-1.  On March 25, 2020, this Court dismissed plaintiffs' takings claim for lack of standing, concluding that "none of the Plaintiffs possesses a property interest in the water supplied to them by or through Reclamation."[4]  *City of Fresno v. United States*, 148 Fed. Cl. 19, 34 (2020).  Pending before the Court are the parties' cross-motions for summary judgment on the breach of contract claim.[5]  For the reasons set forth below, plaintiffs' motion for partial summary judgment is **DENIED** and defendant's and defendant-intervenors'[6] cross-motions for summary judgment are **GRANTED** as to liability.

## BACKGROUND

### I.   HISTORICAL CONTEXT[7]

#### A.   Central Valley Project

"The [CVP] is the largest federal water management project in the United States[,]" built to reengineer natural water distribution "to serve the water needs in California's Central Valley Basin."  *Stockton E. Water Dist. v. United States*, 583 F.3d 1344, 1349 (Fed. Cir. 2009), *aff'd in part on reh'g*, 638 F.3d 781 (Fed. Cir. 2011).  Initiated by the State of California,

---

[3] Prior to the commencement of this case, a similar action was filed in the United States District Court for the Eastern District of California.  After several rulings, including a denial of a motion to transfer the case to this Court, plaintiffs voluntarily dismissed the district court action and filed suit in this Court.  *See Friant Water Auth. v. Jewell*, 23 F. Supp. 3d 1130 (E.D. Cal. 2014) (temporary restraining order denied); *Friant Water Auth. v. Jewell*, No. 1:14-CV-000765, 2014 WL 2197567 (E.D. Cal. May 27, 2014) (motion to intervene granted); *Friant Water Auth. v. Jewell*, No. 1:14-CV-000765, 2014 WL 5325352 (E.D. Cal. Oct. 17, 2014) (motion to intervene granted); *Friant Water Auth. v. Jewell*, No. 1:14-CV-000765, 2014 WL 6774019 (E.D. Cal. Dec. 1, 2014) (motion to transfer denied).

[4] The Court also dismissed the breach of contract claims brought by individual landowners for lack of standing.  *City of Fresno*, 148 Fed. Cl. at 30-31 (individual landowners were neither parties to nor third-party beneficiaries of the water supply contracts at issue).

[5] In their dispositive cross-motions, defendant and defendant-intervenors also sought summary judgment on plaintiffs' claims for expectancy damages.  In a July 30, 2021 Joint Post-Discovery Status report, moreover, the parties highlighted a series of disputes concerning the appropriate calculation of potential damages as well as expert discovery and the reliability of expert opinions.  *See* ECF 202.  During oral argument, the Court announced it would bifurcate the issues of liability and damages and defer ruling upon defendant's and defendant-intervenors' dispositive motions insofar as they addressed issues related to damages.  Tr. at 12 (Apr. 28, 2022) (ECF 226).

[6] Defendant-intervenors include: the San Luis & Delta-Mendota Water Authority along with its member districts (i.e., Westlands Water District, Santa Clara Valley Water District, Grassland Water District, San Luis Water District, James Irrigation District, Byron Bethany Irrigation District, and Del Puerto Water District) (collectively the District Intervenors); and the Central California Irrigation District, San Luis Canal Co., Firebaugh Canal Water District, Columbia Canal Co., and San Joaquin River Exchange Contractors Water Authority (collectively the Exchange Contractor Intervenors).

[7] The Court's March 25, 2020 Opinion and Order summarized the historical background and procedural history of this case.  *See City of Fresno*, 148 Fed. Cl. at 23-29.  To provide context for the analysis herein, the Court provides a brief recapitulation.

the federal government assumed control over the CVP in 1935 and, two years later, assigned construction and operational responsibilities to Reclamation. *Stockton E.*, 583 F.3d at 1349. Extending hundreds of miles through central California, the CVP comprises a complex network of dams, reservoirs, hydroelectric powerplants, canals, and other water storage and conveyance infrastructure. *Id.*; *see also United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 728 (1950). Through this network of facilities, the CVP captures, regulates, and redistributes the natural water flows of the San Joaquin River in the south and the Sacramento River in the north, refreshing arid land in the Central Valley and "mak[ing] water available where it would be of greatest service." *Gerlach Live Stock*, 339 U.S. at 728-29.

To secure the water rights necessary to construct and operate the CVP, discussed *infra*, Reclamation entered into a series of purchase contracts and exchange contracts (hereinafter "Exchange Contract")[8] with holders of water rights on the San Joaquin River. Plaintiffs thereafter entered into water-supply contracts with Reclamation to receive water through CVP's Friant Division (hereinafter "Friant Contract").[9]

In the southern portion of the Central Valley, San Joaquin River water is impounded by the Friant Dam (one of the initial CVP facilities constructed), diverted from its natural course, and forced into the Millerton Lake reservoir. *See, e.g., Westlands Water Dist. v. United States* (*Westland I*), 153 F. Supp. 2d 1133, 1146 (E.D. Cal. 2001), *aff'd*, 337 F.3d 1092 (9th Cir. 2003). From there, through the associated Friant-Kern Canal to the south and Madera Canal to the north, Reclamation is able to furnish the diverted San Joaquin River water to plaintiffs in accordance with the Friant Contract. *See generally* ECF 204-4.

Aside from reengineering water flows for irrigation and other agricultural needs, the CVP serves numerous other beneficial uses and is subject to myriad statutory and regulatory requirements regarding water usage. *See San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d 676, 682-83 (9th Cir. 2012) (discussing Reclamation's various obligations in operating the CVP). In 1992, for example, Congress passed the Central Valley Project Improvement Act (CVPIA) to, inter alia, "achieve a reasonable balance among competing demands for use of Central Valley Project water, including the requirements of fish and wildlife, agricultural, municipal and industrial and power contractors." Pub. L. No. 102–575, § 3402, 106 Stat. 4600, 4706 (1992).

---

[8] Unless otherwise specified, references to the "Exchange Contract" are citations to the 1968 "Second Amended Contract for Exchange of Waters" (ECF 204-3), operative in 2014. References to the "Exchange Contractors" are to private parties to the Exchange Contract or their successors-in-interest, including defendant-intervenors.

[9] Unless otherwise specified, citations to the "Friant Contract" herein refer to the 2010 "Contract Between the United States and Arvin-Edison Water Storage District Providing for Project Water Service from Friant Division and for Facilities Repayment" (ECF 204-4), operative in 2014. The model Friant Contract is representative of the contracts at issue for use of CVP water from the Friant Division, which are substantively identical. References to the "Friant Contractors" herein are to the private parties to the Friant Contracts at issue, namely, the remaining plaintiffs.

B.  **Substitute Water Delivery Under the Exchange Contract**

Diversion of San Joaquin River water at the Friant Dam was made possible by Reclamation's acquisition of water rights from the Exchange Contractors, who "hold riparian and pre-1914 appropriative rights to the San Joaquin River water south of Friant." *Westland I*, 153 F. Supp. 2d at 1146-47.  The acquisition was accomplished through: (1) a series of purchase agreements executed in 1939 by which the Exchange Contractors sold all of their San Joaquin River water rights to the United States, except and in excess of reserved waters measured by specified rates of flow in Schedule 1 of the contact, *see* ECF 204-1 at 4-5 (Articles 7 & 9); and (2) a series of exchange contracts simultaneously executed in 1939, which authorized the United States to "store and divert" the reserved waters in exchange for an agreement to provide "substitute water equivalent in quantity," s*ee* ECF 207-1 at 6-7 (Article 5).

The 1939 Exchange Contract was subsequently amended in 1956 and, again, in 1968. *See* ECF 204-2, 204-3.  The 1968 Exchange Contract governs Reclamation's water delivery obligations to the Exchange Contractors in 2014 (i.e., the year at issue).  Article 4(a) of the 1968 Exchange Contract, titled "Conditional Permanent Substitution of Water Supply," provides that the United States can use the San Joaquin River reserved waters "so long as, and only so long as, the United States does deliver to the [Exchange Contractors] by means of the [CVP] or otherwise substitute water in conformity with this contract."  ECF 204-3 at 7-8.  Article 8, quoted more fully below, specifies the "Quantity of Substitute Water":

> During all calendar years, other than those defined as critical, the United States shall deliver to the [Exchange Contractors] for use hereunder an annual substitute water supply of not to exceed 840,000 acre-feet in accordance with the [specified] maximum monthly entitlements[.]

*Id.* at 18-19.  During critical years where water supply is deficient, the annual delivery quantity is reduced by approximately twenty-five percent to 650,000 acre-feet.  *Id.* at 19-20.

Since 1951, Reclamation has stored and diverted the Exchange Contractors' reserved San Joaquin River water at the Friant Dam and supplied them with substitute water through the Delta-Mendota Canal.  *See* ECF 204-3 at 4-6 (Explanatory Recitals).  Until 2014, moreover, the sole source of substitute water Reclamation used to address its water delivery obligations to the Exchange Contractors was water from the Sacramento-San Joaquin River Delta.  *See, e.g.*, ECF 204-12 at 2 (press release); ECF 204-7 at 2 (allocation letter).

C.  **Water Supply Service Under the Friant Contract**

The Friant Contractors contracted with Reclamation to access water from the Friant Division, namely the San Joaquin River water impounded at the Friant Dam.  *See generally* ECF 204-4  Pursuant to Article 3(a) of the Friant Contract, "each year, consistent with all applicable State water rights, permits, and licenses, Federal law, the Settlement including

the [San Joaquin River Restoration Settlement Act (SJRRSA)[10]], and subject to the provisions set forth in Articles 12 and 13 of this Contract, the Contracting Officer shall make available" specified quantities of water to plaintiffs.  *See* ECF 204-4 at 18.  Relevant here, Article 12 of the Friant Contract provides:

> The Contracting Officer shall make all reasonable efforts to optimize delivery of the Contract Total subject to: . . . (ii) the requirements of Federal law and the [San Joaquin River Restoration] Settlement; and (iii) the obligations of the United States under existing contracts, or renewals thereof, providing for water deliveries from the [CVP].

*Id.* at 48 (Article 12(a)).

Article 13, in turn, memorializes Reclamation's agreement that, in operating the CVP, the Contracting Officer "will use all reasonable means to guard against a Condition of Shortage in the quantity of water to be made available to the [Friant Contractors]."  *Id.* at 49 (Article 13(a)).  Limiting the government's liability under this provision, Article 13(b) states:

> If there is a Condition of Shortage because of errors in physical operations of the [CVP], drought, other physical causes beyond the control of the Contracting Officer or actions taken by the Contracting Officer to meet legal obligations, including but not limited to obligations pursuant to the Settlement then, except as provided in subdivision (a) of Article 19 of this Contract, no liability shall accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising therefrom.

*Id.* at 50.  Article 19(a), in pertinent part, provides: "Where the terms of this Contract provide for actions to be based upon the opinion or determination of either party to this Contract, said terms shall not be construed as permitting such action to be predicated upon arbitrary, capricious, or unreasonable opinions or determinations."  *Id.* at 58.

Finally, Article 3(n) provides that the Friant Contractors' rights "are subject to the terms" of the Exchange Contract.  *Id.* at 24.  It further states, however, that

> The United States agrees that it will not deliver to the Exchange Contractors thereunder the water of the San Joaquin River unless and until required by the terms of [the Exchange Contract], and the United States further agrees that it will not voluntarily and knowingly determine itself unable to deliver to the Exchange Contractors entitled thereto from water that is available or that may become available to it from the Sacramento River and its tributaries or the Sacramento-

---

[10] The San Joaquin River Restoration Settlement Act, Pub L. 111-11, § 10001, 123 Stat. 991, 1349 (2009), authorized the Secretary of the Interior to implement a historic settlement to, among other things, restore river flows and salmon populations in the San Joaquin River by modifying the operations of the Friant Dam.  *See Wolfsen Lan & Cattle Co. v. United States*, 98 Fed. Cl. 507, 510-11 (2011), *aff'd sub nom. Wolfsen Land & Cattle Co. v. Pac. Coast Fed'n of Fishermen's Associations*, 695 F.3d 1310 (Fed. Cir. 2012).

San Joaquin Delta those quantities required to satisfy the obligations of the
United States under said Exchange Contract and under [the Purchase Contract].

*Id.*

Since 1962, under the Friant Contract (as drafted and thereafter amended and renewed),
Reclamation has supplied the Friant Contractors with San Joaquin River water impounded at
the Friant Dam and stored in Millerton Lake.[11]  *See* ECF 204-4 at 148 (Friant Contract
Resolution).  In dry years with deficient water supply, Reclamation allocated and distributed to
the Friant Contractors less than the quantities listed in Article 3(a).  *See* ECF 207-1 at 130-39
(historical water allocations).

## II.    2014 WATER ALLOCATIONS

Between May 2013 and May 2014, drought conditions in California intensified from
a "Category D2—Severe Drought" to a "Category D4—Exceptional Drought" (i.e., the most
severe classification listed in the U.S. Drought Monitor).[12]  ECF 204-12 at 3; *see also* ECF 207-1
at 120.  The drought caused scarce water supply with record low storage throughout California
and prompted unprecedented measures in water management.  *See, e.g.*, ECF 207-1 at 120-21.

### A.  <u>Water Allocation to the Exchange Contractors</u>

On February 15, 2014, as required under Article 8 of the Exchange Contract,
Reclamation informed the Exchange Contractors of its determination that 2014 was a critical
year, predicting that it could allocate "336,000 acre-feet rather than the maximum 650,000
acre-feet critical year entitlement."  *Id.* at 121; ECF 204-3 at 19.  In a May 13, 2014 update
letter to the Exchange Contractors, Reclamation announced that "[d]ue to continued drought
and unique hydrology, Reclamation will for the first time provide water from both Delta and
San Joaquin River sources" and "anticipates being able to meet [the] critical year demands
for the months of April through October which totals 529,000 [acre-feet]."  ECF 204-7 at 2.

As of May 14, 2014, there were 279,605 acre-feet of water stored in Millerton Lake.
ECF 204-13 at 2.  The following day, and continuing through September 2014, Reclamation
released water from the Friant Dam into the San Joaquin River for delivery to the Exchange
Contractors.  *See* ECF 204-12 at 2; ECF 207-1 at 115 (Milligan Decl. ¶ 28) ("these releasees
began May 15"); ECF 207-1 at 161 (Milligan Dep. Tr. at 119:19-22) ("October, November,
December . . . no releases were made from Millerton for [E]xchange [C]ontractor purposes.").
In total, Reclamation delivered approximately 540,000 acre-feet of water to the Exchange
Contractors in 2014, of which roughly 209,000 acre-feet were from Millerton Lake and released

---

[11] The beginning year 1962 is recorded in the representative Friant Contract submitted by plaintiffs, which involves
the Arvin-Edison Water Storage District.  *See* ECF 204-4 at 5 (3rd Explanatory Recital).

[12] Information about and a visual description of the U.S. Drought Monitor can be found at https://droughtmonitor.
unl.edu/About/WhatistheUSDM.aspx (last viewed June 2, 2022).

at the Friant Dam,[13] and the balance (roughly 331,000 acre-feet) released from the Delta-Mendota Canal.[14]

### B. Water Allocation to the Friant Contractors

On or about March 5, 2014, as required under Article 4 of the Friant Contract, Reclamation notified plaintiffs that "based upon California Department of Water Resources' February 2014 Water [Y]ear Runoff Forecast, Reclamation had determined that the Friant Division Water supply allocation was zero percent of Class 1 and zero percent of Class 2 for other than public health and safety considerations." *See* ECF 204-8 at 3; ECF 204-4 at 25 (Article 4(a)). As of May 13, 2014, the Friant Contractors' water allocation and supply remained zero. ECF 207-1 at 134. Reclamation ultimately delivered some water to plaintiffs in 2014, including "health and safety" water and "carryover" water from the previous year's allocation. *See, e.g.*, ECF 207-1 at 160 (Jackson Dep. Tr. at 116:17-117:1). The Friant Contractors also secured 6,403 acre-feet of water through transfers from the Exchange Contractors. ECF 204-9 at 4; *see also* ECF 204-5.

## III.    BREACH OF CONTRACT CLAIM

According to plaintiffs, in 2014, despite the drought, Reclamation had a substantial quantity of San Joaquin River water available in the Friant Division, which was captured at the Friant Dam and stored in Millerton Lake. ECF 128-1 at 31 ¶ 46. Plaintiffs allege, however:

> In 2014, the United States breached Plaintiffs' water supply contracts by failing to make available to them the quantities required by Article 3[(a)] of their contracts. . . .
>
> [T]he United States erroneously determined and asserted that it was required under the terms of the Exchange Contract to provide Defendant-Intervenors, the Exchange Contractors, nearly all the waters of the San Joaquin River available in the Friant Division as substitute water. . . .

*Id.* at 31-32 ¶¶ 46-47. Asserting that the Exchange Contractor allocations exceeded the contractually required amount, plaintiffs maintain that Reclamation's actions breached Articles 3(a) and 3(n) of the Friant Contract. *Id.* at 31-33 ¶¶ 45-48. For plaintiffs, the breach of contract analysis begins and ends with Articles 3(a) and 3(n) of the Friant Contract read in tandem with Article 4 of the Exchange Contract.

---

[13] The total releases at the Friant Dam were 278,400 acre-feet, but due to conveyance losses only 209,000 acre-feet reached the Mendota Pool for delivery to the Exchange Contractors. ECF 204-15 at 3 (Jackson Dep. Tr. at 39:3-18); ECF 204-14 at 2 (Steiner Dep. Tr. at 42:12-23).

[14] Although not material to the liability issues resolved herein, the record includes a slightly different accounting of the water delivered to the Exchange Contractors in 2014. *See* ECF 189-2 at 2 (Steiner Decl. ¶ 4) ("As a matter of record, in 2014 the Exchange Contractors received delivery of 551,436 acre-feet of water, a deficiency of almost 99,000 acre-feet of water.").

Appx28

Defendant and defendant-intervenors counter that under the express terms of the Friant Contract, the Exchange Contractors have superior CVP water rights to those of the Friant Contractors, and that Article 8 of the Exchange Contract required Reclamation to deliver to the Exchange Contractors the water delivered in 2014. Invoking Articles 13 and 19 of the Friant Contract, defendant and defendant-intervenors further aver that Reclamation's actions are immune or, at least, the Contracting Officer's water allocation decisions—including using San Joaquin River water as substitute water to satisfy the Exchange Contractors' superior entitlements—are subject to a highly deferential "arbitrary, capricious, or unreasonable" standard of review. Lastly, defendant and defendant-intervenors maintain that Article 4(b) of the Exchange Contract was not triggered because at no time in 2014 was Reclamation "unable" to deliver water to the Exchange Contractors from non-San Joaquin River sources.

## DISCUSSION

## I. LEGAL STANDARDS

### A. Cross-Motions for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A "genuine dispute" exists where a reasonable factfinder "could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[M]aterial fact[s]," in turn, are those that might "affect the outcome of the suit." *Id.* In deciding motions for summary judgment, particularly where, as here, the parties filed cross-motions for summary judgment, the Court must draw all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987).

The moving party bears the initial burden to demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). That burden can be met by showing "there is an absence of evidence to support the nonmoving party's case." *Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Celotex*, 477 U.S. at 325). "Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence." *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002) (citing *Anderson*, 477 U.S. at 248). Summary judgment is warranted when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587.

### B. Breach of Contract Claim

"To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989) (citations omitted). Here, the parties do not dispute

Appx29

the validity of the Friant Contract or the Exchange Contract.  Instead, the dispute centers on the interpretation of the relevant provisions in these contracts regarding Reclamation's water delivery obligations to the Friant Contractors vis-à-vis the Exchange Contractors.  "Contract interpretation is a question of law generally amenable to summary judgment."  *Varilease Tech. Grp., Inc. v. United States*, 289 F.3d 795, 798 (Fed. Cir. 2002).

In interpreting a contract, the court must begin with "the plain language of the written agreement."  *Hercules Inc. v. United States*, 292 F.3d 1378, 1380 (Fed. Cir. 2002) (citation omitted).  "If a contract provision is clear and unambiguous, the court may not resort to extrinsic evidence to interpret it."  *Premier Off. Complex of Parma, LLC v. United States*, 916 F.3d 1006, 1011 (Fed. Cir. 2019) (citing *McAbee Const. Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996)).  When the contract provision is ambiguous, the court "may appropriately look to extrinsic evidence to aid in [the] interpretation of the contract."  *Metro. Area Transit, Inc. v. Nicholson*, 463 F.3d 1256, 1260 (Fed. Cir. 2006) (citing cases).  To demonstrate ambiguity, however, "it is not enough that the parties differ in their respective interpretations of a contract term. . . .  Rather, both interpretations must fall within a 'zone of reasonableness.'"  *Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 751 (Fed. Cir. 1999) (citation and quotation omitted).

Further, the court "must interpret [a contract] as a whole and 'in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions.'"  *Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1353 (Fed. Cir. 2006) (citations omitted); *accord McAbee Const.*, 97 F.3d at 1435 ("We must interpret the contract in a manner that gives meaning to all of its provisions and makes sense.").  "An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous."  *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (citation omitted).

## II.    ALLEGED BREACH OF THE FRIANT CONTRACT

Central to plaintiffs' breach of contract claim is the nature and scope of Article 3(a) of the Friant Contract.  Titled "Water to be Made Available and Delivered to the Contractor," Article 3(a) provides:

> During each Year, consistent with all applicable State water rights, permits, and licenses, Federal law, the Settlement including the SJRRSA, and subject to the provisions set forth in Articles 12 and 13 of this Contract, the Contracting Officer shall make available for delivery to the Contractor from the Project 40,000 acre-feet of Class 1 Water and 311,675 acre-feet of Class 2 Water for irrigation and M&I purposes.  The quantity of Water Delivered to the Contractor in accordance with this subdivision shall be scheduled and paid for pursuant to the provisions of Articles 4 and 7 of this Contract.

ECF 204-4 at 18.  Plaintiffs' breach of contract claim is based upon Reclamation's failure to deliver Class I Water, defined in Article 1(d) of the Friant Contract:

> "Class I Water" shall mean that supply of water stored in or flowing through
> Millerton Lake which, *subject to the contingencies hereinafter described in
> Articles 3, 12, and 13 of this Contract*, will be available for delivery from
> Millerton Lake and the Friant-Kern and Madera Canals as a dependable water
> supply during each Year[.]

*Id.* at 10 (emphasis added).  Plaintiffs maintain that the inclusion of the obligatory phrase
"*shall* make available for delivery" in Article 3(a) of the Friant Contract entitled them to
40,000 acre-feet of Class 1 Water originating from the San Joaquin River and that Reclamation's
zero-allocation in 2014 constituted a breach.[15]

Plaintiffs attempt to bolster their argument by citing Article 3(n) of the Friant Contract,
which provides:

> The rights of the Contractor under this Contract are subject to the terms of the
> [Exchange Contract of 1939], as amended.  The United States agrees that it will
> not deliver to the Exchange Contractors thereunder waters of the San Joaquin
> River unless and until required by the terms of said contract, and the United States
> further agrees that it will not voluntarily and knowingly determine itself unable
> to deliver to the Exchange Contractors entitled thereto from water that is available
> or that may become available to it from the Sacramento River and its tributaries
> or the Sacramento-San Joaquin Delta those quantities required to satisfy the
> obligations of the United States under said Exchange Contract and under [the
> Purchase Contract of 1939].

ECF 204-4 at 24.  More specifically, plaintiffs highlight the second sentence of Article 3(n),
which constrains Reclamation's use of San Joaquin River water to satisfy its water delivery
obligations under the Exchange Contract.

Despite the contract's use of the modal verb "shall," the plain language of Article 3(a)
makes clear that the Friant Contractors' expected water deliveries are subordinate to the
following: state water rights, permits, and licenses; federal law; the SJRRSA; and, most relevant
here, "the *provisions set forth in Articles 12 and 13* of this Contract."  *See* ECF 204-4 at 18
(emphasis added).  Article 12(a), quoted more fully above, subordinates the Friant Contractors'
contractual rights to, inter alia, "the obligations of the United States under existing contracts,
or renewals thereof, providing for water deliveries from the [CVP]."  *Id.* at 48.  Article 13(b),
also quoted more fully above, further exempts Reclamation from the otherwise required
deliveries to the Friant Contractors during a "Condition of Shortage" attributable to, among other
things, "drought . . . or actions taken by the Contracting Officer to meet legal obligations."  *Id.*
at 50; *id.* at 10 ("Condition of Shortage" defined as a "condition respecting the CVP" causing a
lesser delivery).  The above-quoted definition of "Class I Water" in Article 1(d) similarly notes

---

[15] In defining "Class 2 Water," Article 1(e) of the Friant Contract contains the following disclaimer, rendering any
claimed entitlement unenforceable on its face: "Because of its uncertainty as to availability and time of occurrence,
such water will be undependable in character and will be furnished *only if, as, and when it can be made available as
determined by the Contracting Officer*[.]"  ECF 204-4 at 10 (emphasis added).

that the Friant Contractors' water delivery is "subject to the contingencies hereinafter described in Articles 3, 12, and 13 of this Contract." *Id.* at 10.

Moreover, despite the language in the second sentence of Article 3(n) relegating Reclamation's use of San Joaquin River waters under the Exchange Contract to last resort status, the first sentence reinforces the fact that the contractual rights of the Friant Contractors are subordinate to those of the Exchange Contractors. *Id.* at 24. In other words, at all times, the Exchange Contractors have a superior claim to CVP water than do the Friant Contractors. Article 3(n) simply requires Reclamation to exhaust other sources of CVP water prior to tapping into San Joaquin River water to satisfy the government's first-in-time, first-in-right delivery obligations to the Exchange Contractors. This exhaustion requirement—not negotiated as part of the Exchange Contract—nevertheless inures to the benefit of the Friant Contractors in giving them the best chance at maximum Class I water delivery by requiring Reclamation to look elsewhere first.[16] However, it does not flip the narrative and prioritize the Friant Contractors' contractual rights over the Exchange Contractors when it comes to San Joaquin River water.

The qualifying clauses included throughout the relevant articles of the Friant Contract (quoted above)—negotiated and agreed to by the Friant Contractors—curtail the impact and effect of the "shall make available for delivery" language of Article 3(a) and must be accorded proper meaning. *Metric Constructors*, 169 F.3d at 753 ("Courts prefer . . . an interpretation of a contract that gives effect to all its terms and leaves no provision meaningless.") (citing *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed. Cir. 1983)); *accord NVT Techs.*, 370 F.3d at 1159 ("When interpreting the contract, the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts.") (citing *McAbee Constr.*, 97 F.3d at 1434-35).

Review of the historical context explains the rationale for the agreement memorialized in Article 3(n). As noted above, the Friant Contractors' access to San Joaquin River water derives from the construction of the Friant Dam and the Millerton Lake reservoir as part of the complex and interrelated CVP infrastructure. San Joaquin River water impounded at the Friant Dam is the only source that Reclamation uses to supply water to the Friant Contractors, which refreshes the often-parched land tracts they and their customers occupy. *See Gustine Land & Cattle Co. v. United States*, 174 Ct. Cl. 556, 560-61, 576-78 (1966) (describing origin and planning of the CVP and uses of San Joaquin River water); ECF 204-4 at 6 (5th & 6th Explanatory Recitals). To do so, Reclamation necessarily acquired the rights to use San Joaquin River water from the Exchange Contractors. *See Gustine Land*, 174 Ct. Cl. at 579-80 (describing Reclamation's acquisition of rights from the Exchange Contractors); *Westland I*, 153 F. Supp. 2d at 1146 ("Absent the cooperation of the Exchange Contractors, this diversion [of San Joaquin River water at the Friant Dam] would not be possible . . . ."). This critical acquisition required the simultaneous execution of two contracts: a purchase of rights to water in excess of waters reserved for cropland irrigation (Purchase Contract); and a commitment to supply "substitute

---

[16] Reclamation's last resort option to use San Joaquin River water to satisfy the government's obligations under the Exchange Contract is underscored by the last sentence of Article 3(n); specifically, the contractual provision identifies alternative sources of substitute water and compels Reclamation to consider not only existing water but "water . . . that may become available." ECF at 204-4 at 24.

water" in exchange for using the reserved waters (Exchange Contract).  *See Gustine Land*, 174 Ct. Cl. at 579-581 (discussing Reclamation's agreements with the Exchange Contractors).

The right to use the San Joaquin River reserved waters acquired by the government through the 1939 Exchange Contract was and remains conditional, requiring a continuous supply of substitute water to the Exchange Contractors.  Article 7 of the original Exchange Contract, titled "Substitute Waters," provides that the United States may use the reserved waters of the San Joaquin River otherwise belonging to the Exchange Contractors "only during those periods when a substitute water supply as [therein] defined is being furnished to the [Exchange Contractors]."  ECF 207-1 at 7.  Although the phrasing of the quoted contract provision evolved in the 1956 and 1968 amendments, the Exchange Contractors retained their entitlement to a continuous supply of substitute water as a condition for allowing Reclamation to use the reserved waters.  Article 12(a) of the 1956 Exchange Contract, titled "Conditional Permanent Substitution of Water Supply," provides:

> The United States may hereafter, either in whole or in part, store, divert, dispose of and otherwise use, within and without the watershed of the aforementioned San Joaquin River, the aforesaid reserved waters of said river for beneficial use by others than the [Exchange Contractors] *so long as, and only so long as, the United States does deliver to the [Exchange Contractors] by means of the [CVP] or otherwise substitute water in conformity with this contract*.

ECF 204-2 at 6 (emphasis added).  Article 4(a) of the 1968 Exchange Contract includes identical language.  *Compare* ECF 204-3 at 7-8 *with* ECF 204-2 at 6.

By agreeing to this conditional exchange, the Exchange Contractors never relinquished their superior rights to San Joaquin River water.  In fact, the Exchange Contracts specifically preserved them.  Article 12 of the 1939 Exchange Contract, titled "Construction of Contract," pointedly states:

> This contract shall never be construed as a conveyance, abandonment or waiver of any water right, or right to the use of water of the [Exchange Contractors], or as conferring any right whatsoever upon any person, firm or corporation not a party to this contract, or to affect or interfere in any manner with any right of the [Exchange Contractors] to the use of the waters of the San Joaquin River, its channels, sloughs and tributaries, except to and in favor of the United States to the extent herein specifically provided.

ECF 207-1 at 17-18.  Identical provisions are found in the 1956 and 1968 Exchange Contracts.  *Compare id. with* ECF 204-2 at 26-27 (Article 24 of the 1956 Exchange Contract) *and* ECF 204-3 at 32 (Article 16 of the 1968 Exchange Contract).  The Exchange Contract, as originally executed and thereafter amended, also requires Reclamation to place all third parties, like the Friant Contractors, on written notice of the Exchange Contractors' reserved and superior rights when contracting for the use of San Joaquin River water, or memorialize the Exchange Contractors' superior rights in the subordinate contracts.  *See* ECF 207-1 at 14 (Article 7(k) of

the 1939 Exchange Contract); ECF 204-2 at 7 (Article 12(d) of the 1956 Exchange Contract); ECF 204-3 at 9 (Article 4(d) of the 1968 Exchange Contract).

In subsequently relegating Reclamation's use of San Joaquin River water under the Exchange Contract to last resort status in Article 3(n) of the 2010 Friant Contract, Reclamation was able to repurpose the water for the Friant Contractors' and other CVP purposes while, concomitantly, preserving the Exchange Contractors' reserved and superior rights. Nonetheless, when faced with competing demands and scarce supply, as experienced in 2014, Reclamation must afford the Exchange Contractors superior entitlement to CVP water. *See Westlands Water Dist. v. Patterson*, 864 F. Supp. 1536, 1546-47 (E.D. Cal. 1994) (discussing superiority of Exchange Contractors' contractual rights to CVP water over other contractors, including the Friant Contractors).

Article 4 of the Friant Contract, titled "Time for Delivery of Water," further undermines plaintiffs' claimed entitlement. As required under Article 4(a), in mid to late February of each year, Reclamation's Contracting Officer is required to announce to the Friant Contractors the government's "initial declaration of the Water Made Available."[17]  ECF 204-4 at 25. Updated at least monthly, the Contracting Officer's declarations are "based on then-current operational and hydrologic conditions." *Id.* The Friant Contractors, in response and in accord with Article 4(b), submit written water delivery schedules, by month, that are "satisfactory to the Contracting Officer." *Id.* Article 4(d), moreover, references the subordination clauses included in Article 3(a) and that the water delivery be made, "[p]rovided, [t]hat the total amount of water requested in that schedule or revision *does not exceed the quantities announced by the Contracting Officer . . . and the Contracting Officer determines that there will be sufficient capacity* available in the appropriate Friant Division Facilities . . . ." *Id.* at 26 (emphases added). Thus, consistent with the contractual provisions cited above, Article 4 limits Reclamation's quantitative water delivery obligations to the Friant Contractors by taking into account the Contracting Officer's assessment of current operational needs and hydrologic conditions. Reclamation's obligations are not dictated by plaintiffs' isolated, out-of-context, citation to the "shall make available for delivery" clause in Article 3(a). *See Wi-LAN USA, Inc. v. Ericsson, Inc.*, 574 F. App'x 931, 937 (Fed. Cir. 2014) ("In interpreting an unambiguous contract, the court is to consider its particular words not in isolation but in the light of the obligation as a whole and the intention of the parties as manifested thereby.") (cleaned up); *see, e.g., Tehama-Colusa Canal Auth. v. U.S. Dep't of Interior*, 819 F. Supp. 2d 956, 965, 988 (E.D. Cal. 2011) ("The Bureau [of Reclamation] has contractual authority and administrative discretion over how it provides water service among the CVP's water and power-users, and how it picks its priorities among them." (citation omitted)).

For these reasons, Article 3 of the Friant Contract, read in context and in harmony with the surrounding and interrelated contractual provisions, cannot be interpreted to entitle the Friant Contractors to Class I San Joaquin River water without regard to their documented subordination to, among other competing interests, the contractual rights of the Exchange Contractors. *See,*

---

[17] Article 1(jj) defines "Water Made Available" as "the estimated amount of Project Water that can be delivered to the Contractor for the upcoming Year as declared by the Contracting Officer, pursuant to subdivision (a) of Article 4 of this Contract[.]"  ECF 204-4 at 16.

*e.g.*, *United Int'l Investigative Servs. v. United States*, 109 F.3d 734, 738 (Fed. Cir. 1997) (rejecting contract requirements interpretation because it "conflicted facially" with another contract provision).

Plaintiffs' reliance on *Stockton East* is similarly misplaced. In *Stockton East*, relevant to Reclamation's water delivery obligation, the pertinent portion of the contract at issue provides:

> The United States shall make available to the Contractor the annual quantities of agricultural water, up to a maximum quantity of 80,000 acre-feet, as specified in the schedule submitted by the Contractor in accordance with Article 4 and the Contractor shall pay for said water in accordance with Article 5: Provided, That the United States shall make available and the contractor shall pay for, as a minimum, such quantities of agricultural water specified below:
>
> . . .
>
> [F]or years nine and 10 the minimum quantity of 56,000 acre-feet. . . . Each year beginning in the eleventh year and continuing for the remaining contract term the quantity of water schedule in the eleventh year, which quantity shall be at least equal to or greater than the quantity made available and paid for in the tenth year. . . .

*Stockton E. Water Dist. v. United States* (*Stockton IV*), 761 F.3d 1344, 1350 (Fed. Cir. 2014); *see also Stockton E. Water Dist. v. United States* (*Stockton I*), 75 Fed. Cl. 321, 364-65 (reciting and interpreting relevant contractual language). Based on the above-quoted contractual language, this Court concluded: "The Build-Up Schedule contained in Article 3 of the 1983 Contracts provides for *a minimum annual supply* that specifies that [identified] water needs are to be addressed." *Stockton E. Water Dist. v. United States (Stockton II)*, 76 Fed. Cl. 470, 488 (2007) (emphasis added); *see also Stockton E. Water Dist. v. United States (Stockton III)*, 109 Fed. Cl. 460, 466-67 (2013) (reiterating that the relevant contract provisions "provide the following Build-Up Schedule of annual minimum quantities of water (in acre-feet) that Reclamation was obligated to make available from 1993 through 2004"). Ultimately, "[t]his Court found that Reclamation's failure to provide the minimum quantities of water listed in the Build-Up Schedule violated the requirements of Article 3, but held that Reclamation would not be liable for breach if it had a valid excuse under the Contracts for its non-performance." *Stockton III*, 109 Fed. Cl. at 467 (citing *Stockton II*, 76 Fed. Cl. at 489; *Stockton I*, 75 Fed. Cl. at 365-66). On appeal, the Federal Circuit affirmed the above finding, explaining: "Based on the plain language of the contract, discussing Reclamation's obligation to 'make available' certain quantities of water, we agree with the way in which the trial court defined the breach in this case . . . ." *Stockton IV*, 761 F.3d at 1351.

The Friant Contract presented in this case differs from the contract terms at issue in *Stockton East* in at least two material aspects. First, the Class I water to be made available to the Friant Contractors, capped at 40,000 acre-feet, remained subject to the Contracting Officer's assessment of current operational needs and hydrologic conditions; in contradistinction, the *Stockton East* plaintiffs were entitled to an increasing schedule "of annual minimum quantities

of water (in acre-feet) that Reclamation was obligated to make available from 1993 through 2004." *Compare* ECF 204-4 at 18, 25 *with Stockton III*, 109 Fed. Cl. at 466-67. Second, the Friant Contractors' contractual rights are unequivocally subordinated to, among other competing interests, the contractual rights of the Exchange Contractors, whereas the water supply contracts in *Stockton East* contained no similar subordination clauses. *Compare* ECF 204-4 at 18, 24 (examined above) *with Stockton II*, 76 Fed. Cl. at 489 (annual minimum purchase and supply schedules "subject to two conditions" involving schedules to *exceed* required minimum and application of minimum requirements in relevant years).

Plaintiffs' focus on the claimed availability of 279,600 acre-feet of San Joaquin River water Reclamation pooled and stored in Millerton Lake in the Spring of 2014—the majority of which was released for delivery to the Exchange Contractors between May and September of 2014, *see* Tr. at 153-54, 176 (Apr. 28, 2022) (ECF 226)—is equally unavailing. Premised upon their interpretation of Article 3(a), plaintiffs assert that Reclamation should have made available to the Friant Contractors all water stored in Millerton Lake in excess of minimum pool requirements, 2013 carryover, and "health and safety" releases.[18] Citing Article 4(b)(2) of the Exchange Contract in support of their argument, plaintiffs maintain that Reclamation is not "required to . . . retain water in storage" in Millerton Lake for future delivery to the Exchange Contractors and, if Reclamation engages in such practices, it risks breaching the Friant Contract.

As an initial matter, simply because a contract does not *require* a certain action, it does not necessarily follow that the contract *forbids* that action. The cited language governs the action of "*retain[ing]* water in storage in Millerton Lake *during certain periods under limited circumstances of temporary interruption* under Article 4(b)(2) of the Exchange Contract, which as discussed *infra*, did not apply in 2014. As for the purposed risk, the Court finds the following. Reclamation's operational supply and deliver decisions are based upon forecasting and subject to updates based on changes in operational and hydrologic conditions. In light of the severe drought and resulting water shortage in 2014, Reclamation announced across-the-board reductions in allocations, including to both the Exchange Contractors and the Friant Contractors. *See, e.g.*, ECF 207-1 at 115-18 (Milligan Decl. ¶¶ 25, 27-28, 30-31, 37). Given the continued dry hydrology forecasted, Reclamation stored San Joaquin River water in Millerton Lake in anticipation of critical CVP needs, including compliance with the government's superior delivery obligations under the Exchange Contract over those under the Friant Contract. *See* ECF 204-8 at 12 ("Reclamation retained San Joaquin River water in storage in Millerton Reservoir in anticipation of Central Valley Project needs including the possible need for releases to the Exchange Contractors in 2014.").

If, at any time relevant hereto, forecast models predicted improved CVP water supply or an actual increase in supply materialized that permitted larger allotments, the Contracting Officer likely would have adjusted Reclamation's water delivery declaration to increase allocations to the Friant Contractors, again, *subject to* fulfillment of other superior competing

---

[18] Through a tendered expert witness, plaintiffs aver that, out of the 279,600 acre-feet water stored in Millerton Lake in the Spring of 2014, Reclamation should have allocated to the Friant Contractors all "unobligated water" deducted by volume of water below minimum pool requirements, 2013 carryover water releases, health and safety water releases, and certain other water released to the Friant Contractors. *See* ECF 214-1 at 8.

16

demands.  Indeed, despite taking priority over deliveries to the Friant Contractors, no releases were made at the Friant Dam for salmon under the SJRRSA due to other superior demands, including deliveries under the Exchange Contract.  *See* ECF 207-1 at 118 (Milligan Decl. ¶ 37); ECF 204-4 at 18 (Article 3(a)).  Given the extreme drought conditions of 2014 and the Exchange Contractors' superior entitlement to CVP water, Reclamation's last resort water supply source for the Exchange Contractors necessarily trumped the subordinated contractual rights of the Friant Contractors.

This remained true despite the fact that the sole source of water Reclamation uses to supply water to the Friant Contractors is San Joaquin River water impounded at the Friant Dam and stored in Millerton Lake.  *See* ECF 204-4 at 10 (Article 1(d) and (e) defining Class I Water and Class II Water as water supplied from Millerton Lake).  To conclude otherwise would effectively void the qualifying and subordination clauses memorialized in Articles 1(d), 3(a), 3(n), 4(d), 12(a), and 13(b) of the Friant Contract.  *See Westlands I*, 153 F. Supp. 2d at 1149 (rejecting plaintiffs' interpretation of water-supply contract because it "frustrates the necessary balancing of water rights [Reclamation] undertakes each year to discharge its statutory duty to properly operate the CVP as an integrated unit" and "violates basic principles of equity that would elevate plaintiffs, later-in-time water contractors, who have contributed very little to the creation or operation of the CVP, to an equal priority with the Exchange Contractors . . .").

At bottom, the Friant Contractors' claimed entitlement to the San Joaquin River water pooled in Millerton Lake in 2014 is contrary to the express terms of the Friant Contract as well as the Exchange Contract (further discussed *infra*).  As such, plaintiffs' breach of contract claim fails as a matter of law.  "It is a fundamental rule of contract interpretation that the provisions are viewed in the way that gives meaning to all parts of the contract, and that avoids conflict, redundancy, and surplusage among the contract provisions."  *Massachusetts Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1231 (Fed. Cir. 1997) (citations omitted).  Adherence to this fundamental principle compels this conclusion.

## III.  COMPLIANCE WITH THE EXCHANGE CONTRACT

As explained in Section II, *supra*, in addressing the Exchange Contractors' superior rights to San Joaquin River water, Article 3(n) of the Friant Contract nevertheless prohibited Reclamation from delivering San Joaquin River water to the Exchange Contractors "unless and until required by the terms of [the Exchange Contract]."  ECF 204-4 at 24.  Accordingly, to complete the assessment of whether the government breached the terms of the Friant Contract, the Court must determine whether Reclamation was required to deliver San Joaquin River water to the Exchange Contractors in 2014 to satisfy its obligations under the Exchange Contract.

To delineate Reclamation's water delivery obligations to the Exchange Contractors, the Court, again, begins with the contractual language.  The 1968 Exchange Contract, operative in 2014, recites the historical context of Reclamation's acquisition of rights to San Joaquin River water from the Exchange Contractors through, as described above, the 1939 purchase and conditional exchange.  *See* ECF 204-3 at 4-6.  Article 4(a) of the Exchange Contract, titled

"Conditional Permanent Substitution of Water Supply," restates the conditional exchange embodied in the 1956 and 1939 Exchange Contract:

> The United States may hereafter, either in whole or in part, store, divert, dispose of and otherwise use, within and without the watershed of the aforementioned San Joaquin River, the aforesaid *reserved waters* of said river for beneficial use by others than the [Exchange Contractors] *so long as, and only so long as*, the United States does deliver to the [Exchange Contractors] by means of the [CVP] or otherwise *substitute water in conformity with this contract*.

ECF 204-3 at 7-8 (emphases added); *see* ECF 204-2 at 6 (Article 12(a) of the 1956 Exchange Contract) (same); ECF 207-1 at 7 (Article 7 of the 1939 Exchange Contract) (similar). This conditional exchange initially supplied and continues to supply the water that enables the Friant Division to operate and is readily distinguishable from the Friant Contractors' water supply service purchased through payment. *See Westlands Water Dist.*, 864 F. Supp. at 1545 ("The Exchange Contract does not contemplate the same type of supply and repayment that other water districts have, as described in 43 U.S.C. § 390bb(1).").

Moreover, as explained in Section II, *supra*, in agreeing to this exchange, the Exchange Contractors never relinquished their superior rights to San Joaquin River water; on the contrary, the Exchange Contract specifically disavows any "conveyance, abandonment, or waiver" of their rights. *See* ECF 207-1 at 17-18 (Article 12 of the 1939 Exchange Contract); ECF 204-2 at 26-27 (Article 24 of the 1956 Exchange Contract); ECF 204-3 at 32 (Article 16 of the 1968 Exchange Contract). Indeed, Article 4(b) of the Exchange Contract, discussed further below, provides: "Whenever the United States is temporarily unable for any reason or for any cause to deliver to the [Exchange Contractors] substitute water from the Delta-Mendota Canal or other sources, *water will be delivered from the San Joaquin River . . . .*" ECF 204-3 at 8 (emphasis added). And, when the inability to deliver is "permanent," the Exchange Contractor "shall receive [their] reserved waters of the San Joaquin River." *Id.* at 8-9 (Article 4(c)).

The term "reserved waters," as defined and used in the Purchase Contract and Exchange Contract, refers to the San Joaquin River water the Exchange Contractors held in reserve "for the irrigation of lands and for other purposes" in certain lands downstream from the Friant Dam. *Compare* ECF 204-3 at 5-6 (Exchange Contract Recital referencing "Schedule 1" included in the Purchase Contract) *with* ECF 204-1 at 4-5 (Article 9(a) of the Purchase Contract which includes Schedule 1). "Substitute water," in turn, is broadly defined in Article 3 of the Exchange Contract as "*all* water delivered hereunder at the points of delivery hereinafter specified to the [Exchange Contractors], *regardless of source*." ECF 204-3 at 7 (emphases added).

In contrast to reserved waters measured in "mean 24-hour flow in cubic feet per second," *see* ECF 204-1 at 5 (Schedule 1), the Exchange Contract sets forth the required deliveries of substitute water in units of "acre-feet." *See* ECF 204-3 at 18-19 (Article 8). The aggregate annual amount of substitute water the Exchange Contractors are entitled to receive is dependent upon current hydrological conditions and whether, under Article 7 of the Exchange Contract, the year is deemed a "Critical Calendar Year." *See id.* at 17-18. Under Article 8 of the Exchange Contract, titled "Quantity of Substitute Water," in each calendar year "other than those defined

as critical," the Exchange Contractors are entitled to "an annual substitute water supply of not to exceed 840,000 acre-feet" broken down into monthly maximum allotments. *Id.* at 18-19. Controlling here, as the parties do not dispute that 2014 was properly determined to be a "Critical Calendar Year":

> During all calendar years defined as critical, the United States shall deliver for such use an annual substitute water supply of not to exceed 650,000 acre-feet in accordance with the following maximum monthly entitlements:

| January | 15,000 acre-feet |
|---|---|
| February | 30,000    ″    ″ |
| March | 85,000    ″    ″ |
| April | 81,000    ″    ″ |
| May | 99,000    ″    ″ |
| June | 102,000    ″    ″ |
| July | 107,000    ″    ″ |
| August | 97,000    ″    ″ |
| September | 55,000    ″    ″ |
| October | 29,000    ″    ″ |
| November | 25,000    ″    ″ |
| December | 15,000    ″    ″ |

> provided that the total for (1) the 5 months January, February, March, November and December shall not exceed 121,000 acre-feet, and (2) the total for the period April through the following October shall not exceed 529,000 acre-feet.

*Id.* at 19-20 (table graphic added for clarity). Article 8 further outlines the water allocation and delivery processes as follows. On or about February 15, Reclamation informs the Exchange Contractors of its forecast for that year (i.e., critical or non-critical) and, thereafter, shares any material updates. *Id.* at 21. In turn, the Exchange Contactors "furnish estimates of their aggregate monthly delivery requirements and their daily delivery schedules for each weekly period . . . to [Reclamation] at least 48 hours before beginning of the delivery period." *Id.* at 20-21.

Contrary to plaintiffs' argument, the phrase "not to exceed" as used in Article 8 of the 1968 Exchange Contract is not meant to denote only a *maximum* water delivery requirement, entitling the Exchange Contractors to *no minimum* substitute water. Such an interpretation ignores the interconnected provisions of the contract and, more fundamentally, undermines the foundation of the conditional exchange. *See McAbee Const.*, 97 F.3d at 1435 ("We must interpret the contract in a manner that gives meaning to all of its provisions and makes sense."); *Wi-LAN*, 574 F. App'x at 937 (quoted above).

Read as a whole and in context, Article 8 obligates Reclamation to deliver, in a critical year, quantities of substitute water in accordance with the Exchange Contractors' "estimates of their aggregate monthly delivery *requirements*," subject to corresponding "maximum monthly *entitlements*" and capped at 650,000 acre-feet. *See* ECF 204-3 at 19-21 (emphases added). The

19

terms employed—"requirements" and "entitlements"—are not discretionary. *See Entitlement*, Black's Law Dictionary (11th ed. 2019) ("An absolute right to a . . . benefit[.]"); *Requirement*, Black's Law Dictionary (11th ed. 2019) ("Something that must be done because of a law or rule; something legally imposed, called for, or demanded . . . ."). A comparison of the aggregate maximum monthly entitlements to the annualized cap, as well as an examination of the evolution of this contractual provision, further supports this conclusion.

The specified "maximum monthly entitlements" listed in Article 8 for a critical year total 740,000 acre-feet—i.e., 90,000 acre-feet *more* than the "not to exceed" annual total of 650,000 acre-feet. The perceived mathematical inconsistency is clearly intended to give the Exchange Contractors some flexibility in adjusting their monthly water supply requirements depending upon actual need while, concomitantly, providing predictability to Reclamation and capping the government's obligated delivery at the agreed upon annual maximum. Apportioned within the maximum monthly entitlements, the Exchange Contractors are entitled to demand the full complement of 650,000 acre-feet of water in a critical year and, in that case, the substitute water supply of 650,000 acre-feet would function as both the minimum and maximum Reclamation is obligated to deliver. Since the Exchange Contractors effectively "prepaid" for the maximum supply of water every year through the exchange, and there is no refund for demanding less than the annual maximum, there is little incentive for the Exchange Contractors not to demand their full entitlement.

The structural evolution of the quantitative requirements is consistent with and confirms the above interpretation and elucidates the parties' intent. *TEG-Paradigm Env't, Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006) ("Although extrinsic evidence may not be used to interpret an unambiguous contract provision, [courts] have looked to it to confirm that the parties intended for the term to have its plain and ordinary meaning.") (citing *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003)). The original 1939 Exchange Contract did not require a quantitative "acre-feet" allocation; rather, the relevant contractual provision generally obligated Reclamation to furnish "a water supply (including substitute water) equal in quantity to that reserved by [the Exchange Contractors]" based upon the natural flows in the San Joaquin River. *See* ECF 207-1 at 7 (Article 7). Through the 1956 amendments, the parties replaced the fluctuating natural flow-based requirements with more predictable and concrete schedules measured in acre-feet. *Compare id. with* ECF 204-2 at 12-18 (Articles 15-16 of the 1956 Exchange Contract). More specifically, the parties introduced the concept of a "critical year" and obligated Reclamation to deliver to the Exchange Contractors "an annual substitute water supply of 665,000 acre[-]feet . . . [d]uring all calendar years defined as critical" (855,000 acre-feet in non-critical years), according to *fixed* monthly quantities specified for each month, January through December. *See* ECF 204-2 at 14-15. As a precursor to the 1968 Amendment, subject to certain conditions, the 1956 Exchange Contract authorized the Exchange Contractors to request up-or-down percentage adjustments to the otherwise fixed monthly distributions (e.g., maximum 10% adjustment for November through the following March). *See id.* at 15-16.

The 1968 Exchange Contract maintained the critical versus non-critical year distinction and similarly reduced annual water supply requirements during critical years. However, the parties replaced the permissible monthly percentage-based adjustments with the more flexible

"maximum monthly entitlements" described above.  To implement the monthly and annual calculations of this amendment, the monthly allocations in the 1968 Exchange Contract were adjusted to those found in the table graphic above.  *Compare* ECF 204-2 at 14-15 *with* ECF 204-3 at 18-19.  The 15,000 acre-feet reduction in the annual cap regardless of whether the year is defined as critical, *compare* ECF 204-2 at 14-15 *with* ECF 204-3 at 18-19, reflects the deal reached for the additional monthly flexibility secured by the Exchange Contractors.

At bottom, under Article 8, the Exchange Contractors were entitled to demand and receive 650,000 acre-feet of CVP (substitute) water from Reclamation in 2014.  Due to the extreme drought conditions, the Exchange Contractors agreed to compromise.  Reclamation ultimately delivered approximately 540,000 acre-feet of water to the Exchange Contractors in water year 2014—roughly 110,000 acre-feet shy of the critical-year total entitlement.  Of this aggregate amount, approximately 209,000 acre-feet consisted of San Joaquin River water pooled in Millerton Lake and released at the Friant Dam.  *See* ECF 207-1 at 120-22; ECF 204-7 at 2-3; ECF 204-14 at 2 (Steiner Dep. Tr. at 42:12-23).  Because Reclamation was contractually and legally required to deliver the as-delivered CVP (substitute) water to satisfy the Exchange Contractors' water entitlements—superior to the Friant Contractors' rights—the government's compliance with the express terms of the Exchange Contract cannot constitute a breach of the Friant Contract.

In examining Reclamation's administration of the Exchange Contract, Article 4(b) proved somewhat inartfully drafted but, nevertheless, capable of harmonious interpretation with the surrounding contractual provisions and the fundamental exchange agreement.  Titled "Temporary Interruption of Delivery," the contractual provision provides: "Whenever the United States is temporarily unable for any reason or for any cause to deliver to the [Exchange Contractors] substitute water from the Delta-Mendota Canal or other sources, *water will be delivered from the San Joaquin River*" in accordance with a modified schedule outlined in subsections 4(b)(1)-(2).  ECF 204-3 at 8 (emphasis added).

Under plaintiffs' interpretation, Article 4(b) is triggered whenever Reclamation is unable to deliver the full Article 8 quantities *exclusively* from non-San Joaquin River sources; and, when Reclamation taps into the San Joaquin River to satisfy its obligations under the Exchange Contract, the Exchange Contractors receive a reduced water supply consistent with the schedule included in subsections 4(b)(1)-(2).  Plaintiffs contend that under the delivery schedule included in Article 4(b), the Exchange Contractors would have received less San Joaquin River water in 2014, leaving residual water that should have been made available to the Friant Contractors.

The government's counterargument is similarly two-fold.  First, the United States maintains that all CVP water—including San Joaquin River water—can be used as "substitute water" under the Exchange Contract to satisfy the Article 8 requirements.  *See Westlands I*, 153 F. Supp. 2d at 1166 ("The 1939 Exchange Contract commits the United States to provide substitute water to the Exchange Contractors from any source selected by Interior in its discretion, not necessarily from either the CVP or the San Luis Unit.").  Second, with regard to Article 4(b), the United States maintains that it was never triggered because Reclamation was never *unable* (temporarily or otherwise) to deliver substitute water from non-San Joaquin

21

Appx41

River sources in 2014 (albeit not the full Article 8 quantities); and Article 4(b) is only triggered when the United States is unable to deliver water at all from the Delta-Mendota Canal or other non-San Joaquin River sources.  Although initially skeptical of the government's argument, the Court's doubts waned.  In contrast to the plaintiffs' position, the government's interpretation supplies a harmonized reading of the contract as a whole.

Article 3 of the Exchange Contract, more fully quoted above, broadly defines "substitute water" as including "*all water* delivered hereunder at the points of delivery hereinafter specified to the [Exchange Contractors], *regardless of source*."  ECF 204-3 at 7 (emphases added).  Included among the "Delivery Points" listed in Article 5(d) are points along the San Joaquin River, and the Mendota Pool which receives upper San Joaquin River water for delivery.  *Id.* at 11-13.  Similarly, in addressing the quality of the substitute water to be delivered, Article 9(f) discusses the situation "[w]hen 90 percent or more of the total water being delivered to the [Exchange Contractors] is *coming from the San Joaquin River* and/or Fresno Slough, then *the quality of San Joaquin River water* at [the] Whitehouse [gauging station[19]] shall be used as the basis for quality computations."  ECF 204-3 at 25 (emphases added).  This contractual provision further provides quality computations for "[w]hen less than 90 percent of the total water being delivered to the [Exchange Contractors] is *coming from the San Joaquin River* and/or the Fresno slough . . . ."  *Id.* (emphases added).  Article 11, outlining Mendota Pool operations, further discusses the delivery of San Joaquin River water to the Mendota Pool under the contract, as well as deliveries from the Delta-Mendota Canal.  *Id.* at 27.  The contracting parties therefore contemplated and specifically addressed deliveries of San Joaquin River water as substitute water "at the points of delivery … specified" to the Exchange Contractors.  *See id.* at 7.

Although the parties to the Exchange Contract "anticipated that most if not all of the substitute water provided the [Exchange Contractors under the contract] will be delivered to them via the . . . Delta-Mendota Canal," *see id*. at 9 (Article 5(a)), this contractual provision did not foreclose the use of San Joaquin River water as substitute water.  Indeed, as quoted above, Articles 4(a) and 4(d)—sandwiching the debated Article 4(b)[20]—make clear that the Exchange Contractors are entitled to San Joaquin River water over any water service contractors, including the Friant Contractors, even though it is relegated to a last resort source under the Friant Contract.  A contrary interpretation would prioritize the clearly subordinated contractual rights of the Friant Contractors over the superior rights of the Exchange Contractors.  *Accord Westlands I*, 153 F. Supp. 2d at 1149 (rejecting water service contractors' contractual

---

[19] The Whitehouse gauging station is a San Joaquin River flow-measuring station located below the Friant Dam and above where Lone Willow Slough takes water from the San Joaquin River—the same station where the Exchange Contractors' reserved San Joaquin River waters are measured.  *See* ECF 204-1 at 5 (measurement of reserved waters at the Whitehouse gauging station); *see, e.g.*, State of California, Department of Public Works, Division of Water Resources: *Report of Sacramento-San Joaquin Water Supervision for 1953 (October 1954)*, at 106 (Table 113 showing flow records of San Joaquin River measured at Whitehouse station located at Mile 219.83R), *available at* https://cawaterlibrary.net/wp-content/uploads/2019/12/Bulletin_16__1954.pdf (last viewed June 2, 2022); *accord McFarland v. Superior Ct. of Merced Cnty.*, 194 Cal. 407, 417 (1924) (testimony describing location of the Whitehouse gauging station).

[20] As noted above, Article 4(c), inapplicable here, addresses the situation where Reclamation is "permanently unable" to deliver substitute water to the Exchange Contractors.  *See* ECF 204-3 at 8-9.

Appx42

interpretation because it "violates basic principles of equity that would elevate plaintiffs, later-in-time water contractors, . . . to an equal priority with the Exchange Contractors, senior water rights holders, who own conditionally-reserved senior and pre-existing riparian and pre–1914 appropriative water rights on the San Joaquin River," which enabled operation of the CVP).

For these reasons, the Court concludes that Reclamation necessarily tapped San Joaquin River water to satisfy the government's superior contractual and legal obligations under Article 8 of the Exchange Contract. Consequently, there was no breach of Article 3(n) of the subordinate Friant Contract. The undeniable reality is, in 2014, Reclamation was tasked with navigating competing demands for CVP water in the midst of a historic drought. *See, e.g.*, ECF 207-1 at 120-21. Despite looking elsewhere before using San Joaquin River water to meet the delivery requirements under the Exchange Contract, water scarcity left Reclamation with no other choice. *See id.* at 154 (Jackson Dep. Tr. at 62:6-8) ("Friant was the only other source that was available to Reclamation."). The Court finds that Reclamation's 2014 allocations and deliveries were in accordance with the express terms of the Exchange Contract and the Friant Contract.

## IV.    IMMUNITY UNDER THE FRIANT CONTRACT

The Court's conclusion that Reclamation did not breach the Friant Contract is further supported by the immunity clause included in the Friant Contract. Under the title "Constraints on the Availability of Water," Article 13(b) of the Friant Contract provides in relevant part:

> If there is a Condition of Shortage because of . . . *drought . . . or actions taken by the Contracting Officer to meet legal obligations*, including but not limited to obligations pursuant to the [SJRRSA] then, except as provided in subdivision (a) of Article 19 of this Contract, no liability shall accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising therefrom.

ECF 204-4 at 50 (emphases added). Article 19(a), in turn, states:

> Where the terms of this Contract provide for actions to be based upon the opinion or determination of either party to this Contract, said terms shall not be construed as permitting such action to be predicated upon arbitrary, capricious, or unreasonable opinions or determinations. Both parties, notwithstanding any other provisions of this Contract, expressly reserve the right to seek relief from and appropriate adjustment for any such arbitrary, capricious, or unreasonable opinion or determination. Each opinion or determination by either party shall be provided in a timely manner. Nothing in this Article of this Contract is intended to or shall affect or alter the standard of judicial review applicable under Federal law to any opinion or determination implementing a specific provision of Federal law embodied in statute or regulation.

*Id.* at 58. Read together, the Friant Contract effectively immunizes the government from a breach of contract claim where, as here, the Court finds that the water allocation decisions and actions of the Contracting Officer in the face of a severe drought, coupled

Appx43

with Reclamation's legal obligations under the Exchange Contract,[21] were not "arbitrary, capricious, or unreasonable."

In 2014, in addition to the negotiated reduced substitute water deliveries to the Exchange Contractors (below even critical year entitlements) and the zero allocation for the Friant Contractors, the severe drought adversely impacted Reclamation's overall CVP operations.  *See* ECF 207-1 at 153 (Jackson Dep. Tr. at 53:8-54:2) (discussing reductions in contract allocations, refuge supply and water required for winter-run salmon); *id.* at 115, 116, 118 (Milligan Decl. ¶¶ 27, 30, 37) (discussing reduction in contract allocations and deliveries, refuge supply, and restoration flows).  To be clear, a zero allocation for the Friant Contractors was harsh and, in the eyes of the Friant Contractors, patently unfair particularly since the Exchange Contractors received their maximum entitlement for the critical months of April through October.  Nonetheless, the parties' contractual arrangements and relative entitlement hierarchy do not compel a different result.

## CONCLUSION

For the reasons stated above, plaintiffs' motion for partial summary judgment (ECF 204) is **DENIED**.  Defendant's and defendant-intervenors' cross-motions for summary judgment (ECF 207, 208) are **GRANTED** as to breach of contract liability.  The Clerk is directed to **ENTER** judgment accordingly.  No costs.

**IT IS SO ORDERED**.

_____
Armando O. Bonilla
Judge

---

[21] In addition to the superior contractual obligations owed the Exchange Contractors, Reclamation constructed and operates the CVP to fulfill myriad legal obligations under federal and state law.  *See* ECF 204-4 at 5 (1st Recital); *San Luis & Delta-Mendota Water Auth.*, 672 F.3d at 682-83; ECF 207-1 at 105, 107-08, 111-13, 115-16, 118 (Milligan Decl. ¶¶ 2c, 5, 6, 8, 15-18, 27, 30-32, 37) (outlining Reclamation's federal and state legal obligations in operating the CVP and Reclamation's corresponding water allocations in 2014).

Appx44

# In the United States Court of Federal Claims

**No. 16-1276C**
**(Filed: June 7, 2022)**

**CITY OF FRESNO, et al**

      **Plaintiffs**

   **v**

**THE UNITED STATES**

      **Defendant**

   **and**

**SAN LUIS & DELTA-MENDOTA**
**WATER AUTHORITY, et al., and**
**CENTRAL CALIFORNIA**
**IRRIGATION DISTRICT, et al.,**

      **Defendant-Intervenors**

                                                                **JUDGMENT**

Pursuant to the court's Opinion And Order, filed June 6, 2022, denying plaintiffs' motion for partial summary judgment and granting defendant's and defendant-intervenors' cross-motions for summary judgment as to breach of contract liability,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that judgment is entered in favor or defendant and defendant-intervenors.

                                           Lisa L. Reyes
                                          Clerk of Court

                          By:    s/Anthony Curry

                                           Deputy Clerk

NOTE: As to appeal to the United States Court of Appeals for the Federal Circuit, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs.   Filing fee is $505.00.

Appx45

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2022-1994

**Short Case Caption:** City of Fresno v. United States

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes __12,714__ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: __10/21/2022__

Signature: /s/ Nancie G. Marzulla

Name: Nancie G. Marzulla

Save for Filing