**2022-1994**

# United States Court of Appeals for the Federal Circuit

CITY OF FRESNO, ARVIN-EDISON WATER STORAGE DISTRICT, CHOWCHILLA WATER DISTRICT, DELANO-EARLIMART IRRIGATION DISTRICT, EXETER IRRIGATION DISTRICT, IVANHOE IRRIGATION DISTRICT, LINDMORE IRRIGATION DISTRICT, LINDSAY-STRATHMORE IRRIGATION DISTRICT, LOWER TULE RIVER IRRIGATION DISTRICT, ORANGE COVE IRRIGATION DISTRICT, PORTERVILLE IRRIGATION DISTRICT, SAUCELITO IRRIGATION DISTRICT, SHAFTER-WASCO IRRIGATION DISTRICT, SOUTHERN SAN JOAQUIN MUNICIPAL UTILITY DISTRICT, STONE CORRAL IRRIGATION DISTRICT, TEA POT DOME WATER DISTRICT, TERRA BELLA IRRIGATION DISTRICT, TULARE IRRIGATION DISTRICT, LOREN BOOTH LLC, MATTHEW J. FISHER, JULIA K. FISHER, HRONIS INC., CLIFFORD R. LOEFFLER, MAUREEN LOEFFLER, DOUGLAS PHILLIPS, CARALEE PHILLIPS,

*Plaintiffs-Appellants*,
*(caption continued on inside cover)*

Appeal from the United States Court of Federal Claims
in No. 1:16-cv-01276-AOB, Judge Armando O. Bonilla

## FRIANT WATER AUTHORITY AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL

Matthew G. Adams
Samantha R. Caravello
William C. Mumby
KAPLAN KIRSCH & ROCKWELL LLP
One Sansome Street, Suite 2910
San Francisco, CA 94104
(415) 907-8704 (telephone)
madams@kaplankirsch.com
scaravello@kaplankirsch.com
wmumby@kaplankirsch.com

October 28, 2022

*Counsel for Amicus Curiae Friant Water Authority*

v.

UNITED STATES, SAN LUIS & DELTA-MENDOTA WATER AUTHORITY, SANTA CLARA VALLEY WATER DISTRICT, SAN LUIS WATER DISTRICT, WESTLANDS WATER DISTRICT, GRASSLAND WATER DISTRICT, JAMES IRRIGATION DISTRICT, BYRON BETHANY IRRIGATION DISTRICT, DEL PUERTO WATER DISTRICT, SAN JOAQUIN RIVER EXCHANGE CONTRACTORS WATER AUTHORITY, CENTRAL CALIFORNIA IRRIGATION DISTRICT, FIREBAUGH CANAL WATER DISTRICT, SAN LUIS CANAL COMPANY, COLUMBIA CANAL COMPANY,

*Defendants-Appellees*

FORM 9. Certificate of Interest

Form 9 (p. 1)
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2022-1994 |
| **Short Case Caption** | City of Fresno v. United States |
| **Filing Party/Entity** | Friant Water Authority |

**Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/28/2022

Signature: /s/ Matthew G. Adams

Name: Matthew G. Adams

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Friant Water Authority | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑     None/Not Applicable        ☐     Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐     None/Not Applicable        ☐     Additional pages attached

|  |  |  |
|---|---|---|
| City of Fresno v. United States 1:21-cv-00375-AOB (Fed. Cl.) |  |  |
|  |  |  |
|  |  |  |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable        ☐     Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ..........................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................3

ARGUMENT ......................................................................................................5

    I.  Reclamation's Obligations To The Exchange Contractors In 2014 Were Governed By Article 4(b) Of The Exchange Contract....................................5

    II. Defendants' Interpretation Of The Exchange Contract Would Render The "Exchange Of Waters" Illusory.............................................................10

    III. The Trial Court Misconstrued The Phrase "Regardless Of Source."............12

    IV. Defendants' Interpretation Of The Exchange Contract Cannot Be Reconciled With Express Terms Governing Water Storage. .......................16

    V. Even If The Arbitrary And Capricious Standard Applied, Reclamation Would Not Be Immune From Liability. ......................................................19

CONCLUSION ..................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Ace-Fed. Reps., Inc. v. Barram*,
  226 F.3d 1329 (Fed. Cir. 2000) ............................................................. 12

*Aqua Prods., Inc. v. Matal*,
  872 F.3d 1290 (Fed. Cir. 2017) ............................................................. 21

*BGT Holdings v. United States*,
  984 F.3d 1003 (Fed. Cir. 2020) ............................................................... 8

*Doty v. United States*,
  53 F.3d 1244 (Fed. Cir. 1995) ............................................................... 20

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) ................................................................. 21, 22, 23

*Freightliner Corp. v. Caldera*,
  225 F.3d 1361 (Fed. Cir. 2000) ............................................................... 7

*George Hyman Constr. Co. v. United States*,
  832 F.2d 574 (Fed. Cir. 1987) ............................................................... 17

*Granite Constr. Co. v. United States*,
  962 F.2d 998 (Fed. Cir. 1992) ................................................................. 8

*Hernandez v. Dep't of Def.*,
  325 F. App'x 905 (Fed. Cir. 2009) ......................................................... 12

*Kiewit Infrastructure W. Co. v. United States*,
  972 F.3d 1322 (Fed. Cir. 2020) ................................................... 7, 16, 17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................ 20, 21, 24

*Nat'l Ass'n of Mfrs. v. Dep't of Treasury*,
  10 F.4th 1279 (Fed. Cir. 2021) .............................................................. 24

*New Valley Corp. v. United States*,
  119 F.3d 1576 (Fed. Cir. 1997) ............................................................. 12

*Power Integrations, Inc. v. Lee*,
    797 F.3d 1318 (Fed. Cir. 2015) ............................................................20

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*,
    374 F.3d 1209 (D.C. Cir. 2004) ..........................................................24

*Ridge Runner Forestry v. Veneman*,
    287 F.3d 1058 (Fed. Cir. 2002) ...........................................................11

*United Int'l Investigative Servs. v. United States*,
    109 F.3d 734 (Fed. Cir. 1997) ...............................................................8

## INTEREST OF AMICUS CURIAE

Friant Water Authority ("Friant") is a California joint powers authority formed to operate and maintain certain federal water infrastructure within the Friant Division of the Central Valley Project ("CVP") pursuant to a long-term agreement with the United States Bureau of Reclamation ("Reclamation") and to address issues that may affect the Friant Division's water supply. Friant also works to protect the Friant Division's critical infrastructure from land subsidence caused by third-party groundwater pumping. And, together with state, federal, and environmental stakeholders, Friant helps implement the San Joaquin River Restoration Program – an historic effort to restore fish populations in the main stem of the San Joaquin River below Friant Dam while minimizing adverse effects and water supply uncertainty for water users on the east side of California's San Joaquin Valley.

Friant respectfully submits this amicus curiae brief to provide its unique perspective on the purposes, history, and operational framework of the Friant Division, including Reclamation decision-making regarding the beneficial use of San Joaquin River water. For the Court's convenient reference, a map showing the location of Friant Division facilities and service areas, along with their geographic distance and physical separation from other CVP facilities, appears below.

No counsel for any party authored this brief, in whole or in part, and no party or counsel for any party contributed money that was intended to fund preparing or

1

submitting this brief.  No person other than amicus curiae Friant Water Authority, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief.



**INTRODUCTION AND SUMMARY OF ARGUMENT**

Plain language and common sense compel reversal of the trial court's grant of partial summary judgment to the United States and Defendant-Intervenors (collectively, "Defendants") on the contract claims filed by certain water agencies and water users within the Friant Division of the CVP (the "Friant Contractors").

The plain language of the Friant Contractors' entitlement to water supplies from the Friant Division of the CVP (the "Friant Contract") prohibits Reclamation from delivering San Joaquin River water to the beneficiaries of certain contract rights (the "Exchange Contractors") "unless and until *required*" by the "Second Amended Contract for Exchange of Waters" (the "Exchange Contract") between the Exchange Contractors and the United States.

It is equally plain that the Exchange Contract only "requires" delivery of San Joaquin River water to the Exchange Contractors in case of an inability to provide "substitute water" from the Delta-Mendota Canal or other sources in conformity with the Exchange Contract – and, even then, San Joaquin River water need only be delivered in specified quantities.

And it is undisputed that in 2014, when Reclamation was temporarily unable to provide all substitute water to the Exchange Contractors from the Delta-Mendota Canal, the agency nonetheless delivered to them San Joaquin River water in amounts far exceeding both the requirements of the Exchange Contract and the River's flows.

3

Plain language confirms that Reclamation's over-delivery of San Joaquin River water to the Exchange Contractors breached the agency's obligations to the Friant Contractors. Common sense confirms the same result – when Reclamation is unable to uphold its end of the Exchange Contract, it must apply the contract provision expressly governing temporary inability to deliver substitute water. Thus, both plain language and common sense require reversal of the trial court's decision.

This amicus curiae brief addresses five topics that may be useful in reaching a resolution that is consistent with both plain language and common sense. **Part I** explains that Reclamation's obligations to the Exchange Contractors in 2014 were governed by Article 4(b) of the Exchange Contract and Defendants' arguments to the contrary cannot be reconciled with fundamental principles of contract interpretation. **Part II** shows that adopting Defendants' interpretation of the Exchange Contract would impermissibly render the agreement's "exchange of waters" illusory. **Part III** discusses the trial court's misinterpretation of the Exchange Contract's definition of "substitute water," demonstrating that the phrase "regardless of source" therein should be read as a reference to the Exchange Contractors' obligation to take as "substitute water" the flood flows from the San Joaquin River and Kings River reaching certain specified points. **Part IV** shows Defendants' interpretation of the Exchange Contract cannot be reconciled with the agreement's express terms governing water storage. And **Part V** addresses

Defendants' contentions regarding the arbitrary and capricious standard, explaining that Reclamation would not be immune from liability even if that standard applied.

## ARGUMENT

I. **Reclamation's Obligations To The Exchange Contractors In 2014 Were Governed By Article 4(b) Of The Exchange Contract.**

Article 3(n) of the Friant Contract prohibits Reclamation from "deliver[ing] to the Exchange Contractors … waters of the San Joaquin River *unless and until required* by the terms of [the Exchange Contract]." Appx368 (emphasis added). Consistent with the design of the Friant Division, Reclamation is to deliver "substitute water" to the Exchange Contractors, in amounts determined by Exchange Contract Article 8, from supplies obtained in the Sacramento River basin and conveyed through the Delta-Mendota Canal. Appx315-17, Appx326-329. Only if such deliveries are temporarily or permanently interrupted does the Exchange Contract expressly "require" delivery of San Joaquin River water to the Exchange Contractors pursuant to Exchange Contract Article 4(b) (for temporary interruptions) or 4(c) (for permanent interruptions). Appx316-317.

The parties agree there was no permanent interruption of deliveries to the Exchange Contractors in 2014. Instead, they dispute whether Reclamation was "temporarily unable" to make such deliveries under Exchange Contract Article 4(b), which sets out a specific schedule for the delivery of San Joaquin River water to the Exchange Contractors "[w]henever the United States is temporarily unable *for any*

*reason or for any cause* to deliver to the [Exchange Contractors] substitute water from the Delta-Mendota Canal or other sources." Appx316 (emphasis added). Set forth in Articles 4(b)(1) and 4(b)(2), the delivery schedule requires (i) delivery of San Joaquin River water in amounts equivalent to those set forth in Exchange Contract Article 8 for the first seven consecutive days of the applicable period; and (ii) for the remainder of the period, delivery of San Joaquin River water – including, in certain limited circumstances, stored water from Millerton Lake – in lesser quantities and rates set forth by contract. Appx316.

Appellants' Brief persuasively explains how Reclamation violated Friant Contract Article 3(n) in 2014 by delivering San Joaquin River water to the Exchange Contractors in excess of the amounts required by Article 4(b) – thereby leaving the Friant Contractors with a "zero percent" water allocation. Appellant Br. at 9-12, 21-24, 27-33.

For their part, Defendants have argued – and the trial court ultimately agreed – that Article 4(b) should be disregarded because it applies only when Reclamation is unable to deliver *any* substitute water to the Exchange Contractors from the Delta-Mendota Canal or other sources. Appx29, Appx41-43. That position must be rejected for each of four independent reasons.

First, there is no plain language limiting Article 4(b)'s applicability to situations in which Reclamation cannot deliver *any* substitute water through the

Delta-Mendota Canal or other sources. *See* Appx316. On its face, Article 4(b) applies "[w]henever the United States is temporarily unable for any reason or for any cause to deliver to the [Exchange Contractors] substitute water from the Delta-Mendota Canal or other sources." Appx316. The term "substitute water" is not modified by the term "any." Appx316. Defendants' position (and the trial court's holding) can be sustained only by adding a term that does not appear in the Exchange Contract itself. *See* Appx316. And this Court's precedent prohibits such a result. *See*, *e.g.*, *Kiewit Infrastructure W. Co. v. United States*, 972 F.3d 1322, 1330 (Fed. Cir. 2020) (rejecting federal agency interpretation that would have required a modifier not found in plain language); *Freightliner Corp. v. Caldera*, 225 F.3d 1361, 1367 (Fed. Cir. 2000) (rejecting a proffered interpretation "because it add[ed] an unnecessary interpretive gloss to the contract language").

Second, Defendants' position conflicts with the definition of "substitute water" set forth in Article 3 of the Exchange Contract. As relevant here, Article 3 defines "substitute water" as "*all* water delivered hereunder" to the Exchange Contractors at specified points of delivery. Appx315 (emphasis added). Applying that definition to Article 4(b) yields the following: "Whenever the United States is temporarily unable for any reason or for any cause to deliver to the Contracting Entities [all water delivered hereunder] from the Delta-Mendota Canal or other sources, water will be delivered from the San Joaquin River" according to the

7

specific schedules of subsections 4(b)(1) and 4(b)(2).  Appx315-316.  Thus, reading the two provisions together confirms Article 4(b) is not (as the trial court concluded) limited to situations when Reclamation cannot deliver *any* substitute water whatsoever from the Delta-Mendota Canal or other sources.  *See* Appx315-316; *see also United Int'l Investigative Servs. v. United States*, 109 F.3d 734, 737-38 (Fed. Cir. 1997) (rejecting interpretation that created conflict with another contractual term).  Rather, Article 4(b) applies whenever Reclamation cannot deliver *all* substitute water from those sources – as occurred in 2014.  *See* Appx315-316 (emphasis added).

Third, adopting Defendants' interpretation would produce absurd results and effectively write Article 4(b) out of the Exchange Contract.  If Article 4(b) were triggered only when the United States is unable to deliver *any* substitute water from the Delta-Mendota Canal or other sources, it would become a nullity – applicable only if no molecule of water remained available anywhere.  *See* Appx316.  Core principles of contract interpretation foreclose such an absurdity.  *See, e.g.*, *BGT Holdings v. United States*, 984 F.3d 1003, 1011 (Fed. Cir. 2020) (rejecting federal agency's contract interpretation "because it would produce absurd results"); *Granite Constr. Co. v. United States*, 962 F.2d 998, 1003 (Fed. Cir. 1992) (highlighting "well-established" rule that contracts must be interpreted "as a whole in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage").

8

Fourth, Defendants' interpretation of Article 4(b) cannot be harmonized with their own contention that San Joaquin River water qualifies as "substitute water" within the meaning of the Exchange Contract. As Defendants would have it, (i) Article 4(b) applies only when the United States cannot deliver *any* substitute water from the Delta-Mendota Canal or other sources; and (ii) San Joaquin River water is among the sources of substitute water. If that were true, the detailed San Joaquin River water delivery instructions in Article 4(b)(1) and 4(b)(2) would apply only when no San Joaquin River water is available for delivery – an absurd impossibility.[1] *See* Appx316. Defendants cannot have it both ways. If Article 4(b) applies only when Reclamation cannot deliver *any* substitute water, San Joaquin River water must not be a source of substitute water. Or, if San Joaquin River water is a source of substitute water, Article 4(b) must not be limited to situations in which

---

[1] Adopting Defendants' position would produce similar interpretive problems in Article 4(c), which provides "[w]henever the United States is permanently unable for any reason or for any cause to deliver to the [Exchange Contractors] substitute water in conformity with this contract, the [Exchange Contractors] shall receive the said reserved waters of the San Joaquin River as specified in [a separate contract] and the United States hereby agrees to release at all such times said reserved waters at Friant Dam." Appx316-317. If San Joaquin River water were "substitute water," there could be no circumstance in which Article 4(c) would require "release" of San Joaquin River water to the Exchange Contractors from Friant Dam.

9

Reclamation cannot deliver *any* substitute water at all. Under either scenario, Appellants' contract claim must prevail.[2]

For each of the reasons set forth above, this Court should reject Defendants' position, reverse the trial court, and find Reclamation's 2014 obligations to the Exchange Contractors were governed by Article 4(b).

## II.    Defendants' Interpretation Of The Exchange Contract Would Render The "Exchange Of Waters" Illusory.

Reclamation's 2014 implementation of the Exchange Contract rendered illusory the "exchange of waters" at the heart of the agreement. The keystone of the exchange is Article 4(a), which provides:

> The United States may hereafter, either in whole or in part, store, divert, dispose of and otherwise use … the aforesaid reserved waters of [the San Joaquin] river *for beneficial use by others than the [Exchange Contractors]* so long as and only so long as the United States does deliver to the [Exchange Contractors] … substitute water in conformity with this contract.

Appx315-316 (emphasis added). This plain language makes clear that when the United States delivers substitute water in conformity with the Exchange Contract,

---

[2] If Article 4(b) applies only when Reclamation cannot deliver *any* substitute water, San Joaquin River water cannot be "substitute water," and providing it to the Exchange Contractors as such violated Article 3(n) of the Friant Contract. If San Joaquin River water is "substitute water" then Article 4(b) must not be limited to situations in which no substitute water can be delivered, and Reclamation's provision of water in amounts exceeding those required by Article 4(b) violated Article 3(n) of the Friant Contract.

the reserved waters of the San Joaquin River are concurrently available for use by "others than" the Exchange Contractors – *i.e.*, the Friant Contractors.

As of May 14, 2014, there were 279,605 acre-feet of water stored in Millerton Lake. Appx564, Appx614-618. That water had been properly diverted from the San Joaquin River and placed into storage, and Reclamation had provided monthly deliveries of substitute water to the Exchange Contractors in consideration for those diversions. Appx564, Appx610-618. With respect to (at least) those 279,605 acre-feet, then, the Article 4(a) "exchange" was complete and water supplies were available for use by "others than the [Exchange Contractors]." Appx316.

But Reclamation read the Exchange Contract to require material quantities of the same stored water – for which, again, substitute water had already been provided – be sent back to the Exchange Contractors, without any additional consideration in return. Appx41-42, Appx560-561; *see also* Letter from Michael P. Jackson, Bureau of Reclamation, to Board of Directors, Delano-Earlimart Irrigation Dist. (Mar. 5, 2014), Addendum 1-2.[3] In doing so, Reclamation effectively rendered the "exchange of waters" illusory and void of consideration, in violation of fundamental contract principles. *See*, *e.g.*, *Ridge Runner Forestry v. Veneman*, 287 F.3d 1058, 1062 (Fed. Cir. 2002) ("It is axiomatic that a valid contract cannot be based upon the illusory promise of one party … ."). This Court has consistently rejected federal

---

[3] Substantively identical letters were sent to other Friant Contractors as well.

agency contract interpretations that would render key promises illusory.  *See*, *e.g.*, *Ace-Fed. Reps., Inc. v. Barram*, 226 F.3d 1329, 1331-32 (Fed. Cir. 2000) (rejecting interpretation that would have rendered a key term illusory); *New Valley Corp. v. United States*, 119 F.3d 1576, 1584 (Fed. Cir. 1997) (same); *Hernandez v. Dep't of Def.*, 325 F. App'x 905, 908 (Fed. Cir. 2009) (nonprecedential) (same).  The same result should be entered here.

## III.    The Trial Court Misconstrued The Phrase "Regardless Of Source."

Although the trial court's opinion paid lip service to general principles of contract interpretation (*see* Appx29-30), it failed to address or resolve the specific interpretive issues set forth in Parts I and II (*see* Appx41-43).  Instead, the trial court focused on a portion of the Exchange Contract definition of "substitute water" which refers to "water delivered hereunder at the points of delivery hereinafter specified to the Exchange Contractors, *regardless of source*."  Appx315 (emphasis added).  In the trial court's view, the contracting parties must have intended the phrase "regardless of source" to mean that Reclamation was required to deliver waters of the San Joaquin River as substitute water, in amounts greater than those set forth in Article 4(b), from supplies previously diverted and stored at Millerton Lake. Appx41-42.

Read in the context of the Exchange Contract as a whole, however, the phrase "regardless of source" clearly refers to the Exchange Contractors' obligation to

accept all water delivered to specified points of delivery, including flood flows from the San Joaquin River and the Kings River.  The trial court's construction ignored the clause immediately preceding "regardless of source," referring to "points of delivery hereinafter specified."  Appx315.  The "specification" is found in Article 5. Appx317, Appx319-321.  Article 5(a) provides that "most if not all of the substitute water provided [to the Exchange Contractors] will be delivered to them via the … Delta-Mendota Canal" and, consistent with that intent, Article 5(d) identifies in detail points of delivery for each Exchange Contractor at various "turnouts" along that Canal or at the Canal's terminus (known as "Mendota Pool").  Appx317, Appx319-321.  But the Exchange Contract also recognizes that flood flows from the San Joaquin River and/or the Kings River – the former released from Friant Dam, the latter flowing through Fresno Slough – may, in some years, reach Mendota Pool. Appx321.  And, with that in mind, Article 5(e) provides that "[w]henever *sufficient water* is available from the San Joaquin River and/or Fresno Slough to meet the needs of the [Exchange Contractors] at Mendota Pool" Reclamation "reserves the right" to "make all deliveries to the [Exchange Contractors] at that point" and "terminate deliveries though the [Canal] turnouts."[4]  Appx321 (emphasis added).

---

[4] It is worth noting that Reclamation does not allege the existence of "sufficient water" (*i.e.,* flood flows) in 2014.  And even if such water had been available, Reclamation would only have created an option to deliver San Joaquin River water – not a "requirement," as Article 3(n) of the Friant Contract clearly demands.

13

Thus, when the definition of "substitute water" is read together with Article 5, it is clear the phrase "regardless of source" does not require Reclamation to *give* the Exchange Contractors San Joaquin River water previously placed into storage in Millerton Lake; instead, it requires the Exchange Contractors to *take* all flood flows from the San Joaquin River and Kings River as "substitute water." Appx315, Appx317, Appx319-321. That makes sense. The climate of the San Joaquin Valley produces frequent flooding conditions. And while Friant Dam helps regulate that flooding, its capacity and design are not sufficient to retain all waters of the San Joaquin River in wetter years. In those years, flood flows released from Friant Dam into the bed of the San Joaquin River and/or Kings River flood flows through Fresno Slough regularly reach the Exchange Contractors at Mendota Pool.[5] Indeed, Defendant-Intervenors have acknowledged that such flood flows "have historically been used to meet the demands of the [Exchange Contractors]."[6] If flood flows did

---

[5] Page 13-18 of Reclamation's 2011 Draft Program Environmental Impact Statement/Report ("EIS/R") for the San Joaquin River Restoration Program ("SJRRP") identifies such flows in more than one-third of the 15 years prior. *See* U.S. Bureau of Reclamation, Draft Program Environmental Impact Statement/Report for the San Joaquin River Restoration Program at 13-18 (2011), Addendum 4. The Draft EIS/R is available at https://www.usbr.gov/mp/nepa/includes/documentShow.php?Doc_ID=7563. The Draft EIS/R is a federal agency document available on Reclamation's website, and its contents are not reasonably subject to dispute.

[6] Defendant-Intervenor the San Luis and Delta-Mendota Water Authority confirmed as much in a letter to Reclamation regarding the SJRRP. The letter appears (cont'd)

not count toward Reclamation's obligation to make available "substitute water," the Exchange Contractors would receive an unwarranted surplus.

The trial court also cited Article 9(f) (addressing water quality) and Article 11 (addressing operation of Mendota Pool) in support of its interpretation of "regardless of source." Appx42. But a close look at those provisions supports the understanding that "regardless of source" simply refers to circumstances where flood flows reach Mendota Pool. The critical language in Article 9(f) establishes water quality standards "[w]hen 90 percent or more of the total water being delivered to the [Exchange Contractors] is coming from the San Joaquin River and/or Fresno Slough." Appx333. Likewise, Article 11 addresses Mendota Pool operations when "water is being delivered … from the San Joaquin River and/or Fresno Slough." Appx335. Thus, in both phrasing and effect, Articles 9(f) and 11 confirm an understanding that Mendota Pool deliveries from the San Joaquin River would arise in circumstances similar to Mendota Pool deliveries from Fresno Slough. And Fresno Slough deliveries are only relevant in the context of flood flows. Reading "regardless of source" as a reference to flood flows reaching Mendota Pool therefore

---

on page 3.8-665 of the 2012 Final EIS/R for the SJRRP, which is available at https://www.usbr.gov/mp/nepa/includes/documentShow.php?Doc_ID=10477. *See* U.S. Bureau of Reclamation, Final Program Environmental Impact Statement/Report for the San Joaquin River Restoration Program at 3.8-665 (2012), Addendum 9. The Final EIS/R is a federal agency document available on Reclamation's website, and its contents are not reasonably subject to dispute.

maintains harmony throughout the Exchange Contract and avoids the interpretive conflicts discussed in Parts I and II, above.

## IV. Defendants' Interpretation Of The Exchange Contract Cannot Be Reconciled With Express Terms Governing Water Storage.

Defendants' interpretation of the Exchange Contract should also be rejected because it cannot be reconciled with express terms governing water storage. Providing the Exchange Contractors with substitute water from supplies stored at Millerton Lake would effectively grant them storage rights in that Friant Division facility (which they have not paid to construct or maintain). But the only Exchange Contract term even arguably authorizing storage of water for the Exchange Contractors in any Friant Division facility is Article 4(b), which all Defendants have vigorously disclaimed. *See* Appx41-42. Having done so, they cannot reasonably claim any storage for the Exchange Contractors.

Nor would it be proper to find an implied storage right in favor of the Exchange Contractors (or against Reclamation). The drafters of the Exchange Contract knew how to provide for storage when they meant to provide for storage. *See* Appx316. And the express terms of the agreement do not provide for (much less require) Reclamation to store San Joaquin River water for future delivery to the Exchange Contractors. *See* Appx315-16, Appx326-29. This Court should decline Defendants' invitation to re-write the Exchange Contract to provide Millerton Lake storage for the Exchange Contractors. *See Kiewit*, 972 F.3d at 1330 (refusing to add

16

terms to the plain language of an agreement); *George Hyman Constr. Co. v. United States*, 832 F.2d 574, 581 (Fed. Cir. 1987) ("If we accepted this argument, we would have to rewrite the contract, and insert words the parties never agreed to, which we do not have the authority to do.")  If the Exchange Contractors wanted storage in Millerton Lake, "[they] should have included contract language to that effect." *Kiewit*, 972 F.3d at 1330.

Requiring Reclamation to store San Joaquin River water for future delivery to the Exchange Contractors would be particularly inappropriate given the substantial sums expended by the Friant Contractors on CVP facilities.  The Friant Contractors have fully repaid the United States for their share of construction costs for the CVP, including the Friant Division (approximately $306 million).[7]  They have also paid a special charge for the capital costs of certain facilities within the CVP's San Luis Unit that are used to provide substitute water to the Exchange Contractors from the Delta-Mendota Canal (approximately $47 million).[8]  In addition, Friant Contractors

---

[7] These costs are published on Friant's website.  *See* Friant Water Authority, *Background and History Regarding Allocation of Central Valley Project Construction and Operations, Maintenance, and Replacement Costs to Friant Division Contractors* (Oct. 2022), https://friantwater.org/s/Friant-Costs-History-Oct2022.pdf.

[8] These costs are published on Friant's website.  *See* Friant Water Authority, *Background and History Regarding Allocation of Central Valley Project Construction and Operations, Maintenance, and Replacement Costs to Friant Division Contractors* (Oct. 2022), https://friantwater.org/s/Friant-Costs-History-Oct2022.pdf.

fund annual Operation, Maintenance and Repair ("OM&R") for the Friant Division and certain San Luis Unit facilities (approximately $24 million per year, on average, over the last decade).[9]   Moreover, they are responsible for extraordinary OM&R costs for larger repair projects (for example, a $131.25-million share of current repairs to the Friant-Kern Canal)[10] increasingly needed as Friant Division infrastructure enters its seventh decade of service.   All these sums have been expended in the reasonable expectation that Reclamation would honor the express terms of the Friant Contract and Exchange Contract and allow Friant Contractors their full use of Friant Division facilities.  It would be deeply inequitable if, now that the Friant Contractors have made their payments, the Exchange Contract were belatedly interpreted to require Reclamation to store water for the Exchange Contractors in Friant Division facilities.

---

[9] These costs are published on Friant's website.  *See* Friant Water Authority, *Background and History Regarding Allocation of Central Valley Project Construction and Operations, Maintenance, and Replacement Costs to Friant Division Contractors* (Oct. 2022), https://friantwater.org/s/Friant-Costs-History-Oct2022.pdf.

[10] This cost is set forth in a contract between Friant and the United States, which is published on Friant's website.  *See* Contract Between the United States of America and Friant Water Authority for the Repayment of Extraordinary Maintenance Costs for the Friant-Kern Canal Middle Reach Capacity Correction Project (2021), https://friantwater.org/s/21-WC-20-5855_Repayment-Contract-MRCCP_092321.pdf.

**V.     Even If The Arbitrary And Capricious Standard Applied, Reclamation Would Not Be Immune From Liability.**

Articles 13(b) and 19(a) of the Friant Contract limit Reclamation's liability in certain narrowly defined circumstances. Appx394, Appx402. Article 13(b) identifies the circumstances: "a Condition of Shortage because of errors in physical operations of the Project, drought, other physical causes beyond the control of the Contracting Officer or actions taken by the Contracting Officer to meet legal obligations."[11] Appx394. And the two Articles, read together, define the limits of liability: "no liability shall accrue against the United States" (Appx394) unless its actions are "arbitrary, capricious, or unreasonable" (Appx402).

Appellants' Brief persuasively demonstrates that none of the relevant circumstances was present in 2014 – although Reclamation imposed a Condition of Shortage on Friant Contractors that year, the agency has not invoked "drought" as an affirmative defense in the litigation and its actions were not, in fact, required to meet "legal obligations." Appellant Br. at 40-45; *see also id*. at 19-35 (addressing legal obligations). Accordingly, this Court need not apply the "arbitrary and capricious" standard.

---

[11] "Condition of Shortage" means "a condition … such that the Contracting Officer is unable to deliver sufficient water to meet [a Friant Contractor's] Contract Total." Appx354. The "Contract Total," in turn, refers to the maximum amount of water available for delivery to each Friant Contractor under Article 3(a) of its Friant Contract. Appx355. It is undisputed that Reclamation imposed a Condition of Shortage on Friant Contractors in 2014.

19

But even if the arbitrary and capricious standard applied, Reclamation would not be immune from liability. Indeed, its actions were arbitrary and capricious in multiple respects.

As an initial matter, the arbitrary and capricious standard provides that an agency's decision may only be upheld on the grounds articulated in the decision itself. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983); *Doty v. United States*, 53 F.3d 1244, 1251 (Fed. Cir. 1995). *Post hoc* rationalizations by appellate counsel do not suffice. *State Farm,* 463 U.S. at 50; *see also Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1326 (Fed. Cir. 2015) ("We have no warrant to accept appellate counsel's *post hoc* rationalizations for agency action or to supply a reasoned justification for an agency decision that the agency itself has not given." (internal citations omitted)). Here, Reclamation never issued anything resembling a formal, written decision explaining its actions. To the extent the agency's decision was memorialized at all, it was in a pair of notices: (i) a May 13, 2014, notice to the Exchange Contractors – a few scant paragraphs barely covering a single page – summarily announcing that "Reclamation will for the first time provide water from both Delta and San Joaquin River sources" under the Exchange Contract (Appx1660-1661); and (ii) a notice to the Friant Contractors announcing the Friant Division's annual water supply allocation would be "zero percent" (Addendum 1; *see also* Appx1144, Appx1873). Neither notice analyzes,

discusses, reviews, or even mentions any of the legal bases on which Defendants have now urged the courts to affirm the agency's 2014 actions. *See* Appx1660-1661; Addendum 1-2. And, for that reason alone, those actions cannot survive arbitrary and capricious review. *State Farm*, 463 U.S. at 50; *see also Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1325 (Fed. Cir. 2017) ("[T]he agency must 'articulate a satisfactory explanation' of its reasoning; it many not simply a provide conclusion." (citation omitted)).

Reclamation's 2014 actions were also arbitrary and capricious because they represent an unexplained change in agency position. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016). As noted above, Friant plays a key role in implementation of the San Joaquin River Restoration Program ("SJRRP") – an historic effort to restore salmon populations in the San Joaquin River while maintaining a stable supply of surface water for the east side of the San Joaquin Valley. Appx26 n.10. Reclamation's initial draft environmental review for the SJRRP included an over-broad description of the Exchange Contract, creating ambiguity about the agency's interpretation of Article 4(b).[12]   In response to

---

[12] The text is found on page 2-22, lines 10-14, of the 2011 Draft EIS/R available at https://www.usbr.gov/mp/nepa/includes/documentShow.php?Doc_ID=7557. *See also* Addendum 3. The Draft EIS/R is a federal agency document available on Reclamation's website, and its contents are not reasonably subject to dispute.

questions from Friant and the Exchange Contractors (among others),[13] Reclamation clarified its position in 2012: "Releases from Friant Dam for delivery to the San Joaquin River Exchange Contractors via the San Joaquin River" would be made "in accordance with Article 4.b of the San Joaquin River Exchange Contract."[14]  The agency took precisely the opposite position in 2014, releasing water from Friant Dam for delivery to the Exchange Contractors while refusing to apply Article 4(b).  Appx41-42.  Worse, it provided no explanation or justification for the change.  Addendum 1-2; Appx1660-1661.  Such "'unexplained inconsistency' in agency policy" is arbitrary and capricious.  *Encino Motorcars*, 579 U.S. at 222 (citation omitted).  An agency "must at least display awareness that it is changing position and show that there are good reasons for the new policy."  *Id*. at 221 (cleaned up).  And, when changing position, an agency "must also be cognizant" that its prior policy "may have 'engendered serious reliance interests *that must be taken into*

---

[13] Relevant Friant comments are on page 3.8-405 of the 2012 Final EIS/R, available at   https://www.usbr.gov/mp/nepa/includes/documentShow.php?Doc_ID=10476. *See* Addendum 8.  Relevant Exchange Contractor comments are on page 3.8-110 of the        2012        Final        EIS/R,        available        at https://www.usbr.gov/mp/nepa/includes/documentShow.php?Doc_ID=10474.  *See* Addendum 5.  The Final EIS/R is a federal agency document available on Reclamation's website, and its contents are not reasonably subject to dispute.

[14] Reclamation's response is on Final EIS/R pages 3.8-247 to 248, available at https://www.usbr.gov/mp/nepa/includes/documentShow.php?Doc_ID=10475.  *See* Addendum 6-7.  The Final EIS/R is a federal agency document available on Reclamation's website, and its contents are not reasonably subject to dispute.

*account.*'" *Id*. at 222 (emphasis added) (citation omitted).  Reclamation did none of those things in 2014.

The net result of Reclamation's 2014 actions further confirms the agency acted arbitrarily and capriciously.  The heart of the Exchange Contract is an exchange of waters: the United States obtained rights to use the waters of the San Joaquin River and the Exchange Contractors obtained rights to a substitute supply from elsewhere.  Appx314, Appx315-316.  When the United States cannot uphold its side of the exchange, it makes sense to allow the Exchange Contractors to return to their prior circumstance – that is, to receive the flows of the unimpaired San Joaquin River.  Appx314, Appx315-316.  But in 2014 Reclamation delivered to the Exchange Contractors all available substitute water from the Delta-Mendota Canal *in addition to* stored water from Millerton Lake (*i.e.,* San Joaquin River water for which substitute water had previously been provided).  *See* Part II, *supra*.  In essence, Reclamation interpreted the Exchange Contract to give the Exchange Contractors both sides of the "exchange."  As a result, deliveries to the Exchange Contractors in 2014 far exceeded the natural flows of the San Joaquin River – the basis for their original entitlement.  Appx25, Appx312-314, Appx610-633; *see also* Appx288 (original Exchange Contract describing water to be delivered to Exchange Contractors as "equal in quantity" to that which "would be flowing in the San Joaquin River … in the absence of operation by the United States").  Such a result

is arbitrary and capricious on its face. *See, e.g.*, *Nat'l Ass'n of Mfrs. v. Dep't of Treasury*, 10 F.4th 1279, 1283, 1287-88 (Fed. Cir. 2021) (agency action producing absurd or irrational results is arbitrary and capricious).

If further evidence of Reclamation's arbitrary and capricious decision-making were needed, it could readily be found in the agency's failure to address Articles 12(a) and 13(a) of the Friant Contract. Article 12(a) requires the agency to "make *all reasonable efforts* to optimize" deliveries to Friant Contractors. Appx392 (emphasis added). Article 13(a) requires Reclamation to use "*all reasonable means* to guard against*" a shortage in "the quantity of water to be made available" to Friant Contractors. Appx393 (emphasis added). These provisions direct Reclamation to use every tool at its disposal to protect the Friant Division's water supply. But the agency's decision documents fail to reference them at all. Addendum 1-2; Appx1660-1661. In fact, there is no contemporaneous evidence that Reclamation took any steps to carry out – or even consider – its responsibilities under Articles 12(a) and 13(a). That, too, is arbitrary and capricious. *See, e.g.*, *State Farm*, 463 U.S. at 43 (agency action is arbitrary and capricious if it fails "to consider an important aspect of the problem"); *Pub. Citizen v. Fed. Motor Carrier Safety Admin*., 374 F.3d 1209, 1216 (D.C. Cir. 2004) (failure to address relevant requirements is arbitrary and capricious).

24

# CONCLUSION

For the reasons set forth above and in Appellants' Brief, the trial court's summary judgment in favor of Defendants should be reversed.

Dated: October 28, 2022

Respectfully submitted,

 /s/ Matthew G. Adams
Matthew G. Adams
Samantha R. Caravello
William C. Mumby
KAPLAN KIRSCH & ROCKWELL LLP
One Sansome Street, Suite 2910
San Francisco, CA 94104
(415) 907-8704 (telephone)
(415) 907-8717 (facsimile)
madams@kaplankirsch.com
scaravello@kaplankirsch.com
wmumby@kaplankirsch.com

*Counsel for Amicus Curiae Friant Water Authority*

# ADDENDUM

# TABLE OF CONTENTS

Letter from Michael P. Jackson, Bureau of Reclamation,
to Board of Directors, Delano-Earlimart Irrigation Dist.
(Mar. 5, 2014) ............................................................................ Addendum 1

U.S. Bureau of Reclamation, Draft Program Environmental
Impact Statement/Report for the San Joaquin River Restoration
Program (2011) (Excerpts) ......................................................... Addendum 3

U.S. Bureau of Reclamation, Final Program Environmental
Impact Statement/Report for the San Joaquin River Restoration
Program (2012) (Excerpts) ......................................................... Addendum 5



# United States Department of the Interior

BUREAU OF RECLAMATION
Mid-Pacific Region
South-Central California Area Office
1243 N Street
Fresno, CA 93721-1813

IN REPLY REFER TO:
SCC-440
WTR-4.00

MAR 0 5 2014

Board of Directors
Delano-Earlimart Irrigation District
14181 Avenue 24
Delano, CA 93215

Subject: Notice of 2014 Contract Year Water Allocation Friant Division, Central Valley Project (CVP), California

Dear Board Members:

The Bureau of Reclamation (Reclamation) has announced the initial 2014 Contract Year water supply allocation for Central Valley Project contractors in the Friant Division. Based upon California Department of Water Resources' (DWR) February 2014 Water Year Runoff Forecast, Reclamation has determined the Friant Division water supply allocation is **zero percent of Class 1** and **zero percent of Class 2** for other than public health and safety considerations.

Current water supply conditions throughout the State of California are uncharacteristically dry, with a very low probability of full recovery to normal conditions this water year. On January 17, 2014, Governor Edmund G. Brown, Jr. declared a Drought State of Emergency for the State of California, and on January 31, 2014, DWR announced a zero percent allocation for all 29 public water agencies that buy from the State Water Project. Additionally, on February 14, 2014, President Barack Obama came to Fresno to discuss the drought with farmers and other interested parties.

The state is entering the third consecutive year of below average precipitation and snowmelt runoff. 2013 proved to be one of the driest years on record for many areas of California and 2014 is one of the driest to date. Many of the state and federal natural resource agencies are implementing unprecedented measures in response to this severe drought condition. It is imperative that management of the record low storage levels is carried out in a manner that maximizes conservation throughout the year to assure at a minimum that all aspects of public health and safety are not compromised.

The following is just a snapshot of the actions Reclamation is taking in response to the 2013-14 drought:

- On December 31, 2013, created a Reclamation drought team to track and address all water resource areas affected by the drought and to timely communicate status to the public;
- On January 29, 2014, filed a joint petition with DWR, to the California State Water Resources Control Board requesting a Temporary Urgency Change in License and Permit Terms;

ADDENDUM 001

- On or about January 29, 2014, sent letters to all Central Valley Project Municipal and Industrial users requesting updated information for purposes of calculating unmet public health and safety water demands;
- On February 4, 2014, Reclamation released the 2014 Water Plan which identifies specific measures that are being undertaken in response to the current drought conditions;
- Convene weekly meetings with DWR to identify all opportunities for facilitating water transfers and exchanges between the state and federal water projects; and
- Partner with the Natural Resource Conservation Service to secure federal funding for water districts to conserve water and improve water management.

Reclamation previously sent to all Friant Division contractors, a request to provide information to enable Reclamation to calculate each contractor's public health and safety (PHS) demands. Based on your response, Reclamation has calculated the PHS allocation for Delano-Earlimart Irrigation District to be zero acre-feet (AF).

Therefore, consistent with the enclosed February 21, 2014, press release and Article 4 of your contract with Reclamation, this letter serves as notice of the 2014 Contract year allocation of zero AF. Pursuant to Article 4 of your contract, Reclamation will update the 2014 water allocation monthly and more frequently if necessary, consistent with the most recent operational and hydrologic conditions.

If you have any questions, please contact, Mr. Scott Taylor, Repayment Specialist, at 559-487-5504, staylor@usbr.gov, or at 800-735-2929 for the hearing impaired.

Sincerely,

Michael P. Jackson, P.E.
Area Manager

Enclosure

cc: Mr. Ronald D. Jacobsma
    General Manager
    Friant Water Authority
    854 North Harvard Avenue
    Lindsay, CA 93247-1715
    (w/o enclosure)

1   the Secretary, in consultation with the RA, determines that such flows are not needed.
2   Flushing flows would be accomplished with a quantity of water based on an average flow
3   of 4,000 cfs from April 16 to 30, and include a peak release as close to 8,000 cfs as
4   possible for several hours, within the constraints of channel capacity. The Settlement also
5   includes the following provisions to modify Restoration Flows, in consideration of
6   recommendations to be made by the RA: application of flexible flow periods, as
7   described in Exhibit B of the Settlement; the use of a 10 percent buffer flow to help meet
8   the Restoration Goal; and the release of acquired water for unanticipated river seepage
9   losses for Restoration Flows.

10  Reclamation and the San Joaquin River Exchange Contractors have entered into a Second
11  Amended Contract for Exchange of Waters (Contract Ilr-1144) (San Joaquin River
12  Exchange Contract), dated February 14, 1968. Under the terms and conditions of that
13  contract, Reclamation is obligated to make available required deliveries from the
14  Delta-Mendota Canal (DMC) or releases from Millerton Reservoir. If Reclamation makes
15  deliveries to the San Joaquin River Exchange Contractors via the San Joaquin River,
16  these water deliveries would have a higher priority for channel capacity over Interim or
17  Restoration flows. Therefore, Interim and Restoration flows would be reduced, as
18  necessary, to provide channel capacity for water delivery to the San Joaquin River
19  Exchange Contractors via the San Joaquin River. However, it is important to note that
20  under Article 3(n) of the Friant Division long-term water service contracts and the
21  recently executed Friant Division repayment contracts, "The United States agrees that it
22  will not deliver to the Exchange Contractors thereunder waters of the San Joaquin River
23  unless and until required by the terms of said contract, and the United States further
24  agrees that it will not voluntarily and knowingly determine itself unable to deliver to the
25  Exchange Contractors entitled thereto from water that is available or that may become
26  available to it from the Sacramento River and its tributaries or the Sacramento-San
27  Joaquin Delta those quantities required to satisfy the obligations of the United States
28  under said Exchange Contract and under Schedule 2 of the Contract for Purchase of
29  Miller and Lux Water Rights (Contract I1r-1145, dated July 27, 1939)."

30  **Minimize Flood Risk from Interim and Restoration Flows.**  Throughout Settlement
31  implementation, the maximum downstream extent and rate of Interim and Restoration
32  flows to be released would be limited to then-existing channel capacities. As channel or
33  structure modifications are completed with additional environmental compliance,
34  maximum Interim Flow releases would be correspondingly increased in accordance with
35  then-existing channel capacities and with the release schedule. Consistent with the Act,
36  Interim Flows would be reduced, as needed, to address material seepage impacts, as
37  identified through the monitoring program (see Appendix D, "Physical Monitoring and
38  Management Plan"). If release of water from Friant Dam is required for flood control
39  purposes, concurrent Interim and Restoration flows would be reduced by an amount
40  equivalent to the required flood control release. If flood control releases from Friant
41  exceed the concurrent scheduled Interim and Restoration flows, no additional releases
42  above those required for flood control would be made for SJRRP purposes.

43

1    ***Reach 2***
2    Reach 2 marks the end of the incised channel, and is a meandering channel of low
3    gradient. Reach 2 is subdivided into two subreaches, 2A and 2B, at the Chowchilla
4    Bypass Bifurcation Structure. Reach 2 is typically dry; flows reach the Mendota Pool
5    from Reach 2B or from the Fresno Slough only during periods of flood management
6    releases. Flood flows in the San Joaquin and/or Kings rivers occurred at the Mendota
7    Pool in 1997, 2001, 2005, and 2006. At all other times, the DMC is the primary source of
8    water to the Mendota Pool. The Mendota Pool delivers water to the San Joaquin River
9    Exchange Contractors Water Authority, other CVP contractors, wildlife refuges and
10   management areas, and State water authorities. The Mendota Pool provides no long-term
11   storage for water supply operations or flood management. Diversions for Reach 2 are
12   listed in Appendix J, "Surface Water Supplies and Facilities Operations."

13   Reach 2 ends at Mendota Dam, and the Mendota Pool backwater extends up a portion of
14   this subreach. The Mendota Pool averages about 400 feet wide, is generally less than 10
15   feet deep, and has a total capacity of about 8,500 acre-feet (Reclamation 2004). Mendota
16   Dam, built in 1917, is owned and operated by the Central California ID. Mendota Dam is
17   a flashboard and buttress dam 23 feet high and 485 feet long; the crest elevation is 168.5
18   feet.

19   The primary function of the Mendota Pool is to distribute water from the DMC and San
20   Joaquin River to local diversion points. Manual gates and flashboards are opened or
21   removed during periods of high flow to reduce seepage impacts on land surrounding
22   Mendota Pool. A fish ladder exists at Mendota Dam, but has been inoperable for the last
23   several decades.

24   **Reach 2A.**   Reach 2A is typified by the accumulation of sand caused in part by
25   backwater effects of the Chowchilla Bypass Bifurcation Structure and by a lower gradient
26   relative to Reach 1. Gravelly Ford has high percolation losses, and flow is less than 50 cfs
27   approximately 50 percent of the time (see Appendix J, "Surface Water Supplies and
28   Facilities Operations"). Under steady-state conditions (i.e., losses are calculated under
29   extended periods of steady flow), flow does not reach the Chowchilla Bypass Bifurcation
30   Structure when discharge at Gravelly Ford is less than 75 cfs (McBain and Trush 2002).

31   Reach 2A has a design channel capacity of 8,000 cfs to accommodate controlled releases
32   from Friant Dam. Agricultural return flows within this reach are minor. Ten water
33   diversions are located along this reach. Reach 2A has also been subject to local sand
34   mining, although this has not caused the extensive channel degradation seen in Reach 1.
35   Table 13-13 lists the gage located in this reach segment, its period of record, and average
36   and maximum daily average streamflow. Figure 13-11 shows historical annual average
37   flow at the gage. Table 13-14 shows historical average monthly flow at the gage. An
38   exceedence curve and a rating table for the San Joaquin River at Gravelly Ford gage is
39   shown in Appendix J, "Surface Water Supplies and Facilities Operations."

DuaneMorris

Ms. Alicia Forsythe
Ms. Fran Schulte
September 21, 2011
Page 34

EC1-67
cont'd
the Chowchilla Bypass Bifurcation Structure will not occur May 1 – December 1, 2011 – 2012 as the construction activities in paragraph 11(a) will not have commenced. There is no discussion of lack of funding regarding the facilities specified in paragraph 11(a). Similarly, at page 2-20, line 5, it states that full Restoration Flows are anticipated to begin January 1, 2014, as constrained by then-existing channel capacities. The text should indicate that the flows will be constrained by channel capacities and limitations imposed by the Water Board and the Seepage Management Plan.

EC1-68
Page 2-21. Line 10. The Draft PEIS/R states that "Several federal and state actions, including channel capacity modifications, *are necessary before full Restoration Flows are released*." (emphasis added) Exactly which federal and state actions are necessary before full Restoration Flows are released? Since this Draft PEIS/R looks at flows at a project level, the referred-to state and federal actions must all be set forth at a minimum at a programmatic level in the Draft PEIS/R. Similarly, the channel capacity modifications must also be identified and analyzed.

EC1-69
Page 2-21. Line 36. The Draft PEIS/R states that if for any reason full Restoration Flows are not released in any year beginning 2014, the Secretary may release water from Friant Dam during times of year other than those specified in the applicable flow schedule. What would be the purpose for the release of these flows? Since they are not tailored to provide habitat for fisheries, the release of flows merely for flow purposes would be a waste of water. The purpose of this program is to restore the San Joaquin River for fisheries, not to simply create a wetted channel. If the objective were to create a wetted channel, a warm water fishery could be reestablished at a substantially lower cost and impact.

EC1-70
Page 2-22. Line 14. The Draft PEIS/R states "If Reclamation makes deliveries to the San Joaquin River Exchange Contractors via the San Joaquin River, these water deliveries would have a higher priority for channel capacity over Interim or Restoration Flows. Therefore, Interim and Restoration Flows would be reduced, as necessary, to provide channel capacity for water delivery to the San Joaquin River Exchange Contractors via the San Joaquin River." We are pleased to see that Reclamation recognizes its responsibility to meet the terms of the exchange contract. It is unclear, however, why the water that travels from Friant Dam to the Mendota Pool cannot serve dual purposes. Certainly, this water will be useful for providing fish habitat during that period of time. To the extent that water reaches the Mendota Pool, it could be serving restoration goal purposes. It makes no sense to release additional flows not otherwise necessary for restoration purposes if water has already been released down the river.

EC1-71
Page 2-22. Line 21. Apparently, Article 3(n) of the Friant Division long-term water service contracts and the recently executed Friant Division repayment contracts provide as follows:

a.      The United States agrees that it will not deliver to the Exchange Contractors thereunder waters of the San Joaquin River unless and until required by the terms of said contract, and the United States further agrees that it will not voluntarily and knowingly determine itself unable to deliver to the Exchange Contractors entitled thereto from water that is available or that may become available to it from the San Joaquin River and its tributaries or the Sacramento-San Joaquin Delta those quantities required to satisfy the obligation of the United States under said exchange contract and under Schedule 2 of the Contract for Purchase of Miller and Lux Water Rights (Contract 11r-1145, dated July 27, 1939).

See response to comment EC1-60 for discussion of the conditions of approval for SWRCB water rights permits associated with SJRRP.

**EC1-68:** As described throughout the Draft PEIS/R, many limitations exist to channel capacity within the Restoration Area. Some of these limitations are known and are specified in the Settlement, such as increasing channel capacity in Reaches 2B and 4B1. The lead agencies anticipate that as additional data on the conditions of the system are collected, other channel capacity limitations will be identified.

As described on page 2-95, lines 22 through 40, of the Draft PEIS/R, potential channel improvements to increase channel capacity for reaches not specified in the Settlement may be implemented by parties other than Reclamation to improve levee integrity for conveyance of flood flows irrespective of Settlement implementation. Such modifications could include levee setbacks; cutoff/slurry walls; levee strengthening, widening, and raising; and channel dredging or other techniques to increase channel capacity. These types of future projects would provide flood control benefits and would be expected to have independent utility outside of the implementation of the Settlement. Because these potential future levee and channel modifications are not specified in the Settlement, they are not part of the SJRRP and are not included as part of the alternatives evaluated in the Draft PEIS/R. Further, as noted on page 62 of the Executive Summary, it is possible that the Settlement could be fully implemented in a manner consistent with the Act, and the purpose of the project thereby achieved, without release of the maximum Restoration Flows.

DWR is evaluating levee conditions along the San Joaquin River and the bypasses in the Restoration Area through the NULE Project as part of the California FloodSAFE initiative. Specific future modifications to the flood control system under the FloodSAFE initiative are uncertain and speculative, and are not considered reasonably foreseeable or probable future actions at this time. Reclamation and DWR recognize the importance of coordination and communication in planning and implementing projects that affect the flood control system in order to prevent impacts to flood management. Therefore, the potential for cumulative effects associated with implementation of the Settlement and FloodSAFE programs and projects is presented in Chapter 26.0, "Cumulative Impacts," of the Draft PEIS/R.

**EC1-69:** As described on page 2-21 of the Draft PEIS/R, the schedule for release of flows pursuant to Paragraph 13(i)(3) would be recommended to the Secretary by the RA. The RA would make recommendations to the Secretary on the release of Restoration Flows, and may consider a variety of topics (potentially including, but not limited to, the need for temperature management, fish passage, adult attraction, or floodplain inundation) in making recommendations. Text has not been revised.

**EC1-70:** Any water travelling from Friant Dam to Mendota Pool has the potential to provide benefits to fish within that portion of the river, and thereby contribute to the Restoration Goal. As cited in the comment, Interim and Restoration flows would be reduced, as necessary, to provide channel capacity for water delivery to the San Joaquin River Exchange Contractors via the San Joaquin River. Releases from Friant Dam for

delivery to the San Joaquin River Exchange Contractors via the San Joaquin River in accordance with Article 4.b. of the San Joaquin River Exchange Contract may help satisfy Restoration Flow targets in some portions of the river, but would not be categorized as Interim or Restoration flows under the provisions of the Settlement. Text has not been revised.

**EC1-71:** In the event that recapture within the Restoration Area would prevent the flow targets from being met within then-existing channel capacity, recapture at Mendota Pool as described in Chapter 2.0, "Description of Alternatives," of the Draft PEIS/R would occur only if necessary to avoid interfering with in-channel construction activities associated with the Restoration Goal, minimize increases in flood risk, or to avoid potential material adverse impacts from groundwater seepage (as described in Appendix D, "Physical Monitoring and Management Plan," of the Draft PEIS/R), or for other emergency actions to avoid immediate adverse impacts. As provided in Article 3(o) of the Friant Division long-term water service contracts, recapture at Mendota Pool would occur as follows:

> *(o)  Pursuant to and consistent with Section 10004 of SJRRSA and Paragraph 16 of the Settlement, the Contracting Officer is required to develop and implement a plan for recirculation, recapture, reuse, exchange or transfer of water released for restoration flows or interim flows, as those terms are defined in the Settlement, to reduce or avoid impacts to water deliveries caused by said restoration flows or interim flows and water developed through such activities may be made available (i) to the Contractor without the need of an additional contract, and/or (ii) to other on behalf of the Contractor under terms mutually acceptable to the Contractor and the Contracting Officer that are consistent with the Water Management Goal.*

Text has not been revised.

**EC1-72:** The project description includes multiple provisions to avoid impacts from flows in light of then-existing channel capacities, including actions to minimize flood risk (beginning on page 2-22 of the Draft PEIS/R) and the Physical Monitoring and Management Plan (described beginning on page 2-49 of the Draft PEIS/R and in Appendix D). Under these actions, Reclamation would establish a Channel Capacity Advisory Group to provide independent review of then-existing channel capacities estimated by Reclamation in accordance with standard USACE levee performance criteria. Reclamation would prepare a report for review by the Channel Capacity Advisory Group annually or whenever Reclamation contemplates increasing the upper limit of releases for Interim or Restoration flows. The report would include the data, methods, and estimated channel capacities; flow limits and any maintenance activities; and monitoring efforts and management actions as described in Chapter 2.0 (including actions under Appendix D, "Physical Monitoring and Management Plan," of the Draft PEIS/R).

SJRRP Draft Programmatic EIS/R
Friant Water Authority Comments

| | FWA Comment No. | PES/R Section No. | Page # | Line(s) | FWA Comment |
|---|---|---|---|---|---|
| FWA-15 | 12 | 2.4.2 | 2-38 | 6 | Add "consistent with all applicable law" at the end of the sentence to be in conformance with the language in the Settlement. |
| FWA-16 | 13 | 2.4.2 | 2-39 | 20-30 | The discussion of the Mendota Pool Bypass does not include a discussion of one option that is apparently being considered, currently called the Fresno Slough Dam option, which would in effect move the location of Mendota Pool to a new location. It should be included here. |
| FWA-17 | 14 | 2.4.2 | 2-40 | 18-27 | The document correctly notes that the Act (Section 10009(f)(2)(B)) requires that a determination be made on increasing the channel capacity to 4,500 cfs before undertaking any "substantial construction" in Reach 4B1. The document goes on to state that therefore "modifications in Reach 4B1 to convey at least 475 cfs would not include substantial construction, such as changes to existing levees in Reach 4B1. Based on preliminary studies, these modifications are anticipated to include removing in-channel vegetation and modifying road crossings within Reach 4B1. Modifying Reach 4B1 could also include modifications to establish a low-flow channel to support fish migration, ranging from a single low-flow channel to a series of terraced channels to convey incremental low flows of up to 475 cfs or more." The Act does not define the term "substantial construction." Apparently the author(s) of the document have concluded the modification of road crossings and establishment of a low-flow channel to support fish migration in the 21.3 mile length of Reach 4B1 do not constitute substantial construction. The document should provide any standards, justifications, or rationale that were used to come to that conclusion. |
| FWA-18 | 15 | 2.4.2 | 2-48 | 36-40 | The document notes that during the release of Interim and Restoration flows, the loss of water from the main stem San Joaquin River through the closed gates to the bypass channel could inhibit success of the Restoration Goal by reducing the amount of water flowing to downstream reaches. Such losses would also inhibit the success of the Water Management Goal. The document should be revised accordingly. |
| FWA-19 | 16 | 2.4.3 | 2-51 | 13-16 | The document discusses an immediate response to attain the seepage management objective is the redirection of Interim or Restoration Flows at Chowchilla Bypass Bifurcation Structure, noting directing flow into the bypass system at the Chowchilla Bypass Bifurcation Structure would reduce flow in Reach 2B and downstream reaches. It should be made clear that this would be done only for the purposes of providing an immediate response to a seepage problem. |
| FWA-20 | 17 | 3.1.2 | 3-2 | 23-25 | The sentence on page 3-2, beginning on line 23, should be modified to state: "Reclamation makes releases from Friant Dam to maintain continuous flows past Gravelly Ford, providing deliveries to "holding contracts" in Reach 1." To our knowledge, Reclamation has not made any determination regarding who may or may not have riparian water rights. |
| FWA-21 | 18 | 3.1.2 | 3-2 | 28 | The sentence beginning on line 28 is incomplete. |
| FWA-22 | 19 | 3.1.5 | 3-5 | 10-21 | This paragraph contains several factual errors and should be revised to read as follows: "Reclamation purchased some of the water rights on the San Joaquin River, and through exchange arrangements with entities holding other rights on the San Joaquin River (the most significant of these exchange arrangements is the San Joaquin River Exchange Contract), diverts water at Friant Dam. With the exception of flood control operations, water released from Friant Dam to the San Joaquin River is limited to that necessary to meet the requirements of the holding contracts along the San Joaquin River between Friant Dam and Gravelly Ford. Under the terms and conditions of the San Joaquin River Exchange Contract, Reclamation is obligated to deliver to the San Joaquin River Exchange Contractors water from the Delta-Mendota Canal (DMC) or other sources. If Reclamation is temporarily unable to do so, water is to be delivered from the San Joaquin River in accordance with Article 4.b. of the San Joaquin River Exchange Contract. If Reclamation is permanently unable to deliver water from the DMC or other sources, the San Joaquin River Exchange Contractors shall receive water from the San Joaquin River in accordance with Article 4.c. of the San Joaquin River Exchange Contract." |
| FWA-23 | 20 | 5.1 | 5-2 | 8-10 | The sentence beginning on line 8 seems to be missing some words. |

Alicia Forsythe
September 21, 2011
Page 27

### 7.1    The draft PEIS/R provides inadequate analysis and mitigation of water-supply impacts.

The PEIS/R does not adequately analyze the possibility of reduced water supplies to third parties like the Authority members; nor does it propose adequate mitigation if those impacts result.

SLDMWA-30a

### 7.1.1    Reclamation's own data and modeling show that the SJRRP, as proposed, will affect flood flows and decrease the Authority members' water supply.

Reclamation admits that the Proposed Project study-area comprehends the service areas of third parties, including the Authority, and purports to analyze the potential for reduced water supplies on the third parties. Whether Reclamation conducted that analysis is not evident from the text of the draft PEIS/R. It may be buried within in appendix, but the draft PEIS/R does not reflect it, which is a defect in and of itself.[96] Further, data obtained by the Authority belie the PEIS/R's conclusion: Absent a change in the SJRRP (changes in the project or mitigation measures), third parties will in fact suffer substantial reductions in their water supplies, reductions that at times will be even more harmful than what the Friant Division contractors will experience. This is a significant and material impact, which the PEIS/R must address head on and for which it must avoid or provide full mitigation.

SLDMWA-30b

As the Authority has previously explained on numerous other occasions, the reduction in flood flows in the San Joaquin River reduces the quantity of water available to members of the Authority members in many years. Flood flows occurring below Friant Dam that reach the Mendota Pool have historically been used to meet the demands of the San Joaquin River Exchange Contractor Water Authority members.[97] When that occurs, more water is available in San Luis Reservoir to meet the demands of the Authority's member agencies. Flood flows historically have allowed for as much as a 25 percent increase in contract allocations to the Authority's member agencies.

---

[96] See footnote 93.

[97] The draft PEIS/R acknowledges that flood flows reach the Mendota Pool only during periods of flood management releases and that flood flows in the San Joaquin and/or Kings rivers occurred at the Mendota Pool in 1997, 2001, 2005, and 2006. Draft PEIS/R, Chapter 13, at p. 13-18. But the draft PEIS/R fails to analyze the impacts of changes to these flood flows on third parties.

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2022-1994

**Short Case Caption:** City of Fresno v. United States

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

[✓]  the filing has been prepared using a proportionally-spaced typeface and includes 5,527 words.

[ ]  the filing has been prepared using a monospaced typeface and includes _____ lines of text.

[ ]  the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 10/28/2022

Signature: /s/ Matthew G. Adams

Name: Matthew G. Adams

Save for Filing