**2022-1994**

# United States Court of Appeals
# for the Federal Circuit

CITY OF FRESNO, ARVIN-EDISON WATER STORAGE DISTRICT,
CHOWCHILLA WATER DISTRICT, DELANO-EARLIMART IRRIGATION
DISTRICT, EXETER IRRIGATION DISTRICT, IVANHOE IRRIGATION
DISTRICT, LINDMORE IRRIGATION DISTRICT, LINDSAY-STRATHMORE
IRRIGATION DISTRICT, LOWER TULE RIVER IRRIGATION DISTRICT,
ORANGE COVE IRRIGATION DISTRICT, PORTERVILLE IRRIGATION
DISTRICT, SAUCELITO IRRIGATION DISTRICT, SHAFTER-WASCO
IRRIGATION DISTRICT, SOUTHERN SAN JOAQUIN MUNICIPAL UTILITY
DISTRICT, STONE CORRAL IRRIGATION DISTRICT, TEA POT DOME
WATER DISTRICT, TERRA BELLA IRRIGATION DISTRICT, TULARE
IRRIGATION DISTRICT, LOREN BOOTH LLC, MATTHEW J. FISHER,
JULIA K. FISHER, HRONIS INC., CLIFFORD R. LOEFFLER, MAUREEN
LOEFFLER, DOUGLAS PHILLIPS, CARALEE PHILLIPS

*Plaintiffs-Appellants*

*(For Continuation of Caption See Inside Cover)*

*On Appeal from the United States Court of Federal Claims*
*In No. 1:16-cv-01276-AOB  (Bonilla)*

**CORRECTED BRIEF OF PIXLEY IRRIGATION DISTRICT
GROUNDWATER SUSTAINABILITY AGENCY, EASTERN TULE
GROUNDWATER SUSTAINABILITY AGENCY, GREATER KAWEAH
GROUNDWATER SUSTAINABILITY AGENCY, AND MID-KAWEAH
GROUNDWATER SUSTAINABILITY AGENCY AS *AMICI CURIAE*
IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL**

Alex M. Peltzer
PELTZER & RICHARDSON, LC
3746 W. Mineral King Avenue
Visalia, CA 93291
(559) 372-2400 (telephone)
apeltzer@prlawcorp.com
*Counsel for Amici Curiae*

Josh T. Fox
RUDDELL, STANTON, BIXLER,
MAURITSON & EVANS, LLP
1102 N. Chinowth St.
Visalia, CA 93291-4113
(559) 733-5770 (telephone)
jfox@visalialaw.com

– V. –

UNITED STATES, SAN LUIS & DELTA-MENDOTA WATER AUTHORITY,
SANTA CLARA VALLEY WATER DISTRICT, SAN LUIS WATER
DISTRICT, WESTLANDS WATER DISTRICT, GRASSLAND WATER
DISTRICT, JAMES IRRIGATION DISTRICT, BYRON BETHANY
IRRIGATION DISTRICT, DEL PUERTO WATER DISTRICT, SAN JOAQUIN
RIVER EXCHANGE CONTRACTORS WATER AUTHORITY, CENTRAL
CALIFORNIA IRRIGATION DISTRICT, FIREBAUGH CANAL WATER
DISTRICT, SAN LUIS CANAL COMPANY, COLUMBIA CANAL
COMPANY,

*Defendants-Appellees*

FORM 9. Certificate of Interest

Form 9 (p. 1)
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** | 2022-1994

**Short Case Caption** | City of Fresno, et al. v. United States

**Filing Party/Entity** | Pixley Irrigation District Groundwater Sustainability Agency, et al.

> **Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/28/2022

Signature: /s/ Alex M. Peltzer

Name: Alex M. Peltzer

| 1. **Represented Entities.** Fed. Cir. R. 47.4(a)(1). | 2. **Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | 3. **Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Pixley Irrigation District Groundwater Sustainability Agency | None | |
| Mid-Kaweah Groundwater Sustainability Agency | City of Tulare | |
| " | City of Visalia | |
| " | Tulare Irrigation District | |
| Greater Kaweah Groundwater Sustainability Agency | None | |
| East Tule Groundwater Sustainability Agency | None | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable    ☐ Additional pages attached

| | | |
|---|---|---|
| Alex M. Peltzer<br>Peltzer & Richardson Law Corportation | | |
| Josh T. Fox<br>Ruddell, Stanton, Bixler, Mauritson & Evans, LLP | | |
| | | |

**5. Related Cases.**  Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  Do not include the originating case number(s) for this case.  Fed. Cir. R. 47.4(a)(5).  See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable    ☐ Additional pages attached

| | | |
|---|---|---|
| City of Fresno v. United States<br>Case No.: 1:21-cv-00375-AOB | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable    ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF IDENTITY, INTEREST,
AND SOURCE OF AUTHORITY ....................................................... 1

STATEMENT IN COMPLIANCE WITH
FEDERAL CIRCUIT RULE 29(a)(4)(e) ............................................. 3

STATEMENT OF RELATED CASES ................................................. 4

PROCEDURAL BACKGROUND ........................................................4

SUMMARY OF ARGUMENT .............................................................. 5

GSA AMICI FACTUAL BACKGROUND ........................................... 6

ARGUMENT ...................................................................................... 11

I.      Areas Served by GSA Amici Are Among The Original Central Valley
Project Beneficiary Areas, and Should Not Be Characterized as
Subordinate To The Exchange Contractor Service Areas ...................... 11

     A. The United States Department of Interior and the Congress Authorized
the Central Valley Project In Part to Recover Groundwater Levels in
GSA Amici Areas ............................................................................. 11

     B. Trial Court Characterization of Friant Division Contractors as
"Subordinate" Within the CVP is Erroneous ......................................... 15

II.     Effect of Erroneous Decision ................................................ 16

     A. Imported Surface Water, Including From the San Joaquin River, is
Integral to the GSA Amici Sustainability Plans, Particularly in Avoiding
Subsidence During Extreme Dry Years ................................................. 16

B. Allowing Breach of the Friant Division contracts to stand will have a continuing impact on Groundwater Sustainability Plans of the Southern San Joaquin Valley ................................................................................. 18

C. Failure to Receive Friant Supplies Will have Impacts on GSA Plans to Protect Groundwater Resources for Disadvantaged Communities ........ 21

CONCLUSION ................................................................................................ 23

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS ......... 25

# TABLE OF AUTHORITIES

## <u>Cases</u>

Wolfsen v. United States,
 162 F.Supp. 403, 430 (Ct. Cl. 1958). ......................................................... 12

## <u>Statutes</u>

Cal. Water Code, Part 2.74 of Division 6, commencing at § 10700. ...................... 1

Cal. Water Code § 10723. ................................................................................... 1

Cal. Water Code § 10723.6. ................................................................................ 1

Cal. Water Code § 10725.2. ................................................................................ 2

Cal. Water Code § 10727.4. ................................................................................ 3

Cal. Water Code § 10727.6. ......................................................................... 17, 19

Cal. Water Code §§ 20500 et seq. ....................................................................... 1

Cal. Water Code § 79505.5. ................................................................................ 7

Cal. Govt. Code §§ 6500 et seq. .......................................................................... 1

## <u>Other Authorities</u>

Committee on Interior and Insular Affairs, *Central Valley Project Documents, House Doc. 416, 84th Congress, 2nd Session*, U.S. Government Printing Office (1956). ................................................................................... 13, 14

"Contract Between The United States Of America And Friant Water Authority For The Repayment Of Extraordinary Maintenance Costs For The Friant-Kern Canal Middle Reach Capacity Correction Project, Contract No. 21-WC-20-5855" (Sept. 23, 2021) ("Repayment Contract")  https://friantwater.org/s/21-WC-20-5855_Repayment-Contract-MRCCP_092321.pdf. ....................... 22

Eastern Tule GSA, *Groundwater Sustainability Plan, (*July 2022 Resubmittal)
   https://sgma.water.ca.gov/portal/service/gspdocument/
   download/9090. ...................................................................... 10, 19

Julie Cart, *Tulare County's Never-Ending Drought Brings Dried Up Wells and
   Plenty of Misery*, Cal Matters, (June 15, 2021)
   https://calmatters.org/environment/2021/06/drought-tulare-county. .......... 23

Mid-Kaweah Groundwater Sustainability Agency, *Groundwater Sustainability
   Plan* (July 2022 Resubmission),
   https://sgma.water.ca.gov/portal/service/gspdocument/download/9093.. 9, 19

Pixley Irr. Dist. Groundwater Sustainability Agency, *Groundwater Sustainability
   Plan* (July 2022 Resubmission), https://sgma.water.ca.gov/portal/
   service/gspdocument/download/9021. ...................................................... 8, 9

U.S. Dept. of the Interior, *Central Valley Basin, Sen. Doc. 113, 81ˢᵗ Congress, 1ˢᵗ
   Session*, U.S. Government Printing Office (1949) ..................................... 15

## STATEMENT OF IDENTITY, INTEREST, AND SOURCE OF AUTHORITY

The Amici Curiae are all recognized by the State of California as groundwater sustainability agencies ("GSA" or "GSAs"), local public agencies that have the statutory authorities and powers described in California's Sustainable Groundwater Management Act[1] (hereafter referred to as "SGMA").

The Pixley Irrigation District GSA is a sub-agency of the Pixley Irrigation District, formed and operating pursuant to Division 11 of the California Water Code[2], which has elected to serve as a GSA pursuant to the provisions SGMA[3]. The Eastern Tule Groundwater Sustainability Agency, Greater Kaweah Groundwater Sustainability Agency, and Mid-Kaweah Groundwater Sustainability Agency were each formed as Joint Powers Authorities under the California Joint Exercise of Powers Act[4] for the express purpose of serving as a GSA for the areas that are within the jurisdictional boundaries of their collective member agencies, pursuant to provisions of SGMA[5].

All of these parties (referred to in this brief as the "GSAs" or the "GSA Amici") have been recognized as GSAs under the procedures described in Water

---

[1] Cal. Water Code, Part 2.74 of Division 6, commencing at § 10700.
[2] Cal. Water Code §§ 20500 et seq.
[3] Cal. Water Code § 10723.  See subsection (a).
[4] Cal. Govt. Code §§ 6500 et seq.
[5] Cal. Water Code § 10723.6.  See subsection (a)(1).

1

Code sections 10723-10723.8, and as such they have the powers and authorities as specified in SGMA, in particular Chapter 5 of SGMA, Water Code section 10725-10726.9.  Besides the various specific powers and authorities described throughout that Chapter, SGMA provides that:

> (a) A groundwater sustainability agency may perform any act necessary or proper to carry out the purposes of this part [Part 2.74, SGMA].[6]

The GSA Amici, acting through their governing bodies, have all determined that participating in the subject appeal as Amici Curiae is a proper act related to carrying out the purposes of SGMA as to their jurisdictional areas because the water at issue in this case would have benefited the lands subject to their jurisdiction if it had been delivered to the Plaintiff irrigation districts in 2014 as those districts have asserted it should have been.  Surface water, and in particular imported surface water such as the Plaintiff irrigation district's Central Valley Project supplies, are an integral tool in the management of groundwater in that it provides a critical means to either replace extracted groundwater, or avoid the need to extract groundwater in the first place.  In recognition of this fundamental practical reality, SGMA specifically requires California GSAs to include in their Groundwater Sustainability Plans "[a]ctivities implementing, opportunities for, and removing impediments to,

---

[6] Cal. Water Code § 10725.2(a).

conjunctive use or underground storage."[7,8]

The loss of this water, at the very outset of the groundwater management planning mandate that SGMA ushered when it was adopted in 2014, has had a negative and long-lasting effect on the ability of the GSA Amici to plan for groundwater sustainability in the future without causing large economic impacts on the served area. Further, the outcome of the subject litigation has the potential for impacting the future availability of Central Valley Project water within each of the jurisdictional boundaries of the GSA Amici in critically dry years, such as the current water year. As such, the future availability of Central Valley Project water has an impact on the GSAs' ability to appropriately manage the groundwater resources within the GSAs' jurisdictional boundaries.

## STATEMENT IN COMPLIANCE WITH
## FEDERAL CIRCUIT RULE 29(a)(4)(e)

The undersigned counsel for the GSA Amici provide the following statement:

(i) Alex M. Peltzer, Peltzer & Richardson LC, acting as counsel for the GSA Amici, authored this brief in part, and separately represents, in the capacity of general counsel, the following parties who are Plaintiffs-Appellants in the main case:

---

[7] Cal. Water Code § 10727.4(f).

[8] The phrase "conjunctive use" is "a catch-phrase for coordinated use of surface water and groundwater . . . ." Water Education Foundation, *Conjunctive Use*, https://www.watereducation.org/aquapedia/conjunctive-use.

Delano-Earlimart Irr. Dist; Exeter Irr. Distr; Ivanhoe Irr. Dist.; Lower Tule River Irr. Dist.; Tea Pot Dome Water Dist.; and Stone Corral Irr. Dist.

Josh T. Fox, Ruddell Stanton, Bixler, Maurtison and Evans LLP, acting as counsel for the GSA Amici, authored this brief in part, and separately represents, in the capacity of general counsel, the following parties who are Plaintiffs-Appellants in the main case: Lindmore Irr. Dist., Lindsay-Strathmore Irr. Dist., Terra Bella Irr. Dist., and Saucelito Irr. Dist.

(ii) no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and

(iii) no person — other than the amicus curiae, its members, or its counsel — contributed money that was intended to fund preparing or submitting the brief.

## STATEMENT OF RELATED CASES

Counsel for Amici Curiae are aware of one related case according to Fed. Cir. R. 47.5; that case is currently pending in the U.S. Court of Federal Claims—*City of Fresno v. United States*, 1:21-cv-00375-AOB (Fed. Cl.) and relates to a second year of zero-CVP allocations for the Friant Division of the Central Valley Project.

## PROCEDURAL BACKGROUND

The Second Amended Complaint states two causes of action: (1) breach of contract and (2) taking of property rights in water. The Court of Federal Claims granted Defendants-Appellees' motions to dismiss the taking claims, holding that

Appellants do not possess a constitutionally protected property right in the water they receive and beneficially use from the Friant Division and therefore lack standing.[9] Subsequently, the Court of Federal Claims denied summary judgment to the Friant Contractors on their contract claim, granting Defendants-Appellees' cross-motions for summary judgment, holding that, despite Article 3(n) of the Friant Contracts, the United States could deliver San Joaquin River water to the Exchange Contractors even when not required to do so by the terms of the Exchange Contract.[10] The Appellants appeal both rulings and the trial court's entry of final judgment against them.[11]

## SUMMARY OF ARGUMENT

Plaintiffs-Appellants in this case are agencies with permanent water supply contracts from the Friant Division of the Central Valley Project ("CVP"). Some these parties (the "Friant Division Contractors") are located within or near the jurisdictional areas of the GSA Amici.

The Friant Division Contractors' central premise in this litigation is that the United States breached their contracts by delivering all of the available water from the San Joaquin River in 2014 to the San Joaquin River Exchange Contractors, instead of delivering a portion of the available supplies to the Friant Division

---

[9] Appx1–20.
[10] Appx36.
[11] *See* Appx971–973; Appx45.

Contractors.   The Plaintiffs-Appellants are asserting a breach of contract that resulted in <u>at least</u> 100,000 acre feet less in San Joaquin River water being delivered to their service areas in that year than they were entitled to under their contracts. And they are asserting a similar breach in the following year.

As might be expected, the failure to receive such large quantities of imported waters had devastating effects in the areas that were just embarking on sustainable groundwater management, including the areas subject to the planning authority of the GSA Amici.

SGMA, with its mandate for sustainable groundwater planning, became effective January 1, 2015.   Its passage started a process for establishment of Groundwater Sustainability Plans, culminating in January of 2021, when the first plans were required to be adopted and implemented.   The timing of the two consecutive years of "zero allocations" from the Friant Division of the CVP, coinciding as it did with the passage of SGMA, could not have been worse.

The breach by the United States as asserted by the Plaintiffs-Appellants, if allowed to go uncorrected, will have a lasting negative effect on the region served by the GSA Amici, including the farmer landowners and the disadvantaged communities served by their agencies.

## GSA AMICI FACTUAL BACKGROUND

The GSA Amici are the agencies with the primary groundwater management authority over a large portion of the southern San Joaquin Valley. Collectively, the GSA Amici are responsible for the sustainable management of more than 1 million acre-feet of groundwater production within the areas they serve. This groundwater production supports cultivation of more than half a million acres of some of the world's most productive farmland, as well as an urban population of nearly 400,000 people, including six of the eight incorporated cities of Tulare County. More than two thirds of this population reside in cities and unincorporated communities that qualify under California law as being either a Disadvantaged Community ("DAC") or a Severely Disadvantaged Community ("SDAC"). These designations have been created for the purpose of providing special access to funding intended to improve clean water resources and other state-sponsored development assistance for low-income areas.[12] Many of these communities primarily house farmworker and other low-income populations.

---

[12] A Disadvantaged Community (DAC) in California is defined in Water Code §79505.5 as a community with an annual median household income that is less than 80% of the Statewide annual median household income but more than 60%, or between $62,938 and 47,203 in 2020. A Severely Disadvantaged Community (SDAC) is defined by median household income below 60% of the statewide average, or $47,203 in 2020.

The below table identifies for illustrative purposes the communities (with DAC designation), acreage, population and average annual groundwater demand covered by the respective GSA:

| GSA | Communities Located in Jurisdiction | Acreage and Population Served | Avg. Annual Groundwater Demand |
|---|---|---|---|
| Pixley ID GSA | Pixley Pub. Util. Dist. (SDAC) Teviston Comm. Svcs. Dist (SDAC) | 71,314 acres (mostly irrigated agriculture)<br><br>~15,000 population | ~146,000 ac-ft per year[13] |
| Greater Kaweah GSA | o City of Exeter (DAC)<br>o City of Farmersville (SDAC)<br>o City of Woodlake (SDAC)<br>o Unincorporated communities (SDAC except as indicated):<br>• West Goshen<br>• Goshen<br>• Ivanhoe<br>• Tract 92<br>• Patterson Tract (DAC)<br>• Lemon Cove (DAC)<br>• Linnell Camp<br>• Cameron Creek Colony | 219,000 acres, (mostly irrigated agriculture)<br><br>~50,000 population | ~ 453,000 ac-ft per year |

---

[13] Avg. reflects the period 1987-2017.  Source: Pixley Irr. Dist. Groundwater Sustainability Agency, Groundwater Sustainability Plan (July 2022 Resubmission), https://sgma.water.ca.gov/portal/service/gspdocument/download/9021, pgs. 1012-1013 (T. Harder Technical Memorandum "*Tule Subbasin Technical Advisory Committee Groundwater Flow Model of the Tule Subbasin,*" Appendix A, pgs. 1-7).

| | | | |
|---|---|---|---|
| | • Hypericum | | |
| Eastern Tule GSA | ○ City of Porterville (DAC)<br>○ Unincorporated communities (SDAC)<br>  • Terra Bella<br>  • Ducor<br>  • East Porterville<br>  • Richgrove<br>  • Springville<br>  • Woodville | 161,700 acres (mostly irrigated agriculture)<br><br>~80,000 population | ~192,000 ac-ft[14] |
| Mid-Kaweah GSA | ○ City of Visalia<br>○ City of Tulare (DAC)<br>○ Unincorporated communities (SDAC):<br>  • Okieville Highland-Acres Community Services District<br>  • Waukena | 104,000 acres; of which ~58,000 is irrigated agriculture and ~ 46,000 is urban development<br><br>~225,000 population | ~192,000 ac-ft[15] |

A key component of managing groundwater in enclosed basins such as those

managed by the GSA Amici is what is known as "imported" or "foreign" water –

---

[14] Avg. reflects the period 1987-2017. Source: Pixley Irr. Dist. Groundwater Sustainability Agency, *Groundwater Sustainability Plan (July 2022 Resubmission)*, pgs. 1012-1013 (T. Harder Technical Memorandum "*Tule Subbasin Technical Advisory Committee Groundwater Flow Model of the Tule Subbasin*," Appendix A, pgs. 1-7), https://sgma.water.ca.gov/portal/service/gspdocument/download/9021.

[15] Avg. reflects the period 1997-2017. Source: GEI Consultants, for Mid-Kaweah GSA, *Groundwater Sustainability Plan (July 2022 Resubmission)*, at pg. 6-3, https://sgma.water.ca.gov/portal/service/gspdocument/download/9093.

that is, water from other watersheds or developed by projects such as the federal Central Valley Project or California State Water Project, which is imported to, or foreign to, the area in which it is used.  Imported water serves to both lessen the reliance on groundwater for crop production and urban use within the area of import, as well as to replace extracted groundwater in the imported area and restore groundwater levels.  For all of the GSA Amici, the primary if not only source of imported water is the Friant Division water service contracts that the irrigation districts within or near the GSA service areas have long used to bring San Joaquin River water to their landowners.  This water is brought to the service areas from Millerton Lake to the north, by way of the Friant-Kern Canal, which traverses the heart of the service areas of the GSA Amici.

By way of example, the Eastern Tule GSA members Saucelito, Terra Bella, and Porterville Irrigation Districts, and the Kern-Tulare and Tea Pot Dome Water Districts each have Friant Division contracts that have provided them, on average

between 1987 and 2017, with 79,100 acre feet of imported San Joaquin River water annually.[16]

---

[16] Eastern Tule GSA, *Groundwater Sustainability Plan* (July 2022 Resubmittal), https://sgma.water.ca.gov/portal/service/gspdocument/download/ 9090. See page 1471: Table 1a of Appendix B, Thomas Harder & Co. *Tule Subbasin – Chapter 2 Groundwater Setting,* July 2022.

Other primary Friant Division contractors located within or immediately adjacent to the GSA Amici include:

- Tulare Irrigation District
- Exeter Irrigation District
- Lower Tule River Irrigation District
- Ivanhoe Irrigation District
- Stone Corral Irrigation District

Together, these contractors import hundreds of thousands of acre feet of Friant Division supplies from the San Joaquin River. When the Congressional and Interior Department reports that are cited below refer to the lands of the southern end, or the upper east side, of the San Joaquin Valley as being the primary beneficiary of the original Central Valley Project, a significant portion of the lands being referred to lie within the Amici GSA jurisdictional boundaries.

## ARGUMENT

I.    **Areas Served by GSA Amici Are Among The Original Central Valley Project Beneficiary Areas, and Should Not Be Characterized as Subordinate To The Exchange Contractor Service Areas**

A.    **The United States Department of Interior and the Congress Authorized the Central Valley Project In Part to Recover Groundwater Levels in GSA Amici Areas**

As described in detail in the Plaintiffs-Appellants' Principal Brief on record in this case, the Central Valley Project was first envisioned as a project of the State of California, with the primary purpose of developing water through seasonal storage of the waters of the Sacramento River in the Sacramento Valley north of San

Francisco.  The water that could be developed in the Sacramento Valley was excess to the needs of the Sacramento Valley and was needed primarily for use in the more arid areas south of San Francisco Bay, specifically in the southern portion of the San Joaquin Valley, from Fresno south to Bakersfield.

When the Great Depression of the 1930s left the State of California financially unable to proceed with the project, the United States, through the Bureau of Reclamation, stepped in and determined to undertake the project pursuant to the federal Reclamation Law of 1909.[17]  In 1935, the then-Secretary of the Interior Harold Ickes reviewed the plans for the Central Valley Project, and reported to President Franklin Roosevelt, that the project was "feasible" as a federal reclamation project, clearing the way for the project to proceed under the Reclamation Law.[18] In Secretary Ickes' feasibility report to President Roosevelt, the general design and purpose of the project was described as follows:

> The key unit of the project tis Kennett Reservoir [later renamed as Lake Shasta, or Shasta Reservoir] on the Sacramento River.  A dam 420 feet high will regulate floods and store 3,000,000 acre-feet of water.[19]

> The report went on to describe a series of "pumping plants and intervening

---

[17] *Wolfsen v. United States*, 162 F.Supp. 403, 430 (Ct. Cl. 1958).

[18] See *Finding of Feasibility, Secretary of the Interior Harold L. Ickes, Nov. 26, 1935,* as reproduced at p. 564 of U.S. House of Representatives, Committee on Interior and Insular Affairs, *Central Valley Project Documents, House Doc. 416, 84th Congress, 2nd Session*, U.S. Government Printing Office (1956).

[19] *Id.*

natural and artificial channels" that would carry the water released from storage at what is now Shasta Reservoir, some 150 miles to the northern portion of the San Joaquin Valley, to the area now known as the San Joaquin River Exchange Contractors (the "Exchange Contractors") service area. [20]

> This water will replace San Joaquin River water now used for irrigation in the northern San Joaquin Valley, thus permitting the entire flow of the San Joaquin River … to be utilized in the southern San Joaquin Valley where local supplies are deficient. [21]

In other words, the reason for building facilities to bring the Sacramento River water to the Exchange Contractor areas was not because those areas needed additional water from the project. Instead, the purpose of the project was to replace the water from the San Joaquin River those lands had been using, so that the San Joaquin River water could be imported into the Friant Division contractors service areas, where it was (and still is) desperately needed.

The Ickes feasibility report is one in a lengthy record of studies and feasibility reports related to the Central Valley Project's original design and approvals, which all support the central premise that the primary original irrigation beneficiaries of the Central Valley Project were the farmlands of the Southern San Joaquin Valley.[22]

---

[20] *Id.*

[21] *Id.*

[22] See also documents assembled as U.S. House of Representatives, Committee on Interior and Insular Affairs, *Central Valley Project Documents, House Doc. 416, 84th Congress, 2nd Session*, U.S. Government Printing Office (1956).

Another common theme in the history of the Central Valley Project is that the water imported from the San Joaquin River was specifically intended to be used for groundwater replenishment and recharge in the Friant Division service area (the southern portion of the San Joaquin Valley). As a further example, in a 1949 Report to Congress from the Department of Interior, the Commissioner of Reclamation Michael W. Straus described the Central Valley Project (then under construction) as follows:

> Irrigation in the east side upper San Joaquin Valley[23] has reached a stage where dependable stream flow has long since been completely used and in many areas the draft on ground water greatly exceeds the natural replenishment. An alarming lowering of the groundwater table has brought this overdraft forcibly to the attention of the water users of the area. For some time it has been realized that unless additional water is secured, pumping depths will become so great that considerable areas of land now irrigated will have to be abandoned because of excessive water costs. ***One of the principal objectives of the Central Valley Project now under construction, is to remedy this situation***. Through exchange of waters and purchase of water rights the run-off of San Joaquin River will be made available for diversion at Friant Dam to Friant-Kern and Madera Canals.[24] (Emphasis added.)

---

[23] The word "upper" in the phrase "east side upper San Joaquin Valley" requires some explanation: as is clear from the rest of the quoted passage, "upper" in this phrase refers to the upstream direction, not to be confused with the northern direction. The lower elevation portions of the San Joaquin Valley are in the north and west, while the upper elevation portions lie to the south and east. As noted later in the quoted passage, "east side upper San Joaquin Valley" refers specifically to the area served now by the Friant-Kern and Madera Canals, which has been referred to throughout this brief as the Southern San Joaquin Valley, or the Friant Division service area.

[24] U.S. Dept. of the Interior, *Central Valley Basin, Sen. Doc. 113, 81st Congress, 1st Session*, U.S. Government Printing Office (1949).

This groundwater protection function of the CVP was specifically noted as being among the "beneficial uses" of the San Joaquin River water, which are encompassed within the diversion and storage permits obtained by the United States for the benefit of the Friant Division contractors.  The original granting of the water rights, through Decision D-935 of the State Water Resources Control Board (1959), contains the following clarification in response to a question as to whether the permits include as a beneficial use the groundwater replenishment plans of the contracting districts:

> An expert witness for the districts testified that about one-half of the Class 2 waters diverted at Friant Dam will be placed directly underground upon delivery with subsequent recovery being made for application of the water to beneficial use.[25]

D-935 went on to note that these groundwater replenishment programs are consistent with the beneficial use requirements of the California Constitution, and as such they could be, and in fact were, specifically included within the beneficial uses provided for under the water diversion and storage permits issued to the United States as a result of D-935.[26]  Consistent with these permit provisions, nearly all of the districts noted earlier in this brief as being either directly within or adjacent to the GSA Amici have a 60-plus year history of using a portion of their Friant Division supply for extensive groundwater recharge and replenishment programs.

---

[25] Appx1064.
[26] Appx1065.

## B.    Trial Court Characterization of Friant Division Contractors as "Subordinate" Within the CVP is Erroneous

In light of the foregoing statutory and regulatory history of the CVP, the GSA Amici are alarmed by the incongruent finding of the trial court that the Friant Division contractors are somehow subordinate to the Exchange Contractors.  As noted in the Plaintiffs-Appellants' Principal Brief, the trial court justified its refusal to find that the United States breached its contracts with the Friant Division Contractors in part on the notion that the Friant Contracts are "subordinate" in some way to the Exchange Contract.  Specifically, the trial court concluded that "the contractual rights of the Friant Contractors are subordinate to those of the Exchange Contractors,"[27] and therefore, "at all times, the Exchange Contractors have a superior claim to CVP water than do the Friant Contractors."[28]

The Principal Brief provides conclusive reasons for this Court to find that the trial court's conclusion in this regard is a gross legal error.  The GSA Amici need not repeat this legal argument here.  In addition to those reasons, the GSA Amici point out that such a conclusion flies in the face of the history of the CVP as described in this brief, and in particular the well-documented notion that a central purpose of the CVP was to provide a water supply to the Southern San Joaquin Valley, in the form of the Friant Division Contractors.  There is no logical

---

[27] Appx32.
[28] *Id*.

16

support for the notion that the same contractors who are recognized as primary beneficiaries of the CVP can somehow be deemed to have a "subordinate claim to CVP water".

Further, the GSA Amici point out that the effect of this ruling, if allowed to stand, is to put a central element of nearly all Groundwater Sustainability Plans of the southern San Joaquin Valley at an inappropriate disadvantage.  As described more fully below, the CVP contracts of the Friant Division contractors serve as a central element in Groundwater Sustainability Plans that have been developed for the large geographic area that overlaps with Friant Division service area.  Finding those contractors, and their contracts, to be subordinate to contractors in other areas creates inequity that is not justified by the provisions of any contract and should be overturned.

## II.    Effect of Erroneous Decision

### A.    Imported Surface Water, Including From the San Joaquin River, is Integral to the GSA Amici Sustainability Plans, Particularly in Avoiding Subsidence During Extreme Dry Years

The GSA Amici, like all groundwater sustainability agencies in the Central San Joaquin Valley, have adopted Groundwater Sustainability Plans ("GSPs"), which set forth a range management actions intended to bring groundwater use in the respective basins and subbasins to sustainable levels.  These plans document the

degree to which these areas rely on imported water from the CVP to achieve sustainable use of the available groundwater, in two distinct ways.

First, imported water applied directly to crops allows growers to forego reliance on groundwater for that purpose. This practice has a direct beneficial impact on groundwater levels, and for that reason is referred to as "in-lieu" groundwater recharge.

Second, imported water can be used to augment groundwater resources directly. This is accomplished in a number of ways: through seepage losses in conveyance canals between the source of the imported water and the end use, through placing the water in a recharge basin for direct recharge, and through return flow percolation of water that is applied to a crop which percolates past the root zone without being consumed by the plant through evapo-transpiration. All of these avenues result in groundwater additions, which are then available for later extraction.

A required element of all GSPs is the preparation of a "water budget" showing available groundwater supply and the sources for the annual replenishment of that supply.[29] All of the GSA Amici's GSPs rely heavily on imported water as an integral part of these water budgets, for both application to crops as in-lieu recharge, and for direct recharge. For example, the Mid-Kaweah GSA and Greater Kaweah GSA

---

[29] Cal. Water Code § 10727.6.

forecast an estimated 61,000 a.f. of groundwater recharge in the Kaweah Subbasin annually that occurs from "imported" water sources, nearly 100% of which is from Friant Division supplies.[30]  And the Eastern Tule GSA and Pixley Irrigation District GSA forecast an estimated 51,400 combined in average annual imported recharge, through a combination of deliveries to recharge basins, conveyance canal losses and applied irrigation water return flows.[31]

As can be seen, the Friant Division contracts, which provide the primary source of imported San Joaquin River supplies, form an obvious and essential element for the multitude of groundwater plans that have been prepared and are being implemented throughout the southern San Joaquin Valley.  And the converse is obvious also: water *not* imported into the planning areas will play a large role in the failure of those plans.  Simply put, every acre-foot of San Joaquin River that could be delivered to the Friant Division contracts, but is delivered elsewhere instead, creates a significant challenge to the sustainability efforts of the region.

---

[30] GEI Consultants, for Mid-Kaweah GSA, *Groundwater Sustainability Plan (July 2022 Resubmission)* (2022) at pg. 6-3, https://sgma.water.ca.gov/portal/service/gspdocument/download/9093.
[31] Eastern Tule GSA, *Groundwater Sustainability Plan,* July 2022 Resubmittal, https://sgma.water.ca.gov/portal/service/gspdocument/download/9090.   See page 1474: Table 3b of Appendix B, Thomas Harder & Co. *Tule Subbasin – Chapter 2 Groundwater Setting,* July 2022; and pg. 1503: Table 3b of Appendix D, Thomas Harder & Co. *Tule Subbasin – Chapter 2 Groundwater Setting,* July 2022.

**B.    Allowing Breach of the Friant Division contracts to stand will have a continuing impact on Groundwater Sustainability Plans of the Southern San Joaquin Valley**

The Central premise of the Plaintiffs-Appellants' breach of contract and takings claims in the underlying action is that the Friant Division contracts were breached when Reclamation delivered <u>all</u> of the water that was available at Millerton Reservoir in 2014 to the Exchange Contractors and <u>none</u> of it to the Friant Division contractors.  The Friant Division contractors provided evidence in support of their motion for summary judgment to the effect that, had the relevant provisions of the Friant Division contracts and the Exchange Contract been read and applied by the Bureau of Reclamation appropriately, more than 100,000 acre feet of supplies should have been available for delivery to the Friant Division Contractors in that year.

The GSA Amici note that the related case identified above, which has been stayed pending the outcome of this case, involves a similar "zero allocation" for the Friant Division contractors in the subsequent water year, 2015. [32]

To reiterate, the Friant Contractors are asserting a breach of contract that resulted in <u>at least</u> 100,000 acre feet less San Joaquin River water being delivered to their service areas in one year than they were entitled to under their contracts.  And they are asserting a similar breach in the following year.

---

[32] See Complaint filed in *City of Fresno v. United States*, 1:21-cv-00375-AOB (Fed. Cl.), ¶¶ 33-39.

As might be expected, the failure to receive such large quantities of imported waters had devastating effects in the areas that were just embarking on sustainable groundwater management.

SGMA, with its mandate for sustainable groundwater planning, became effective January 1, 2015. Its passage started a process for establishment of Groundwater Sustainability Plans, culminating in January of 2021, when the first plans were required to be adopted and implemented. The timing of the two consecutive years of "zero allocations" from the Friant Division of the CVP, coinciding as it did with the passage of SGMA, could not have been worse.

Among the "undesirable results" that the SGMA law seeks to avoid through groundwater management is the subsidence that occurs when groundwater is extracted and not replaced within a reasonable time. This causes compression of subsurface soil structures that ordinarily hold water, making the structures unable to store groundwater in the future while also reducing the surface elevation. Subsidence is "undesirable" (as defined in SGMA) in part because of this loss of groundwater storage capacity and in part because the surface elevation reduction has the potential to damage critical public infrastructure, such as highways, utilities, and water conveyance canals.

The zero allocations in 2014 (at issue in this litigation) and again 2015 for the Friant Division has now been documented to have caused an acceleration in

subsidence, because landowners were forced to increase reliance on groundwater pumping, and because of the successive years in which there was no imported water to counteract the effects of this groundwater pumping.    Ironically, these effects contributed to significant new subsidence within the Friant Division, resulting subsidence damage to the conveyance capacity of the Friant-Kern Canal relied upon by the Friant Division contractors.[33]

### C.    Failure to Receive Friant Supplies Will have Impacts on GSA Plans to Protect Groundwater Resources for Disadvantaged Communities

As detailed in the Introduction section above, the GSA Amici have a significant number of disadvantaged communities within their planning jurisdiction.

The depletion of groundwater resources has a distinct effect upon water users in disadvantaged and severely disadvantaged communities.  In rural areas, domestic

---

[33] See "Contract Between The United States Of America And Friant Water Authority For The Repayment Of Extraordinary Maintenance Costs For The Friant-Kern Canal Middle Reach Capacity Correction Project, Contract No. 21-WC-20-5855" (Sept. 23, 2021) ("Repayment Contract") https://friantwater.org/s/21-WC-20-5855_Repayment-Contract-MRCCP_092321.pdf.

See Recital D of the Repayment Contract:  "Following the drought years of 2014 and 2015, it was observed that the Friant-Kern Canal could no longer convey its historic water quantities between mile - post (MP) 88.1 and 121.5 (which segment is referred to as the "Middle Reach*") largely resulting from subsidence due to overdraft in the region* …." (Emphasis added.)

water users who cannot afford to construct new wells are faced with the prospect of losing the ability to readily engage in such basic activities as drinking, bathing, and washing clothes. The loss of domestic wells is an ongoing phenomenon within the boundaries of the GSA Amici[34]. Achieving sustainability as prescribed by SGMA, the GSA Amici seek to avoid these qualitatively distinct harms for the communities they serve.

Each of the GSA Amici seeks to achieve sustainability by, in part, relying upon conjunctive use programs to identify and preserve a *sustainable and reliable water supply*. The GSPs for each of the GSA Amici explicitly rely upon imported surface water for the conjunctive use programs which SGMA requires be considered as a means of achieving sustainability. *See, e.g.*, Pixley GSP at § 1.4.11 (describing surface water recharge policies); ETGSA GSP at § 3.12 (same); GKGSA GSP at § 7.3.7.1 (describing structured incentives for conjunctive use and increase groundwater recharge).

Accordingly, diminution of surface water available to water users within the GSAs' boundaries has an effect contrary to the stated objectives of both the CVP and SGMA. This is among the many negative effects that a zero allocation to Friant

---

[34] *See, e.g.*, Julie Cart, *Tulare County's Never-Ending Drought Brings Dried Up Wells and Plenty of Misery*, Cal Matters, June 15, 2021, https://calmatters.org/environment/2021/06/drought-tulare-county.

Division Contractors caused in 2014 and will cause in the future if the breach by the United States of the Friant Division contracts at issue in this case is not corrected.

## CONCLUSION

For all these reasons, GSA Amici ask this Court to reverse the trial court's granting of Defendants-Appellees' cross-motion for summary judgment on the Plaintiffs-Appellants' contract claims, dismissal of the Plaintiffs-Appellants' taking claims, and entry of judgment against Plaintiffs-Appellants.

Respectfully submitted,

November 1, 2022

/s/ Alex M. Peltzer
Alex M. Peltzer
PELTZER & RICHARDSON, LC
apeltzer@prlawcorp.com

Counsel for Amici PIXLEY IRRIGATION DISTRICT GROUNDWATER SUSTAINABILITY AGENCY and MID-KAWEAH SUSTAINABILITY AGENCY

November 1, 2022

/s/ Josh T. Fox
Josh T. Fox
RUDDELL, STANTON, BIXLER, MAURITSON & EVANS, LLP
jfox@visalialaw.com

Counsel for Amici EASTERN TULE GROUNDWATER SUSTAINABILITY AGENCY

and GREATER KAWEAH
SUSTAINABILITY AGENCY

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) and 32(a)(7)(B) and Federal Circuit Rule 32(a) in that the brief contains 5,972 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) in that the brief has been prepared in a proportionally spaced typeface using Microsoft 365 – Microsoft Word in a 14-point Times New Roman font.

/s/Alex M. Peltzer
Alex M. Peltzer

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 1st day of November, 2022, I electronically filed the MOTION OF PIXLEY IRRIGATION DISTRICT GROUNDWATER SUSTAINABILITY AGENCY, EASTERN TULE GROUNDWATER SUSTAINABILITY AGENCY, GREATER KAWEAH GROUNDWATER SUSTAINABILITY AGENCY, AND MID-KAWEAH GROUNDWATER SUSTAINABILITY AGENCY FOR LEAVE TO FILE BRIEF AS *AMICI CURIAE* and BRIEF OF PIXLEY IRRIGATION DISTRICT GROUNDWATER SUSTAINABILITY AGENCY, EASTERN TULE GROUNDWATER SUSTAINABILITY AGENCY, GREATER KAWEAH GROUNDWATER SUSTAINABILITY AGENCY, and MID-KAWEAH GROUNDWATER SUSTAINABILITY AGENCY AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit using the CM/ECF system, which automatically served counsel of record in this case.

/s/Adriana R. Macias
Adriana R. Macias