No. 2022-1994

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

CITY OF FRESNO, ARVIN-EDISON WATER STORAGE DISTRICT,

Plaintiffs-Appellants (list continued on inside cover),

v.

UNITED STATES, SAN LUIS & DELTA-MENDOTA WATER AUTHORITY,

Defendants-Appellees (list continued on inside cover).

Appeal from the United States Court of Federal Claims
Case No. 16-cv-1276, Judge Armando O. Bonilla

<u>CORRECTED BRIEF FOR DEFENDANT-APPELLEE UNITED STATES</u>

MICHAEL D. GRANSTON
Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

ELIZABETH M. HOSFORD
Assistant Director

VINCENT D. PHILLIPS, JR.
Senior Trial Counsel
MATTHEW J. CARHART
Trial Attorney
Commercial Litigation Branch
Civil Division, U.S. Dept. of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-4591

January 26, 2023                          *Attorneys for Defendant-Appellee*

CHOWCHILLA WATER DISTRICT, DELANO-EARLIMART IRRIGATION DISTRICT, EXETER IRRIGATION DISTRICT, IVANHOE IRRIGATION DISTRICT, LINDMORE IRRIGATION DISTRICT, LINDSAY-STRATHMORE IRRIGATION DISTRICT, LOWER TULE RIVER IRRIGATION DISTRICT, ORANGE COVE IRRIGATION DISTRICT, PORTERVILLE IRRIGATION DISTRICT, SAUCELITO IRRIGATION DISTRICT, SHAFTER-WASCO IRRIGATION DISTRICT, SOUTHERN SAN JOAQUIN MUNICIPAL UTILITY DISTRICT, STONE CORRAL IRRIGATION DISTRICT, TEA POT DOME WATER DISTRICT, TERRA BELLA IRRIGATION DISTRICT, TULARE IRRIGATION DISTRICT, LOREN BOOTH LLC, MATTHEW J. FISHER, JULIA K. FISHER, HRONIS INC., CLIFFORD R. LOEFFLER, MAUREEN LOEFFLER, DOUGLAS PHILLIPS, CARALEE PHILLIPS,

Plaintiffs-Appellants (list continued from front cover),

v.

SANTA CLARA VALLEY WATER DISTRICT, SAN LUIS WATER DISTRICT, WESTLANDS WATER DISTRICT, GRASSLAND WATER DISTRICT, JAMES IRRIGATION DISTRICT, BYRON BETHANY IRRIGATION DISTRICT, DEL PUERTO WATER DISTRICT, SAN JOAQUIN RIVER EXCHANGE CONTRACTORS WATER AUTHORITY, CENTRAL CALIFORNIA IRRIGATION DISTRICT, FIREBAUGH CANAL WATER DISTRICT, SAN LUIS CANAL COMPANY, COLUMBIA CANAL COMPANY,

Defendants-Appellees (list continued from front cover).

# **TABLE OF CONTENTS**

STATEMENT OF THE ISSUES.................................................................1

STATEMENT OF THE CASE.................................................................2

  I.   Nature Of The Case .....................................................................2

  II.  Statement Of Facts And Course Of Proceedings Below ................3

     A.  The Reclamation Act And The Central Valley Project .............4

     B.  The Precursors To The 1968 Exchange Contract ....................6

     C.  The 1968 Exchange Contract ....................................................8

     D.  The Friant Contracts................................................................11

     E.  The 2014 Drought And Reclamation's Response.....................14

     F.  The Court Of Federal Claims Complaint.................................16

     G.  The Trial Court Enters Judgment Against Appellants.............17

SUMMARY OF THE ARGUMENT ....................................................20

ARGUMENT ......................................................................................22

  I.   Jurisdiction And Standard Of Review.........................................22

  II.  The Trial Court Correctly Granted Summary Judgment On The Breach Of Contract Claim...................................................................23

     A.  Because Reclamation Was "Required" To Provide The Available San Joaquin River-Sourced Water To The Exchange Contractors In 2014, It Did Not Breach The Friant Contracts .................................................23

       1.    Reclamation's Obligation To Provide "Substitute Water" To The Exchange Contractors Encompassed San Joaquin River-Sourced Water.....25

         i.  Only Reclamation's Interpretation Of "Substitute Water" Can Be Reconciled With The Exchange Contract's Language .............................25

         ii.   The Overarching Purpose Posited By Appellants Is Inconsistent With The Parties' Agreement.................................................................29

         iii.   If The Court Deems Article 3 Ambiguous, The Extrinsic Evidence Supports Our Position .................................................................34

       2.    Article 4(b) Of The Exchange Contract Did Not Limit Reclamation's Obligations Under Article 8 Of The Exchange Contract In 2014................36

i.   Article 4(b) Was Not Triggered Because Reclamation Was Able To Deliver Substitute Water To The Exchange Contractors Throughout 2014 ............................................................................................................36

ii.   Appellants' Interpretation Of Article 4(b) Would Create Conflict With Other Provisions Of The Exchange Contract And Lead To Illogical Results ..................................................................................................39

iii.   If The Court Considers The Arguments Raised Solely By Amicus Friant Water Authority, The Court Should Reject Them .........................43

iv.   If The Court Deems Article 4(b) Ambiguous, The Extrinsic Evidence Supports Our Position ................................................................46

3.   Reclamation Did Not Breach Any Duties To Appellants By Delivering Water Stored In Millerton Lake To The Exchange Contractors ..................47

4.   Because Reclamation Was "Required" To Deliver The Available San Joaquin River-Sourced Water To The Exchange Contractors, The Friant Contractors' Rights Were Subordinate To The Exchange Contractors' Rights In 2014 ...............................................................................................50

B.   Alternatively, Article 13 Of The Friant Contracts Immunize The United States For Its Actions In 2014 ..........................................................51

III.   The Trial Court Correctly Dismissed Appellants' Takings Claims...........53

A.   Appellants Have No Water Rights Under California Law .......................54

B.   Appellants Have No Water Rights Under Federal Law.............................57

C.   Even If Appellants Had Water Rights To San Joaquin River-Sourced Water, The Friant Contracts Limited Those Rights..........................................59

CONCLUSION .....................................................................................62

# TABLE OF AUTHORITIES

Page(s)

*Cases*

*Anderson v. United States*,
   23 F.4th 1357 (Fed. Cir. 2022) ..................................................................23

*Baley v. United States*,
   134 Fed. Cl. 619 (2017), *aff'd*, 942 F.3d 1312 (Fed. Cir. 2019) .................. 53, 58

*Bank of Am. Corp. v. United States*,
   964 F.3d 1099 (Fed. Cir. 2020) ............................................................ 44, 49

*Barcellos and Wolfsen, Inc. v. Westlands Water Dist.*,
   849 F. Supp. 717 (E.D. Cal. 1993) ..........................................................60

*Barseback Kraft AB v. United States*,
   121 F.3d 1475 (Fed. Cir. 1997) ..............................................................34

*Burnside–Ott Aviation Training Ctr. v. Dalton*,
   107 F.3d 854 (Fed. Cir. 1997) ............................................................ 40, 41

*California v. United States*,
   438 U.S. 645 (1978) ....................................................................... 4, 6, 57

*Casitas Mun. Water Dist. v. United States*,
   708 F.3d 1340 (Fed. Cir. 2013) ..............................................................54

*Central Delta Water Agency v. Bureau of Reclamation*,
   452 F.3d 1021 (9th Cir. 2006) ......................................................... 5, 6, 49, 50

*County of San Joaquin v. State Water Res. Control Bd.*,
   63 Cal. Rptr. 2d 277 (Ct. App. 1997) ......................................................55

*Del Puerto Water Dist. v. U.S. Bureau of Reclamation*,
   271 F.Supp.2d 1224 (E.D. Cal. 2003) ......................................................61

*F.T.C. v. Phoebe Putney Health System*,
   568 U.S. 216 (2013) .............................................................................43

*Friant Water Authority v. Jewell*,
   23 F.Supp.3d 1130 (E.D. Cal. 2014) .......................................... passim

*Godwin v. United States*,
   338 F.3d 1374 (Fed. Cir. 2003) ..............................................................22

*Gustine Land & Cattle Co. v. United States*,
   174 Ct. Cl. 556 (1966) ...........................................................................4

*H.F. Allen Orchards v. United States*, 749 F.2d 1571 (Fed. Cir. 1984)..................58
   53, 59

*Hughes Communications Galaxy, Inc. v. United States*,
   271 F.3d 1060 (Fed. Cir. 2001) ..............................................................60

iii

*Hughes Communications Galaxy, Inc. v. United States,*
   998 F.2d 953 (Fed. Cir. 1993) ................................................................42
*Hunt Const. Group v. United States,*
   281 F.3d 1369 (Fed. Cir. 2002) ..............................................................26
*Ickes v. Fox,*
   300 U.S. 82 (1937) ..................................................................................57
*Irwin v. Phillips,*
   5 Cal. 140 (Cal. 1855) ............................................................................56
*Israel v. Morton,*
   549 F.2d 128 (9th Cir. 1977) ............................................ 30, 31, 55, 56
*Ivanhoe Irr. Dist. v. All Parties and Persons,*
   350 P.2d 69 (Cal. 1960) ..........................................................................56
*Klamath Irrigation District v. United States,*
   635 F.3d 505 (Fed. Cir. 2011) ......................................................... 58, 59
*Merced Irr. Dist. v. Cnty. of Mariposa,*
   941 F.Supp.2d 1237 (E.D. Cal. 2013) .................................... 17, 18, 19
*Nebraska v. Wyoming,*
   325 U.S. 589 (1945) ................................................................................57
*Nevada v. United States,*
   463 U.S. 110 (1983) ................................................................................57
*San Carlos Irrigation & Drainage Dist. v. United States,*
   877 F.2d 957 (Fed. Cir. 1989) ................................................................23
*San Luis Unit Food Producers v. United States,*
   772 F.Supp.2d 1210 (E.D. Cal. 2011) ............................................ 55, 62
*SmithKline Beecham Corp. v. Apotex Corp.,*
   439 F.3d 1312 (Fed. Cir. 2006) ..............................................................61
*Stockton East Water Dist. v. United States,*
   583 F.3d 1344 (Fed. Cir. 2009) ....................................................... 29, 30
*United States v. Ford Motor Co.,*
   463 F.3d 1267 (Fed. Cir. 2006) ..............................................................35
*United States v. State Water Resources Control Bd.,*
   227 Cal. Rptr. 161 (Ct. App. 1986) ........................................................61
*Westlands Water Dist. v. United States,*
   153 F. Supp. 2d 1133 (E.D. Cal. 2001) .......................................... 32, 61

Statutes

43 U.S.C. § 372 ..............................................................................................58
43 U.S.C. § 383 ................................................................................................4
43 U.S.C. § 498 ..............................................................................................49

iv

*Rules*

Rule 12 of the Court of Federal Claims .................................................................22
Rule 56 of the Court of Federal Claims .................................................................23

*Other Authorities*

The Random House Dictionary of the English Language 1536 (1967) .................38

## **STATEMENT OF COUNSEL**

Pursuant to Rule 47.5 of this Court's Rules, counsel for respondent-appellee is unaware of any other appeal from this civil action that previously was before this Court or any other appellate court under the same or similar title.  Counsel is also unaware of any case pending in this or any other court that may directly affect or be affected by this Court's decision in this appeal, other than the case identified by plaintiffs-appellants in their "statement of related cases."  *See City of Fresno v. United States*, 1:21-cv-00375-AOB (Fed. Cl. filed Jan. 8, 2021).

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

| | | |
|---|---|---|
| CITY OF FRESNO, *et. al.*, | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | No. 2022-1994 |
| | ) | |
| UNITED STATES, *et. al.*, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

**CORRECTED BRIEF FOR DEFENDANT-APPELLEE**

_____

**<u>STATEMENT OF THE ISSUES</u>**

1.  Under Article 3(n) of their governing contracts (the Friant Contracts), the rights of the appellants Friant Contractors to San Joaquin River-sourced water are "subject to" the contractual rights of defendants-intervenors Exchange Contractors.  Did the trial court err in holding that the Department of the Interior's Bureau of Reclamation (Reclamation) had no duty to deliver this water to the Friant Contractors in the drought year of 2014 because Reclamation was required to deliver the available San Joaquin River-sourced water to the Exchange Contractors?

2.  Alternatively, is Reclamation immune from liability for delivering the available San Joaquin River-sourced water to the Exchange

Contractors, considering the extreme drought conditions in 2014, and that Reclamation's actions were undertaken to comply with its legal obligations?

3.     Did the trial court err by concluding that appellants cannot state a takings claim because they have no water rights in the Central Valley Project water under California or Federal law; and, even if appellants do have water rights, did the trial court err by concluding that those rights do not entitle them to more water than is prescribed in the Friant Contracts?

## STATEMENT OF THE CASE

### I.     Nature Of The Case

In 2014, Reclamation allocated the available San Joaquin River-sourced water to the defendant-intervenors Exchange Contractors, a group consisting of the San Joaquin River Exchange Contractors Water Authority, Central California Irrigation District, Columbia Canal Company, Firebaugh Canal Water District and San Luis Canal Company.  This allocation was made pursuant to a contract between Reclamation and the Exchange Contractors (the Exchange Contract).

Appellants challenged this water allocation decision in a complaint filed in the United States Court of Federal Claims, *City of Fresno v. United States*, No. 16-1276.  The appellants consist of two groups: first, the parties to the Friant

Contracts, consisting of the City of Fresno and 17 water districts, whom we refer to as the "Friant Contractors"; and second, a group of eight individual plaintiffs who are not parties to the Friant Contracts but who used water received under the Friant Contracts for agricultural purposes, whom we refer to as the "irrigators."

The trial court dismissed appellants' takings claims, Appx1-20, and granted the United States' motion for summary judgment on their breach of contract claim. Appx21-45. Here, appellants seek review of both decisions. This appeal requires the Court to decide whether Reclamation erred by concluding that it was the Exchange Contractors, not appellants, that had priority to the available San Joaquin River-sourced water in 2014.

## II.    <u>Statement Of Facts And Course Of Proceedings Below</u>

Even by the standards of California's Central Valley, 2014 was a brutally dry year. Without enough water to go around, crops and residents alike suffered. Notwithstanding the extreme ecological adversity caused by this extraordinary drought, Reclamation still needed to find a way to meet its numerous intertwined contractual, regulatory, and statutory obligations.

Of particular relevance to this appeal, Reclamation was obligated to deliver substitute water to the Exchange Contractors in the quantities required by Article 8 of the Exchange Contract. With insufficient water available from the Delta-Mendota Canal, Reclamation concluded that it must provide San Joaquin River-

sourced water to the Exchange Contractors to comply with its Exchange Contract obligations. The background to Reclamation's decision and appellants' challenge to Reclamation's decision is set forth below.

## A.     The Reclamation Act And The Central Valley Project

The Reclamation Act of 1902, ch. 1093, 32 Stat. 388-90 (codified, as amended, at 43 U.S.C. §§ 371 *et seq*.), provides for federal financing, construction, and operation of water storage and distribution projects. Congress directed the Secretary of the Interior to "proceed in conformity with [state] laws" when appropriating waters for such projects. *See* 43 U.S.C. § 383; *California v. United States*, 438 U.S. 645, 675-76 (1978).

Among the Western lands in need of "reclamation" was California's Central Valley. Even as the Sacramento River saturated the northern Central Valley's barren land, the San Joaquin River could not satiate the south's fertile soil. *See Gustine Land & Cattle Co. v. United States*, 174 Ct. Cl. 556, 560-61 (1966). The Central Valley Project was conceived to match the abundance of the Sacramento River system, in the north, with the unmet potential of the San Joaquin River system, to the south. *See id.* at 561.

The state of California developed a plan for the Central Valley Project that involved constructing, among other facilities, a dam across the upper San Joaquin River and two major canals. *See id.* at 577. After the Great Depression depleted

California's finances, the United States assumed responsibility for this project under the Reclamation Act. *See Friant Water Authority v. Jewell*, 23 F.Supp.3d 1130, 1135 (E.D. Cal. 2014).

The Central Valley Project "consists of a massive set of dams, reservoirs, hydropower generating stations, canals, electrical transmission lines, and other infrastructure." Appx4. Reclamation is charged with operating the Central Valley Project "pursuant to statute, regulations, permit terms, and conditions and contractual obligations that affect the timing and amount of water that may be available for various uses." Appx1848. In operating the Central Valley Project, Reclamation is faced with "an extremely difficult task: to operate the country's largest federal water management project in a manner so as to meet the Bureau's many obligations." *Central Delta Water Agency v. Bureau of Reclamation,* 452 F.3d 1021,1027 (9th Cir. 2006).

Of particular significance here, Reclamation has entered into numerous contracts to facilitate the purposes of the Central Valley Project, such as the Exchange Contract and the Friant Contracts. Appx1845-1846. Reclamation has also obtained state water right permits, including permits "that allow it to draw upon the waters of the San Joaquin, subject to the vested priority rights of the Exchange Contractors." Appx16.

At the time relevant to this case, David Murillo was the regional director for Reclamation's mid-Pacific region who served as contracting officer for the Friant Contracts.  Appx1881-1882 (Murillo Dep. 11:19-12:1).  To carry out this responsibility, he relied upon the advice of Reclamation employees, including Michael Jackson, Reclamation's Fresno area manager, and Ron Milligan, Reclamation's operations manager.   Appx1883-1884 (Murillo Dep. at 25:20-26:22).

## B.     The Precursors To The 1968 Exchange Contract

Before it could embark upon constructing "the country's largest federal water management project," *Central Delta Water Agency,* 452 F.3d at 1027, the United States was required under Article 8 of the Reclamation Act to acquire water rights pursuant to state law.  *See California*, 438 U.S. at 665-66.  Of particular importance, the United States needed to acquire rights to use the water of the San Joaquin River, which were held by the Exchange Contractors' predecessors-in-interest.  *See Friant Water Authority*, 23 F.Supp.3d at 1136.

The United States obtained rights to use water from the San Joaquin River by entering into two contracts on the same day in 1939.  The 1939 Purchase Contract conveyed the right to use specified quantities of San Joaquin River water to the United States—but did not convey the right to use certain quantities expressly "reserved" in the contract.  Miller & Lux and Gravelly Ford Canal

Company agreed to sell to the United States "the right to divert, store, and use" San Joaquin River water, as "would flow in the absence of operations of the United States, in excess of the aggregate 24-hour mean flows" that are specified in Schedules One and Two of the 1939 Purchase Contract. Appx235-236. (The quantities set forth in Schedules One and Two were referred to as the "reserved" quantities in the 1939 Exchange Contract, described below.)

The reserved quantities described in the 1939 Purchase Contract were addressed by the 1939 Exchange Contract. The 1939 Exchange Contract—which, as discussed below, was subsequently amended—acknowledged that the United States may "store, divert, dispose of and otherwise use" the quantities of water reserved in the Purchase Contract. Appx1746. But it permitted such use only when "substitute water" is provided to the Exchange Contractors, in the amounts reserved in the Purchase Contract. *Id.*

After operating under the 1939 Exchange Contract for 17 years, the parties executed the 1956 Exchange Contract. Of particular significance to this case, instead of measuring the United States' obligation to provide "substitute water" by reference to the daily flows of the San Joaquin River, the 1956 Exchange Contract provided for specific volumetric quantities of water that must be delivered by the United States as "substitute water." Appx1780.

### C.     The 1968 Exchange Contract

The parties thereafter modified the 1956 Exchange Contract through the 1968 Exchange Contract. *See* Appx309-344. The 1968 Exchange Contract—which, like the 1956 Exchange Contract, required the United States to deliver particular volumetric quantities of substitute water—governs the United States' obligations to the Exchange Contractors relevant to this appeal.[1]

The specific volume that the United States is required to provide to the Exchange Contractors in a given year depends upon whether that year is a "critical" or a "noncritical" year. Under Article 7, the determination of whether a particular year is a critical year is based upon inflow into the Central Valley Project's largest reservoir, Shasta Reservoir. Appx325-326. A calendar year is critical if either (a) the United States forecasts less than 3,200,000 acre-feet of water in Shasta Reservoir in that water year (*i.e.*, the period beginning on October 1 of the preceding calendar year and lasting until September of the current calendar year); or (b) after accounting for deficiencies in preceding water years, there is a cumulative "deficiency" of 800,000 acre-feet as measured against a baseline of 4,000,000 acre-feet of annual inflow into Shasta Reservoir. Appx325. If a year is not a critical year, it is a noncritical year. Appx326.

---

[1] Unless noted otherwise, references to the "Exchange Contract" in this brief are referring to the 1968 Exchange Contract.

Article 8 of the Exchange Contract quantifies the volumes of "substitute water" the United States must deliver in critical and noncritical years.   Article 8 provides that the United States "shall deliver" a supply of "substitute water" to the Exchange Contractors "during all calendar years[.]"  Appx326.  Article 8 further establishes that "substitute water" must be delivered in the amount set forth in the Exchange Contractors' "estimates of their aggregate monthly delivery requirements and their daily delivery schedules for each weekly period," which amount is "not to exceed" the amounts set forth in Article 8.  *Id.*   The annual entitlements were 840,000 acre-feet in noncritical years, and 650,000 acre-feet in critical years, with specific monthly volumes also noted for each type of year.  *See id.*  The 1968 Exchange Contract contained a broad definition of "substitute water," which defined the term as "all water delivered hereunder at the points of delivery hereinafter specified to the [Exchange Contractors], regardless of source." Appx315.  Article 5(d) sets forth the "delivery points" for substitute water, which specifically contemplates the delivery of San Joaquin River-sourced water as substitute water.  Appx319-321.

Article 19 explains what happens when the "performance, in whole or in part, of the obligations of the respective parties under this contract is hindered, interrupted or prevented by war, strikes, lockouts, fires, acts of God, or by other similar or different acts of civil or military authorities, or by any cause beyond the

9

control of the respective parties hereto, whether similar to the causes herein specified or not[.]" Appx341. Under such circumstances, "such obligations of the respective parties under this contract shall be suspended to the extent and for the time that performance thereof is prevented or affected by such hindrance, interruption or prevention, but due diligence shall be observed by the respective parties hereto, so far as lies in their power, in performing their respective obligations under this contract." Appx340-341.

Additionally, Article 4(b) explains what happens if Reclamation is "temporarily unable" to deliver substitute water to the Exchange Contractors. "Whenever the United States is temporarily unable for any reason or for any cause to deliver to the Contracting Entities substitute water from the Delta-Mendota Canal or other sources," it provides, "water will be delivered from the San Joaquin River" in quantities that are set forth in Article 4(b). Appx316. For the first seven days after the interruption, San Joaquin River-sourced water is provided in the quantities set forth in Article 8; thereafter, San Joaquin River-sourced water is provided at the rates of flow reserved in the 1939 Purchase Contract (with those flows supplemented by waters maintained in storage in Millerton Lake when the water is flowing at sufficiently low rates). *Id.*

Article 4(a) explains that the Unites States may "divert, dispose of, and otherwise use" the waters of the San Joaquin River—"so long as, and only so long

as, the United States does deliver to the [Exchange Contractors] by means of the Project or otherwise substitute water in conformity with this contract." Appx315-316. At the same time, the Exchange Contract provided that "[t]his contract shall never be construed as a conveyance, abandonment or waiver of any water right" by the Exchange Contractors. Appx340.

### D.    **The Friant Contracts**

After receiving this conditional right to use the waters of the San Joaquin River from the Exchange Contractors' predecessors-in-interest, Reclamation agreed to provide the Friant Contractors with particular quantities of available San Joaquin River-sourced water each year—subject to numerous "contingencies" set forth in the Friant Contracts. *See generally* Appx346-418.

Article 3(a) of the Friant Contracts requires the Contracting Officer to "make available for delivery to the Contractor from the Project 40,000 acre-feet of Class 1 Water and 311,675 acre-feet of Class 2 Water for irrigation and [municipal and industrial] purposes." Appx362.[2] Article 3(a) is qualified by language explaining that the amounts set forth in Article 3(a) can be delivered only to the extent such delivery is "consistent with all applicable State water rights, permits, and licenses, Federal law, the Settlement including the [San Joaquin River Restoration

---

[2] As the parties did below, we cite to Reclamation's contract with the Arvin-Edison Water Storage District as a representative sample of the Friant Contracts.

Settlement Act], and subject to the provisions set forth in Articles 12 and 13 of this Contract[.]" *Id.* Moreover, the amounts set forth in Article 3(a) constitute the "contract total," which reflect the "*maximum* amount of Class 1 Water plus the *maximum* amount of Class 2 Water[3] specified in [Article 3(a)] and is the stated share or quantity of the Project's *available* water supply to which the Contractor will have a permanent right in accordance with the 1956 Act and the terms of this Contract . . . ." Appx355 (emphasis added). Class 1 Water is defined to mean "that supply of water stored in or flowing through Millerton Lake which, *subject to the contingencies hereinafter described in Articles 3, 12, and 13 of this Contract*, will be available for delivery from Millerton Lake and the Friant-Kern and Madera Canals as a dependable water supply during each Year." Appx354 (emphasis added).

Of particular significance to this appeal, the rights created under the Friant Contracts are also expressly "subject to the terms of the [Exchange Contract]," as amended. Appx368. Article 3(n) emphasizes that the United States is permitted to deliver water from the San Joaquin River to the Exchange Contractors when such deliveries are "required by the terms of" the Exchange Contract. *Id.*

---

[3] Appellants do not challenge Reclamation's decision not to allocate any Class 2 water to the Friant Contractors in 2014.

The Friant Contracts also specifically limit the liability of the United States during a "condition of shortage," such as drought years.  The Friant Contracts define "condition of shortage" to mean "a condition respecting the Project during any Year such that the Contracting Officer is unable to deliver sufficient water to meet the Contract Total[.]"  Appx354.  Article 13(a) requires the contracting officer to "use all reasonable means to guard against a Condition of Shortage in the quantity of water to be made available to the Contractor pursuant to this Contract," and requires that the contracting officer notify the Friant Contractors if she "determines that a Condition of Shortage appears probable[.]"  Appx393-394.  Article 13(b) then explains that the United States is immune from liability when a "condition of shortage" results from (among other causes) a "drought" or "actions taken by the Contracting Officer to meet legal obligations . . . except as provided in subdivision (a) of Article 19 of this Contract . . . ."  *Id.*  Article 19(a) of the Friant Contract, in turn, provides that actions based upon an "opinion or determination" shall not "be predicated upon arbitrary, capricious, or unreasonable opinions or determinations[.]"  Appx402.  Read together, Articles 13 and 19 prevent liability from accruing against the United States during periods of drought so long as the contracting officer does not take actions that are "predicated upon arbitrary, capricious, or unreasonable opinions or determinations[.]"  *See* Appx393-394, Appx402.

Historically, the amount of water received by the Friant Contractors has fluctuated year-by-year.  In recent years, they have on numerous occasions received less than a 100 percent allocation of the Class 1 water supply.  *See* Appx1869-1878.

### E.    The 2014 Drought And Reclamation's Response

In 2014, California experienced a "historic, extreme drought[.]"  *Friant Water Authority v. Jewell*, 23 F.Supp.3d 1130, 1140 (E.D. Cal. 2014).  Although 2014 was not the driest year in Reclamation's history, the effect of the drought was "extremely significant given that the state ha[d] many more water users and environmental criteria than it did in 1977, or even the early 1990s."  Appx2061.

The drought "left [Reclamation] with not enough supply to meet the obligations of the project."  Appx1892 (Jackson Dep. 53:6-9).  On February 15, 2014, Mr. Jackson wrote to a representative of the Exchange Contractors noting the "uncharacteristically dry" conditions "with a very low probability of full recovery to normal conditions this water year."  Appx1859.  Three months later, Mr. Jackson advised the Exchange Contractors that "[t]he Central Valley has experienced improved hydrology since the February 15th letter, but the drought and poor hydrologic conditions continue."  Appx1660.  He explained that, "[d]ue to the continued drought and unique hydrology, Reclamation will for the first time provide water from both Delta and San Joaquin River sources consistent with your

14

Contract" so that Reclamation could meet the Exchange Contractors' critical year requirements of 529,000 acre-feet for the months of April through October. *Id.*

This decision resulted from Reclamation's conclusion that, given its other obligations, and the hydrological and operational conditions in 2014, the San Joaquin River "was the only other source that was available to Reclamation" to satisfy Reclamation's contractual obligations to the Exchange Contractors. Appx1893 (Jackson Dep. 62:5-8). In so concluding, Reclamation personnel needed to account for how much water Reclamation could make available in a given month while still ensuring that, among other things, future supplies would be available for wildlife refuges, "health and safety" drinking water supplies would not be jeopardized, and minimum storage requirements in reservoirs could be met. Appx1894-1895 (Jackson Dep. 84:14-85:17). Given the hydrological conditions and Reclamation's other obligations, even providing the available San Joaquin River-sourced water to the Exchange Contractors was insufficient to satisfy the Exchange Contractors' critical year entitlement amounts set forth in Article 8. Appx1892 (Jackson Dep. 53:6-14).

The drought conditions of 2014 resulted in no water being available for appellants, after accounting for the operational and hydrological conditions in 2014 and Reclamation's other Central Valley Project obligations. Appx1888-1889 (Jackson Dep. 40:21-41:20). Although Reclamation did not allocate water to the

15

Friant Contractors in 2014, Reclamation ultimately delivered some water to them that year: both "health and safety" water and "carry over" water that the Friant Contractors had not used the previous year.  Appx1899 (Jackson Dep. 116:9-21).

For all these reasons, among others, "[o]perating the Central Valley Project during this critically dry period" of 2014 was "exceedingly difficult."  *See* Appx1848.

## F.    The Court Of Federal Claims Complaint

Appellants brought suit challenging the actions taken by Reclamation during the 2014 drought.  They initially sought a preliminary injunction against Reclamation in Federal district court, but voluntarily dismissed that case.  Appx8.  Appellants then brought suit in this Court, with the operative complaint filed on December 18, 2018.  Appx197-231.

Appellants brought two causes of action.  First, they alleged that they had a property interest in the water that Reclamation had not delivered to appellants.  Appx222-223.  They contended that the United States violated the Fifth Amendment of the United States Constitution by taking this property without just compensation.  *Id.*  Second, appellants alleged that the United States had breached the Friant Contracts by not providing water to appellants in 2014.  Appx223-230.  Appellants alleged that the United States made a "voluntary" decision to deliver to

16

the Exchange Contractors water from the San Joaquin River that appellants were entitled to under Article 3 of the Friant Contracts.  Appx228-229.

### G.    The Trial Court Enters Judgment Against Appellants

The trial court ultimately entered judgment against appellants on their takings and contract claims.

On March 25, 2020, the trial court granted in part and denied in part the United States' motion to dismiss the second amended complaint.  Appx1-20.  The trial court dismissed the individual landowners as plaintiffs, as they were not in privity of contract with the United States.  Appx13.  The trial court also dismissed the takings claim.  The trial court explained that "project water is of a different legal character from water that users that draw directly from streams or rivers such as the San Joaquin."  Appx18.  Under California law, the trial court explained, Reclamation holds water rights to Project water.  The court acknowledged a 1959 decision from California's State Water Rights Board holding that Reclamation had only nominal title to Project water.  Appx17.  But the trial court explained that appellants' reliance on this 1959 decision is "misplaced" in light of a 2000 decision from California's State Water Resources Control Board[4] that "rejected the theory

---

[4]  The State Water Resources Control Board assumed responsibility for adjudicating water rights from the State Water Rights Board.  *See Merced Irr. Dist. v. Cnty. of Mariposa*, 941 F.Supp.2d 1237, 1254 (E.D. Cal. 2013).  In this brief, we refer to each entity as the "board."

that the United States is merely a trustee of the water rights it secured for project purposes[.]" *Id.* The trial court also rejected appellants' reliance on Federal cases in which differently situated plaintiffs did have water rights, writing "[i]n none of these cases did the courts suggest that a plaintiff irrigation district or landowner could assert a property right that arose exclusively out of their use of project water supplied through a contract with the federal government." Appx18-19. Ultimately, the trial court explained that "[p]laintiffs cannot assert property rights greater than those secured through their contracts, which give a priority to the Exchange Contractors." Appx19.

The parties then conducted discovery on appellants' surviving breach of contract claim. After discovery closed, the trial court granted summary judgment to the United States and defendant-intervenors. Appx21-44. First, the trial court rejected appellants' argument that the Friant Contractors were entitled to fixed quantities of water each year under Article 3(a) of the Friant Contracts. Appx31-32. The trial court reasoned that "[t]he qualifying clauses included throughout the relevant articles of the Friant Contract[]—negotiated and agreed to by the Friant Contractors—curtail the impact and effect of the 'shall make available for delivery language' of Article 3(a) and must be accorded proper meaning." Appx32. Second, the trial court rejected appellants' argument that Article 8 did not impose any mandatory requirements upon the United States because it was a ceiling upon,

18

rather than a floor below, the United States' obligations to the Exchange Contractors. Appx39-40. The trial court explained that appellants' interpretation "ignores the interconnected provisions of the contract and, more fundamentally, undermines the foundation of the conditional exchange." Appx39. Third, the trial court rejected the argument that San Joaquin River-sourced water cannot constitute "substitute water[.]" Appx42. The trial court explained that "[t]he contracting parties therefore contemplated and specifically addressed deliveries of San Joaquin River water as substitute water 'at the points of delivery . . . specified' to the Exchange Contractors." *Id.* And fourth, the trial court rejected the argument that Article 4(b) of the Exchange Contract governed Reclamation's obligations in 2014. The trial court explained that the United States' position—that Reclamation was never unable to deliver substitute water in 2014—"supplies a harmonized reading of the contract as a whole." Appx42.

Ultimately, the trial court concluded that, "[d]espite looking elsewhere before using San Joaquin River water to meet the delivery requirements under the Exchange Contract, water scarcity left Reclamation with no other choice" besides delivering San Joaquin River-sourced water. Appx43. Accordingly, Reclamation's delivery of San Joaquin River-sourced water was "in accordance with the express terms of the Exchange Contract and the Friant Contract." *Id.*

19

The trial court also determined that its conclusion that "Reclamation did not breach the Friant Contract is further supported by the immunity clause included in the Friant Contract." Appx43. The Court explained that the Friant Contracts "effectively immunize[] the government from a breach of contract claim where, as here, the Court finds that the water allocation decisions and actions of the Contracting Officer in the face of a severe drought, coupled with Reclamation's legal obligations under the Exchange Contract, were not 'arbitrary, capricious, or unreasonable.'" Appx43-44. And in 2014, although the allocation for the Friant Contractors was "harsh" in its consequences, the "parties' contractual arrangements and relative entitlement hierarchy do not compel a different result." Appx44.

## SUMMARY OF THE ARGUMENT

The trial court did not err in granting summary judgment on appellants' breach of contract claim or by dismissing appellants' takings claim. The judgment should be affirmed.

With respect to the breach of contract claim, Reclamation did not breach any duties owed to the Friant Contractors by delivering the available San Joaquin River-sourced water to the Exchange Contractors in the historic drought year of 2014. Article 3(n) of the Friant Contracts prescribes that the Friant Contractors' rights are "subject to" to the terms of the Exchange

20

Contract.  Article 8 of the Exchange Contract, in turn, specifies the quantities of "substitute water" that Reclamation must provide to the Exchange Contractors, and Article 3 specifies that "substitute water" is "all water delivered hereunder . . . regardless of source."  In 2014, Reclamation needed to deliver the available San Joaquin River-sourced water to the Exchange Contractors so that it could comply with its obligations under Article 8 of the Exchange Contract.  Appellants contend that Article 4(b) of the Exchange Contract limited Reclamation's obligations in 2014, but they are wrong. Because Reclamation was able to deliver Delta-sourced substitute water to the Exchange Contractors throughout 2014, Article 4(b) was never triggered.  For all these reasons, as the Court of Federal Claims correctly concluded, Reclamation was required to deliver San Joaquin River-sourced water to the Exchange Contractors under Article 8 of the Exchange Contract in 2014. Doing so was not a breach of the Friant Contracts, as Article 3(n) of the Friant Contracts establishes.

Independently, the trial court's grant of summary judgment on the breach of contract claim should be affirmed because of the Friant Contracts' immunity provision.  Article 13 of the Friant Contracts provides immunity for damages arising out of the "actions taken by the Contracting Officer to meet legal obligations" during a "Condition of Shortage," unless those actions are

"predicated upon arbitrary, capricious, or unreasonable opinions or determinations."  Because Reclamation acted reasonably to comply with its contractual obligations during a drought year, it is entitled to immunity under Article 13 for its actions in 2014.

Appellants' takings claim fares no better than their contract claim.  The trial court properly relied upon California authorities that have established that Reclamation, not the water users, holds water rights to Central Valley Project water under California law.  Article 8 of the Reclamation Act—which does nothing more than affirm that Reclamation must act consistently with state law—is not to the contrary.  And in any event, none of the appellants are entitled to more than is specified in the Friant Contracts, which prescribe that the Friant Contractors' rights are "subject to" the terms of the Exchange Contract.  Appellants' arguments to the contrary must be rejected.

## ARGUMENT

## I.    Jurisdiction And Standard Of Review

A motion to dismiss pursuant to Rule 12(b)(6) of the Court of Federal Claims (RCFC) for failure to state a claim upon which relief may be granted is appropriate when the plaintiff alleges facts that do not entitle him to a remedy.  *Godwin v. United States*, 338 F.3d 1374, 1377 (Fed. Cir. 2003).  This Court "review[s] decisions to dismiss complaints under Rule 12(b)(6) de novo."  *Zafer*

*Construction Company v. United States*, 40 F.4th 1365, 1367 (Fed. Cir. 2022).

Summary judgment is appropriate if the evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. RCFC 56(a). The Court "review[s] a grant of summary judgment by the Court of Federal Claims de novo." *Anderson v. United States*, 23 F.4th 1357, 1361 (Fed. Cir. 2022).

## II. The Trial Court Correctly Granted Summary Judgment On The Breach Of Contract Claim

"To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States,* 877 F.2d 957, 959 (Fed. Cir. 1989).

For the reasons set forth below, the United States did not breach any duties owed to the appellants in 2014. The trial court correctly granted summary judgment on appellants' breach of contract claim.

### A. Because Reclamation Was "Required" To Provide The Available San Joaquin River-Sourced Water To The Exchange Contractors In 2014, It Did Not Breach The Friant Contracts

The trial court held that Reclamation had no duty to deliver water to the Friant Contractors in 2014 because (a) under Article 3(n) of the Friant Contracts, the Friant Contractors' rights were "subject to" the terms of the Exchange

23

Contract; and (b) Article 8 of the Exchange Contract "required" Reclamation to deliver the available San Joaquin River-sourced water to the Exchange Contractors in 2014. Appx36-37; Appx42-43. Appellants challenge this holding. They contend that Reclamation cannot rely upon Article 3(n) of the Friant Contracts because Reclamation delivered water to the Exchange Contractors in excess of the requirements in the Exchange Contract in 2014. Pl.-App. Br. 19-21.[5]

In setting forth this argument, Appellants do not dispute that Reclamation's obligation to deliver substitute water under Article 8 of the Exchange Contract, Appx326-327, is generally mandatory.[6] Nor do they dispute that, without delivering San Joaquin River-sourced water to the Exchange Contractors in 2014, Reclamation could not meet the Article 8 quantities during the relevant months of 2014. And they do not point to any source of water, other than the San Joaquin River, that Reclamation could have used in 2014 to supply the quantities set forth in Article 8.

---

[5] In this brief, we use the abbreviation "Pl.-App. Br [x]" to cite plaintiffs-appellants' opening brief and the abbreviation "FWA Am. Br. [x]" to cite the brief filed by amicus Friant Water Authority.

[6] On appeal, appellants do not pursue their argument—rejected by the trial court, Appx39-40—that Article 8 of the Exchange Contract set forth maximum quantities of substitute water that Reclamation *could* deliver to the Exchange Contractors, rather than minimum quantities that Reclamation *must* deliver.

Instead, appellants offer three arguments in support of their contention that the United States was not "required" to deliver the available San Joaquin River-sourced water to the Exchange Contractors in 2014. First, they contend that San Joaquin River-sourced water is not "substitute water," as that term is defined in Article 3 of the Exchange Contract. Second, they argue that, in 2014, the quantities set forth in Article 4(b) displaced the quantities set forth in Article 8. And third, they contend that Reclamation was not required to deliver water to the Exchange Contractors after it had been stored in Millerton Lake. Pl.-App. Br. 19-40.

Each argument is unavailing.

> 1.    Reclamation's Obligation To Provide "Substitute Water" To The Exchange Contractors Encompassed San Joaquin River-Sourced Water

Appellants' contention that Article 8's obligation to deliver "substitute water" does not extend to San Joaquin River-sourced water, Pl.-App. Br. 24-27, cannot be reconciled with the Exchange Contract's language or structure.

> i.    Only Reclamation's Interpretation Of "Substitute Water" Can Be Reconciled With The Exchange Contract's Language

Under the plain language of Article 3 of the Exchange Contract, the San Joaquin River-sourced water that Reclamation delivered to the Exchange Contractors in 2014 constituted "substitute water."

Article 3 provides that "substitute water" means "all water delivered hereunder at the points of delivery hereinafter specified to the Contracting Entities, *regardless of source*." Appx315 (emphasis added). Among the "points of delivery hereinafter specified" is Mendota Pool. Appx319 (permitting delivery to "pool back of Mendota Dam"). Reclamation delivered San Joaquin River-sourced water to the Exchange Contractors at Mendota Pool in 2014. Appx28 n.13. Under Article 3 of the Exchange Contract, San Joaquin River-sourced water became "substitute water" once this water arrived at Mendota Pool for delivery to the Exchange Contractors. *See* Appx315.

Even as appellants argue that San Joaquin River-sourced water cannot be substitute water under Article 3, they do not make a serious attempt to argue that the language of Article 3 supports their position. The one subordinate clause of their brief that acknowledges Article 3's "regardless of source" language does not grapple with it. Pl.-App. Br. 26 (after quoting the "regardless of source" language, asserting without further explanation that it "fails to evidence an intent different than the plain meaning of the terms 'exchange of water,' 'substitution of water supply,' and 'substitute water.'"). Because their position is contrary to Article 3's plain language, the Court must reject appellants' argument. *See Hunt Const. Group v. United States,* 281 F.3d 1369, 1373 (Fed. Cir. 2002) (". . . the plain language of the contract controls.").

26

In addition to being the only reading that flows from Article 3's plain language, our interpretation is also consistent with the remainder of the Exchange Contract. For instance, by noting that the parties expected that "*most if not all of the substitute water*" delivered to the Exchange Contractors would be delivered via the Delta-Mendota Canal, Article 5(a) leaves open the possibility that San Joaquin River-sourced water will be delivered to the Exchange Contractors. Appx317 (emphasis added). Article 20—which appellants' brief emphasizes, *see* Pl.-App. Br. 26. —similarly acknowledged that "substitute water" can be provided from the "Delta *and elsewhere*[.]" Appx342 (emphasis added). More generally, throughout the Exchange Contract, there is a baseline assumption that Reclamation would deliver San Joaquin River-sourced water as substitute water. Appx42 (citing Articles 5(d), 9(f), and 11 as proof that the Exchange Contract "contemplated and specifically addressed deliveries of San Joaquin River water as substitute water 'at the points of delivery . . . specified' to the Exchange Contractors.").

Contrary to the argument of amicus Friant Water Authority, FWA Am. Br. 12-16, the provisions contemplating the delivery of San Joaquin River-sourced water are not limited to flood years. Article 5(d)(5)(e) permits Reclamation to forgo deliveries at other delivery points—or "turnouts"—"[w]henever sufficient water is available" to meet the Exchange Contractors' requirements solely by making deliveries to Mendota Pool. Appx321. But Article 5(d)(5)(e) does not

27

purport to describe the only circumstance in which Reclamation will make deliveries of San Joaquin River-sourced water under the Exchange Contract. Indeed, elsewhere in Article 5, the Exchange Contract expressly permits the delivery of substitute water at Mendota Pool, which is the point of delivery for San Joaquin River-sourced water, without suggesting any limitations on when such deliveries can be made.  *See* Appx319.  Both Article 9(f) and Article 11 reinforce this conclusion by contemplating the delivery of San Joaquin River-sourced water as substitute water without any suggestion of a distinction between flood years and non-flood years.  *See* Appx333, Appx335.

For all these reasons, the trial court was correct to conclude that "[t]he contracting parties therefore contemplated and specifically addressed deliveries of San Joaquin River water as substitute water 'at the points of delivery . . . specified' to the Exchange Contractors."  Appx42.[7]

---

[7]  Appellants' reliance upon Article 4(c), which governs "permanent failure" of the delivery of substitute water, Appx316-317, is misplaced.  *See* Pl.-App. Br. 27. Appellants argue that Reclamation's position—*i.e.*, that San Joaquin River-sourced water can be "substitute water"—is illogical because, under Reclamation's view, Article 4(c) would not be triggered until all San Joaquin River-sourced water was exhausted.  *See id.*  Appellants are reading too much into Article 4(c), the intent of which is simply to "recognize that the Contracting Entities retain their basic rights to use of San Joaquin River water," Appx1779, in light of the numerous express indications in the Exchange Contract that San Joaquin River-sourced water can be substitute water.  *See* Appx42.

ii.    The Overarching Purpose Posited By Appellants Is
Inconsistent With The Parties' Agreement

Sailing upstream against the language of the Exchange Contract, appellants

take a different tack.  Appellants assert that, in entering into the Exchange

Contract, the United States and the Exchange Contractors agreed to "exchange"

waters of the San Joaquin River for Delta-sourced water.  Pl.-App. Br. 22-24.

Appellants then contend that the interpretation of Article 3 proffered by

Reclamation and the Exchange Contractors, and adopted by the trial court, is

inconsistent with this putative purpose.

But this argument fails to account for the Exchange Contract's language.

The water received by the Exchange Contractors in exchange for the right to use

the waters of the San Joaquin River was *not* limited to Delta-sourced water; they

instead received "substitute water"—"regardless of source."  Appx315.  The

"exchange" and "substitution" are therefore defined by the meaning reflected in the

Exchange Contract.  *See* Restatement of Contracts (2d) at § 201(1) (1981).  And it

is the intent of the parties to the Exchange Contract—who agree on the scope of

each provision at issue here—that controls, because "contract interpretation is

fundamentally a question of the *contracting parties' intent.*"  *Stockton East Water

Dist. v. United States*, 583 F.3d 1344, 1362 (Fed. Cir. 2009) (emphasis added).

Similarly, appellants argue that the trial court's analysis does not square with

their intuitions about what "exchange" and "substitution" mean.  Under the trial

court's construction of the Exchange Contract, appellants posit, the Exchange Contractors "exchanged" their rights to San Joaquin River water for rights to other San Joaquin River-sourced water.  Pl.-App. Br. 26.  If the Exchange Contractors were trading San Joaquin River water for itself, appellants argue, the Exchange Contract's use of the terms "exchange" and "substitution" would not make sense.  *See id.*  For the reasons described above, even if the premise were correct, this amorphous argument would provide no reason to depart from the unambiguously broad definition of "substitute water" contained in Article 3 of the Exchange Contract.  *See* Appx315; Restatement of Contracts (2d) at § 201(1) (1981).  But appellants' premise is incorrect.  There is nothing anomalous about describing the bargain struck in the Exchange Contract as an "exchange" or a "substitution."  The Exchange Contractors' predecessors-in-interest conditionally "exchange[d]" their rights to use San Joaquin River water for contractual rights to "substitute water"— a specified quantity of Central Valley Project water that, while usually made up of Delta-sourced water, can also consist of San Joaquin River-sourced water.  Appx42-43.  There is a difference between, on one hand, the natural flow water to which the Exchange Contractors had rights prior to the 1939 Exchange Contract and, on the other hand, the Central Valley Project water that the Exchange Contractors now receive, which is delivered by means of facilities constructed by Reclamation.  *See Israel v. Morton*, 549 F.2d 128, 132 (9th Cir. 1977)

(distinguishing "between the nature of nonproject water, such as natural-flow water, and project water"). Even putting this fundamental distinction aside, the 1939 Exchange Contracts is as much an "exchange" or "substitution" as, in different contexts, it would be if an investor "exchanged" shares of Stock A for shares of an index fund consisting of, among other securities, Stock A; or if a restaurant offered to "substitute" a three-course meal of salad, chicken, and ice cream for a three-course meal of salad, beef, and ice cream.

Appellants are also wrong when they contend that San Joaquin River-sourced water is "expressly stated to be beneficially used only by '*others than*' the Exchange Contractors[.]" Pl.-App. Br. 23 (quoting Appx316). Even as they quote part of Article 4(a) of the Exchange Contract, they omit the second half of that provision: ". . . so long as, and only so long as, the United States does deliver to the [Exchange Contractors] by means of the Project or otherwise substitute water in conformity with this contract." Appx316; *see also* Appx33. If Reclamation had not delivered the available San Joaquin River-sourced water to the Exchange Contractors in 2014, it would not have complied with its obligation to deliver "substitute water in conformity with [the Exchange Contract]." Appx316. And if the United States had not complied with its delivery obligations under the Exchange Contract, the United States would not have been permitted to use San Joaquin River-sourced water to supply the Friant Contractors. *See id.*

In addition to being undermined by the Exchange Contract's language, appellants' purpose-based argument fails on its own terms.  Appellants reduce the motivation of the parties to the Exchange Contract to guaranteeing the delivery of San Joaquin River-sourced water to the Friant Contractors notwithstanding any contingencies that might arise.  *See* Pl.-App. Br. 22-27.  This misunderstands the parties' priorities and constraints in negotiating the Exchange Contract.  The context for the 1939 Exchange Contract was that the Exchange Contractors' predecessors-in-interest held senior water rights that Reclamation needed to obtain to make possible the Central Valley Project.  *See Friant Water Authority*, 23 F.Supp.3d at 1135-36 (noting that it was the "cooperation of the Exchange Contractors [that] made possible the expansion of the" Central Valley Project) (cleaned up).   Possessing that leverage, the Exchange Contractors' predecessors-in-interest were able to protect themselves by obtaining broad "substitute water" rights in the Exchange Contract that were not limited to Delta-sourced water.  *See* Appx315.  At the same time, the Exchange Contract allowed the United States to select from where "substitute water" was obtained.  *See Westlands Water Dist. v. United States*, 153 F. Supp. 2d 1133, 1155 (E.D. Cal. 2001).  The resulting flexibility was extremely valuable to the United States in "operat[ing] the CVP as an integrated unit."  *Id.* at 1149.  It was therefore entirely reasonable for the parties

to define substitute water such that it encompassed San Joaquin River-sourced water.

Appellants also miss the bigger picture by focusing only upon how Reclamation's interpretation of the Exchange Contract harmed them in 2014. So long as Delta-sourced water is available to meet the Exchange Contractors' requirements (which it has been in the vast majority of years), the United States has been able to use San Joaquin River-sourced water to supply the Friant Contractors. *See* Appx352 (recital of the Friant Contracts indicating that "water obtained from the Central Valley Project has been relied upon by urban and agricultural areas within California for more than fifty (50) years . . . ."). Even so, as is clear from the "contingencies" set forth in the Friant Contracts, Reclamation never guaranteed that it would deliver fixed quantities of San Joaquin River-sourced water to the Friant Contractors each year. *See* Appx354. Reclamation's construction of the Exchange Contract has permitted Reclamation to achieve the goals of both the Exchange Contract and the Friant Contracts: making San Joaquin River-sourced water "an essential portion" of the Friant Contractors' water supply, *see* Appx352, subject to enumerated "contingencies" (such as Article 3(n)) that limit the Friant Contractors' rights in years like 2014. *See* Appx354.

Accordingly, appellants' broad-brush, purpose-based arguments cannot displace the Exchange Contract's plain language. Even if they could, appellants'

failure to fully account for the tradeoffs Reclamation necessarily faced in

negotiating the Exchange Contract undermines their argument.

        iii.    If The Court Deems Article 3 Ambiguous, The Extrinsic
                 Evidence Supports Our Position

Similarly unavailing is appellants' reliance on the "whereas" clause in the

Exchange Contract as evidence of a putative "course of performance" that supports

their position. Pl.-App. Br. 25-26. If the Court considers extrinsic evidence like

the parties' course of performance—which it should not, because the Exchange

Contract is unambiguous—the extrinsic evidence is on the side of the United

States.

To begin, "whereas" clauses generally cannot displace unambiguous

contract language. *See Barseback Kraft AB v. United States*, 121 F.3d 1475, 1481

(Fed. Cir. 1997). Here, the "whereas" clause relied upon by appellants simply

states, as a matter of historical fact, that, between 1951 and 1968, Reclamation

delivered Delta-sourced water to the Exchange Contractors, and San Joaquin

River-sourced to other users. Appx314. This anodyne recitation of historical

background reflects no intent to bind the parties or to contradict the Exchange

Contract's operative provisions. *See Barseback*, 121 F.3d at 1481 (rejecting

argument that "whereas" clauses rendered the contract ambiguous, where they did

not express "binding commitments.").

The recital fares no better as "course of performance" evidence.  As noted above, "[c]ourse of performance evidence in most circumstances is relevant to interpretation of an instrument only if the terms of that instrument are ambiguous," which Article 3 is not.  *United States v. Ford Motor Co.*, 463 F.3d 1267, 1278 (Fed. Cir. 2006).  Even if Article 3 were ambiguous, the putative course of performance evidence cited by appellants is not probative.  The language cited by appellants supports the proposition that, for those eighteen years, Reclamation did not use San Joaquin River-sourced water as substitute water.  But appellants cite no evidence—in this recital or otherwise—giving any indication that, in any year before 2014, the parties ever considered circumstances similar to those that gave rise to this case.  Years in which Delta-sourced water satisfied the Exchange Contractors' requirements shed no light on years when it did not.

The course of performance evidence is particularly weak considering the other extrinsic evidence in the record.  According to a November 21, 1955 memorandum about the negotiations that preceded the execution of the 1956 Exchange Contract, the contract's definition of "substitute water" explained that "[t]he last three words of the article"—that is, "regardless of source"—"recognize that substitute water may be delivered from San Joaquin River, from Delta-Mendota Canal, or partially from each source . . . ."  Appx1778-1779.  Additionally, it is undisputed that the parties' course of performance is to count

San Joaquin River-sourced water as "substitute water" under the Exchange

Contract in years of abundant water supply.  *See* Appx2230 (Jackson Dep. 100:1-

14).  Accordingly, even if the Court decides that Article 3 is ambiguous, and

considers extrinsic evidence to resolve that ambiguity, the extrinsic evidence

supports our position.

> ### 2. Article 4(b) Of The Exchange Contract Did Not Limit Reclamation's Obligations Under Article 8 Of The Exchange Contract In 2014

As set forth above, Reclamation's obligation to deliver substitute water

under Article 8 of the Exchange Contract extends to San Joaquin River-sourced

water.  Contrary to appellants' arguments, this obligation was not limited in 2014

by Article 4(b) of the Exchange Contract.

> ### i. Article 4(b) Was Not Triggered Because Reclamation Was Able To Deliver Substitute Water To The Exchange Contractors Throughout 2014

Article 4(b) is triggered only when Reclamation is "temporarily unable for

any reason or any cause to deliver to the Contracting Entities substitute water from

the Delta-Mendota Canal or other sources[.]"  Appx316.  Because Reclamation

was able to deliver Delta-sourced substitute water to the Exchange Contractors

throughout 2014, Article 4(b) had no application in 2014.

Article 8 specifies "substitute water" quantities that Reclamation "shall

deliver" to the Exchange Contractors "[d]uring all calendar years[.]"  Appx326-

327.  When Reclamation does not have sufficient "substitute water" available to meet the applicable Article 8 quantity in a given time period, Reclamation's obligations "shall be suspended to the extent and for the time that performance thereof is prevented or affected by such hindrance, interruption, or prevention[.]" Appx341.  Articles 8 and 19 of the Exchange Contract governed Reclamation's obligations to the Exchange Contractors in 2014.

Article 4(b), by contrast, applies only when Reclamation is "temporarily unable" to deliver substitute water to the Exchange Contractors.  Article 4(b) was not triggered in 2014.  A *reduction in the amount* of water available in Reclamation's reservoirs, as happens during drought years like 2014, does not render Reclamation "*unable*" to deliver water to the Exchange Contractors.  Reclamation can, however, become "*unable*" to deliver water to the Exchange Contractors when the delivery of water from the reservoirs to the Exchange Contractors is interrupted—as happens when the facilities that Reclamation uses to deliver water are inoperative or under repair.  Nothing of the sort happened in 2014.  Throughout the entire period during which appellants allege that their water deliveries were interrupted, Reclamation was able to deliver water sourced from the Delta-Mendota Canal to the Exchange Contractors.  *See* Appx1892 (Jackson Dep. 54:19-55:5); Appx2114 (Tormey Dep. 216:15-19).  Accordingly,

Reclamation was never "temporarily unable" to deliver substitute water in 2014 such that Article 4(b) was triggered.

This is the best reading of Article 4(b)'s plain language.  Generally, "unable" is defined by reference to its object, which sets forth a particular objective that cannot be achieved.  *See* The Random House Dictionary of the English Language 1536 (1967) (defining "unable as "lacking the necessary power, competence, etc., to accomplish some specified act.").  Article 4(b) makes that objective the delivery of substitute water to the Exchange Contractors—which, as explained above, Reclamation was able to do throughout 2014)—rather than the satisfaction of the quantity requirements in Article 8.  Further supporting our interpretation, the language of Article 4(b) focuses solely upon the quantity of San Joaquin River-sourced water that must be delivered when Article 4(b) is triggered, while omitting entirely any mention of how much Delta-sourced water must be delivered.  Appx316.  This further suggests that the parties were contemplating a scenario where Reclamation was unable to deliver *any* Delta-sourced water to the Exchange Contractors when they drafted Article 4(b).

Because Reclamation was able to deliver substitute water to the Exchange Contractors in 2014, the "for any reason or any cause" language in Article 4(b), Appx316, does not advance appellants' position.  Although this language makes clear that an *inability to deliver* substitute water triggers Article 4(b) regardless of

38

why Reclamation is unable to make deliveries, it does not expand Article 4(b) to

cover situations when Reclamation is *able to deliver substitute water* to the

Exchange Contractors, as it was in 2014.

Article 4(b) thus creates a narrow exception to the general rule set forth in

Article 8 to deal with the unique issues posed by delivery problems in the Delta.

Our interpretation of Article 4(b) is consistent with both the provision's language

and with the structure of the Exchange Contract.

>    ii.    Appellants' Interpretation Of Article 4(b) Would Create
>           Conflict With Other Provisions Of The Exchange
>           Contract And Lead To Illogical Results

Appellants contend that, any time Reclamation delivers less than the full

Article 8 quantity of substitute water to the Exchange Contractors in a given year,

the quantities set forth in Article 4(b) supersede the Article 8 quantities.  Pl.-App.

Br. 32-33.  This reading suffers from numerous flaws.

*First*, this reading would create a conflict between Article 4(b) and Article

19 of the Exchange Contract.  Article 19 is a catch-all provision that governs what

happens when Reclamation is unable to deliver the full complement of substitute

water in a given month.  Appx341-342.  Under Article 19, if Reclamation's

delivery of substitute water is "hindered, interrupted, or prevented" by "any cause

beyond the control of the respective parties hereto," its obligations "shall be

suspended to the extent and for the time that performance thereof is prevented or

39

affected by such hindrance, interruption, or prevention[.]" *Id.* Article 19 further provides that, in any event, "due diligence shall be observed by the respective parties hereto, so far as lies in their power, in performing their respective obligations under this contract." Appx342.

If Article 4(b) were read as broadly as appellants say it should be, Reclamation would be subject to conflicting imperatives when it does not have enough substitute water to deliver to the Exchange Contractors in a given period. Even as Article 19 instructed Reclamation to do its "due diligence" to meet its Article 8 obligations, Article 4(b) would instruct that the Exchange Contractors' entitlement would revert to the much lower volumes set forth in Article 4(b). That appellants' interpretation would result in *"conflicts in, or surplusage of, its provision,"* militates against their reading. *See Burnside–Ott Aviation Training Ctr. v. Dalton,* 107 F.3d 854, 860 (Fed. Cir. 1997).

*Second*, appellants' reading ignores that the parties specifically contemplated droughts and addressed how water would be allocated during them. The possibility of droughts was addressed through the combination of Article 7, which deems years with relatively low inflows into Shasta Dam "critical years," and Article 8, which provides that the United States must provide less water in "critical years" than in noncritical years. To illustrate this distinction, Article 7 included a chart that set forth how much water Reclamation would have been required to

40

deliver in each year between 1922 and 1935, which the chart characterized as "an unusually dry period." Appx326. According to this chart, for each year during this "unusually dry period," Reclamation would have been required to deliver at least 650,000 acre-feet of substitute water. Appx326. This chart provides no indication that, when a drought year was particularly severe, the parties intended for Reclamation's obligations to revert to the quantities set forth in Article 4(b). *Id.* To the contrary, even during the "unusually dry period" of the Dust Bowl, the parties acknowledged that Reclamation's obligations would have been fixed by the quantities set forth in Article 8. *Id.* At the very least, given how precisely the Article 7 chart describes the quantities of substitute water that must be delivered during an "unusually dry period," one would expect Article 7 to also note any circumstances when the parties did not intend for the quantities set forth in Article 8 to control. There is no reason to think that the parties intended the drastic departure from the framework set forth in Articles 7 and 8 that results from appellants' interpretation of Article 4(b).

*Third*, the interpretation proffered by the appellants would lead to illogical results. Under Reclamation's reading of the Exchange Contract, if the Exchange Contractors request 30,000 acre-feet of water pursuant to Article 8 in a given month, but Reclamation is able to deliver only 29,999 acre-feet of Delta-sourced water, the combination of Article 8 and Article 19 of the Exchange Contract would

41

require Reclamation to deliver 29,999 acre-feet from the Delta, and fill in the gap with San Joaquin River-sourced water.  Although appellants take the position that Article 4(b) should apply in such a scenario, appellants do not clearly explain how Article 4(b) would apply.  *See* Pl.-App. Br. 32-33.  One possible interpretation of appellants' position is that Article 4 extinguishes the Article 8 requirements, such that—even though 29,999 acre feet of Delta-sourced water is available to be delivered to the Exchange Contractors—Reclamation is completely excused from its obligation to deliver Delta-sourced water to the Exchange Contractors.  An alternative interpretation of appellants' position is that Reclamation's obligation to deliver San Joaquin River-sourced water is in addition to its obligation to deliver Delta-sourced water—which would result in a windfall to the Exchange Contractors in situations where Reclamation can almost (but not completely) deliver substitute water in the quantities set forth in Article 8.  Whether appellants are arguing that the Exchange Contractors' "entitlement" should fall off a cliff or that they should receive a windfall, neither interpretation makes sense.  In the absence of any indication that the parties intended such illogical results, appellants' construction should be rejected.  *See Hughes Communications Galaxy, Inc. v. United States*, 998 F.2d 953, 958 (Fed. Cir. 1993).

Appellants' construction of Article 4(b) should therefore be rejected.

iii.   If The Court Considers The Arguments Raised Solely By
Amicus Friant Water Authority, The Court Should Reject
Them

Amicus Friant Water Authority raises a number of arguments about the

interpretation of Article 4(b) of the Exchange Contract that were not pressed by

appellants in their opening brief or below.

At the outset, because these arguments were raised for the first time by an

amicus brief, the Court need not consider them—especially considering that they

are being raised by a non-party to the Exchange Contract with no special insight

into its meaning.  *See F.T.C. v. Phoebe Putney Health System*, 568 U.S. 216, 226

n.4 (2013) (declining to consider argument raised by amicus that "was not raised

by the parties or passed on by the lower courts[.]").

If the Court considers these arguments, they should be rejected.  The Friant

Water Authority contends that the absence of the modifier "any" in front of

"substitute water" undermines our interpretation of Article 4(b).  FWA Am. Br. 6-

7.  Although "any" might have added additional emphasis, it is unnecessary.  If

anything, focusing upon the language that the parties chose to omit from Article

4(b) cuts against appellants' interpretation.  If appellants were correct about the

meaning of Article 4(b), one would expect Article 4(b) to refer not solely to an

*inability to deliver substitute water*, but to an *inability to deliver substitute water in*

*the amount required by the Exchange Contractors*.  By analogy, if a customer

asked a hardware store to deliver ten canisters of propane, the response "we are unable to deliver propane" would most naturally be understood as meaning that the store is unable to deliver *any* propane.  The response "we are unable to deliver *ten canisters of propane*" or "we are unable to deliver propane *in the requested quantity*" would be more natural ways of expressing that the store could deliver some propane but not the ten canisters sought by the customer.  To the same effect, that Article 4(b) does not state that it is invoked when Reclamation is "temporarily unable . . . to deliver . . . substitute water *in the quantities required by the Exchange Contractors . . .*" undermines appellants' argument.

Friant Water Authority also argues that Article 4(b)—which applies when Reclamation is unable to deliver "substitute water from the Delta Mendota-Canal or other sources []"—would never be triggered, because it would require that "no San Joaquin River water is available for delivery – an absurd impossibility."  FWA Am. Br. 9.  But the "Delta-Mendota Canal or other sources" language of Article 4(b) is most reasonably understood as referring to the Delta-Mendota Canal and other sources of *Delta* water.  *See Bank of Am. Corp. v. United States*, 964 F.3d 1099, 1104 (Fed. Cir. 2020) (explaining that broad terms can be "narrowed by the commonsense canon of *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring words with which it is associated").  Read in this light, Article 4(b) simply addresses how much San Joaquin River-sourced

44

water Reclamation must deliver if it is "temporarily unable" to deliver Delta-sourced water.  Similarly, Friant Water Authority suggests that our interpretation would render Article 4(b) a nullity because it would be "applicable only if no molecule of water remained available anywhere."  FWA Am. Br. 8.  To the contrary, as the negotiating history shows, the parties absolutely contemplated that non-operational facilities in the Central Valley could result in Reclamation becoming "temporarily unable" to deliver any Delta-sourced water to the Exchange Contractors.  *See* Appx1779.

Finally, Friant Water Authority argues that, to demonstrate the trial court's error, one need only cut part of the definition of "substitute water" from Article 3 and paste it in place of the phrase "substitute water" in Article 4(b).  FWA Am. Br. 7-8.  There is no indication that the parties intended the Exchange Contract to be interpreted through such semantic devices.  In any event, the reconstructed Article 4(b) proposed in the amicus brief is nonsensical, in that it applies when the United States is "temporarily unable . . . to deliver . . . all water delivered hereunder . . ." *See* FWA Am. Br. 7.  Such anomalous constructions cannot possibly provide insight into the parties' intent.

Friant Water Authority's arguments should therefore be rejected even if the Court entertains them.

iv.    If The Court Deems Article 4(b) Ambiguous, The
       Extrinsic Evidence Supports Our Position

As we explained above, the language, structure, and context of Article 4 render the provision unambiguous.  Alternatively, if the Court concludes that Article 4 is ambiguous, extrinsic evidence supports our reading.

A document reflecting the United States' contemporaneous understanding of the 1956 Exchange Contract notes that the 1956 Exchange Contract contains a provision corresponding to Article 4 in the operative Exchange Contract—and then explains that "[w]e believe that *only* through failure of the Tracy Pumping Plant or Delta-Mendota Canal would this provision come into effect."  Appx1864.  To similar effect, another document describing Reclamation's understanding of the 1956 Exchange Contract explains that the provision corresponding to Article 4 of the operative Exchange Contract "recognizes that [Reclamation] may wish to suspend deliveries of substitute water for operational or maintenance reasons, or may be forced to suspend deliveries due to emergencies."  Appx1779.

These contemporaneous documents about the parties' negotiations support our narrow construction of Article 4(b).  Therefore, even if the Court concludes that Article 4(b) is ambiguous, the extrinsic evidence in the record relating to the interpretation of Article 4(b) supports our interpretation.

3.     Reclamation Did Not Breach Any Duties To Appellants By Delivering Water Stored In Millerton Lake To The Exchange Contractors

Appellants' reliance on the language in Article 4(b) providing that the United States is not required "to retain water in storage in Millerton Lake in anticipation of the possible future need for such releases," does not help their position. *See* Pl.-App. Br. 33, 34-35.

Appellants appear to be contending that, because Article 4(b) of the Exchange Contract did not require Reclamation "to retain water in storage in Millerton Lake in anticipation of the possible future need for such releases," the United States was not required to deliver water that was stored in Millerton Lake to the Exchange Contractors.[8]  The entire basis for this argument is the United States' admission in this litigation that, in 2014, "Reclamation retained San Joaquin River water in storage in Millerton Reservoir in anticipation of Central Valley Project needs including the possible need for releases to the Exchange Contractors in

---

[8]  Based on the framing of their brief, we understand appellants to be challenging Reclamation's decision to deliver stored water to the Exchange Contractors, not Reclamation's decision to store water in Millerton Lake *per se*. Pl.-App. Br. 33, 35.  Even if appellants had challenged the storage decision *per se*, such a challenge would be baseless.  Reclamation did not make any commitments relating to the *storage* of water (as opposed to the *delivery* of water) in Article 3(n) of the Friant Contracts.  *See* Appx368.

2014." Appx1153. This admission provides no basis for a breach of contract claim.

First, the limitation of Reclamation's storage obligations contained in Article 4(b) is relevant at most to Reclamation's obligations under Article 4(b). But as appellants acknowledge, Reclamation did not invoke Article 4(b) in 2014. Pl.-App. Br. 21. Instead, Reclamation delivered substitute water to the Exchange Contractors pursuant to Article 8. Because Reclamation had no reason to anticipate that Article 4(b) would be triggered in 2014, it did not store water in Millerton Lake "in anticipation of the possible future need for" releases to satisfy its obligations under Article 4(b) of the Exchange Contract. The storage language in Article 4(b) thus has no application to this appeal.

Second, even if the storage language in Article 4(b) had been relevant in 2014, neither Article 4(b) nor any other provision of the Exchange Contract limited Reclamation's delivery obligations to non-stored water. In setting forth Reclamation's *delivery* obligations (as opposed to Reclamation's *lack of storage* obligations), none of Articles 3, 4, or 8 of the Exchange Contract distinguish between water that is in storage and water that is not in storage. Appx315-316; Appx326-327. That the available San Joaquin River-sourced water happened to have been stored in Millerton Lake in 2014 did not provide the United States with

an excuse for nonperformance of its obligations to deliver "substitute water" to the Exchange Contractors.  *See id.*

Finally, appellants focus upon their repayment of the cost related to the construction of Millerton Dam.  Pl.-App. Br. 8-9, 34.  These assertions are completely untethered from the contractual provisions at issue in this appeal, none of which turn on facility repayments made by the Friant Contractors.  Moreover, although payments made by the Friant Contractors permit them to receive water at cost from Reclamation, those payments do not give them the right to dictate to Reclamation how Millerton Lake—a reservoir that is maintained and operated by Reclamation—is used.  *See* 43 U.S.C. § 498 (providing that, while responsibility for operating irrigation works transfers to landowners after payments are made, "the title to and the management and operation of the reservoirs and the works necessary for their protection and operation shall remain in the Government until otherwise provided by Congress.").  Appellants have not identified any provisions in either the Exchange Contract or the Friant Contracts that limited Reclamation's discretion to manage Central Valley Project reservoirs in 2014.  *See generally Central Delta Water Agency,* 452 F.3d at 1027.

For these reasons, Reclamation did not breach any duties owed to the Friant Contractors by delivering water stored in Millerton Lake to the Exchange Contractors.

4.      Because Reclamation Was "Required" To Deliver The Available San Joaquin River-Sourced Water To The Exchange Contractors, The Friant Contractors' Rights Were Subordinate To The Exchange Contractors' Rights In 2014

We have demonstrated above that the Exchange Contract required Reclamation to deliver the available San Joaquin River-sourced water to the Exchange Contractors in 2014.  Article 3(n) of the Friant Contracts thus expressly permitted Reclamation to deliver that water to the Exchange Contractors instead of the Friant Contractors.

Of note, appellants do not contend that Reclamation's obligations to the Friant Contractors extend to water that Reclamation was required to deliver to the Exchange Contractors.  Pl.-App. Br. 20 (explaining that "[a]ny amount of San Joaquin River water delivered by the United States *that exceeds its legal obligations to the Exchange Contractors* results in a breach of Article 3(n) of the Friant Contracts . . . .") (emphasis added).  If the Court agrees with us that Reclamation was required to deliver the available San Joaquin River-sourced water to the Exchange Contractors in 2014, then the Court should affirm the trial court's breach of contract decision on the grounds that the water Reclamation delivered to the Exchange Contractors did not "exceed[] its legal obligations to the Exchange Contractors[.]" *See id.*

50

Appellants argue that the trial court erred by characterizing the Friant Contractors' rights as "subordinate" to the Exchange Contractors' rights.  Pl.-App. Br. 36-40.  Though Article 3(n) supports the trial court's characterization in providing that the Friant Contractors' rights are "subject to the terms of the" Exchange Contract, Appx368, the Court need not decide whether the Friant Contractors' rights are always subordinate to the Exchange Contractors' rights to resolve this appeal.  This Court must decide only whether Reclamation breached the Friant Contracts in 2014 (which, of course, was the context for the trial court's analysis that appellants challenge).   And, on this point, appellants fail to appreciate the significance of the trial court's finding that Reclamation could satisfy the Exchange Contract's "substitute water" requirements only by providing San Joaquin River-sourced water to the Exchange Contractors in 2014.  *See* Appx43.  At the very least, under such circumstances, the rights of the Friant Contractors are "subject to" the provisions of the Exchange Contract under Article 3(n) of the Friant Contracts.  *See* Appx368.

Accordingly, the trial court correctly granted summary judgment to the United States on appellants' breach of contract claim.

**B.    Alternatively, Article 13 Of The Friant Contracts Immunize The United States For Its Actions In 2014**

Alternatively, though the Court need not reach this issue if it agrees with us that Reclamation did not breach any duties owed to the Friant Contractors,

51

Reclamation is entitled to summary judgment under Article 13 of the Friant

Contracts.  Article 13 provides that "no liability shall accrue against the United

States . . . for any damage . . . arising" from "actions taken by the Contracting

Officer to meet legal obligations" during a "Condition of Shortage," unless those

actions are "arbitrary, capricious, or unreasonable."  Appx394; Appx402.  This

provision immunizes Reclamation from liability for delivering the available San

Joaquin River-sourced water to the Exchange Contractors.

Nobody disputes that the water allocation decisions made by Reclamation in

2014 arose out of drought conditions.  Appx22.  A "Condition of Shortage" exists

when Reclamation is "unable to deliver sufficient water to meet the Contract

Total."  Appx354.  As a result of the drought in 2014, Reclamation did not have

enough water to deliver the Contract Total to appellants, or, for that matter, to meet

its other Central Valley Project requirements.  *See* Appx1892 (Jackson Dep. 53:6-

9).  Accordingly, the drought conditions of 2014 triggered a "Condition of

Shortage" under Article 13 of the Friant Contracts.  So long as Reclamation does

not act in a manner that is "arbitrary, capricious, or unreasonable," Reclamation is

immune from the consequences of actions undertaken to comply with its legal

obligations.  Appx393-394; Appx402. [9]

---

[9]  Appellants mischaracterize our position when they state that the "Government wisely chose not to rely on drought as an affirmative defense in this case."  Pl.-App. Br. 42.  Contrary to appellants' contention, and as we explain above, the 2014

Appellants cannot show that Reclamation used Central Valley Project water in an "arbitrary, capricious, or unreasonable" manner in 2014.  Water availability was greatly limited as a result of the "historic, extreme drought" in 2014.  *Friant Water Authority*, 23 F.Supp.3d at 1140.  Reclamation reasonably determined that the only way to satisfy the Exchange Contractors' contractual needs was to deliver the available San Joaquin River-sourced water to the Exchange Contractors.  Appx1893 (Jackson Dep. 62:5-8).  Contrary to appellants' suggestion, we are not arguing that Reclamation's actions amounted to a "reasonable breach."  Pl.-App. Br. 43-45.  We are arguing that Reclamation's actions complied with both the Exchange Contract and the Friant Contracts.  *See* Appx43-44.

Under Article 13 of the Friant Contracts, Reclamation is therefore immune from liability for its actions.  *See id.*; *cf. Baley v. United States*, 134 Fed. Cl. 619, 658-59 (2017), *aff'd*, 942 F.3d 1312 (Fed. Cir. 2019) (interpreting immunity provision in different Reclamation contract).

## III.   <u>The Trial Court Correctly Dismissed Appellants' Takings Claims</u>

Finally, as the trial court correctly held, appellants did not state a takings claim.

---

drought triggered Article 13 of the Friant Contracts.  *See* Appx43-44.  We are therefore relying upon drought as an affirmative defense.  But we have also acknowledged that, even in drought years, Reclamation is not immunized if it acts in a manner that is "arbitrary, capricious, or unreasonable"—which, as explained above, Reclamation did not in 2014.

Generally, the Fifth Amendment to the Constitution proscribes the taking of private property "for public use, without just compensation." U.S. Const. amend. V, cl. 4. "When evaluating whether governmental action constitutes a taking, a court employs a two-part test." *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1348 (Fed. Cir. 2013). "First, the court determines whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking." *Id.* "Second, if the court concludes that a cognizable property interest exists, it determines whether the government's action amounted to a compensable taking of that interest." *Id.*

Appellants argue that they have a water right to Central Valley Project water that gives rise to a claim under the Takings Clause. Pl.-App. Br. 45-55.[10] Because this theory defies California law, Federal law, and the terms of the governing contracts, it should be rejected.

### A.    Appellants Have No Water Rights Under California Law

To begin, appellants do not have any water rights under California law because appropriative rights to Central Valley Project water are held by Reclamation, not appellants.

In arguing that they have, under California law, water rights in water to which Reclamation is the permit holder, appellants depend solely upon a 1959

---

[10]  Appellants' brief is not clear as to whether they are contending that (a) the

54

decision of the California State Water Resources Control Board. Pl.-App. Br. 50-51. The trial court correctly rejected this argument. Relying upon a litany of decisions that post-dated the 1959 board decision, the trial court held that the United States, not the irrigation districts or water users, holds the water rights for the Central Valley Project water. *See* Appx17-18; *County of San Joaquin v. State Water Res. Control Bd.*, 63 Cal. Rptr. 2d 277, 285 n.12 (Ct. App. 1997) ("The Bureau has appropriative water rights in the Central Valley Project."); Appx2399-2403 (1999 board decision recognizing that Reclamation holds water rights in Central Valley Project water). To similar effect, Federal courts have recognized that "[u]nder California law, even though Reclamation itself does not apply project water to lands, it remains the holder of the relevant water rights." *See San Luis Unit Food Producers v. United States*, 772 F.Supp.2d 1210, 1246 (E.D. Cal. 2011); *see also Israel*, 549 F.2d at 132 (explaining that Central Valley Project water "is not there for the taking (by the landowner subject to state law), but for the giving by the United States.").

---

irrigators alone possessed a property interest that was the subject of a taking or (b) both the irrigators and the Friant Contractors possessed a property interest that was the subject of a taking. *Compare* Pl.-App. Br. 45 (asserting that Friant Contractors were bringing takings claim "in their representative capacity") *with* Pl.-App. Br. 46 (asserting that "the Friant Contractors and their Growers Have Protected Property Interests in Friant Division Water"). Each of our arguments for why appellants cannot state a takings claim applies to both the irrigators and the Friant Contractors.

California law has coalesced around this rule for good reason. The purpose of the appropriation doctrine is to reward initiative that allows water that would have otherwise sat worthless to be put to beneficial use, thus contributing to the state's development. *See Irwin v. Phillips*, 5 Cal. 140, 146 (Cal. 1855). This is exactly what the United States did by constructing the Central Valley Project. After all, "[p]roject water . . . would not exist but for the fact that it has been developed by the United States." Appx18 (quoting *Israel*, 549 F.2d at 132); *see also Ivanhoe Irr. Dist. v. All Parties and Persons*, 350 P.2d 69, 75 (Cal. 1960) (explaining that "[t]he federal government with federal funds has lawfully developed water project water that without the project would not have been developed."). By focusing solely upon who used the water, Appx1075-1076, the 1959 board decision does not account for the distinctive character of Central Valley Project water, which is "developed through the exercise of the rights" obtained by Reclamation, Appx350, and "[i]n a very real sense it is or will become the property of the United States." *Ivanhoe*, 350 P.2d at 75. Appellants, who completely ignore the trial court's analysis on this point, provide no reason that this Court should disregard decades of state law precedent undermining their position, and revert to superseded analysis from a 1959 board decision.

Appellants therefore have no water rights under California law.

## B.    Appellants Have No Water Rights Under Federal Law

Appellants fare no better under the Federal authorities they cite.

Federal law does not create water rights beyond those created under state law.  Appellants' lack of state water rights is thus dispositive, and appellants' focus on Supreme Court decisions interpreting the Reclamation Act is therefore misplaced.  Pl.-App. Br. 51-53 (discussing *Ickes v. Fox*, 300 U.S. 82, 95 (1937); *Nebraska v. Wyoming*, 325 U.S. 589, 613-615 (1945); and *Nevada v. United States*, 463 U.S. 110, 122 (1983)).  As the Supreme Court has explained when construing the Reclamation Act, water rights are created by state law.  In *Nevada v. United States*, the Court stressed the rule of *California v. United States* that "'*the [Reclamation] Act clearly provided that state water law would control in the appropriation and later distribution of the water*'," and rested its decision on "the law of Nevada."  463 U.S. at 122, 126 (emphasis in original).   The *Nevada* Court also noted that, "[a]s in *Ickes v. Fox* and *Nebraska v. Wyoming*, the law of [the] relevant State and the contracts entered into by the landowners and the United States" formed the basis for its ruling.  *Id*. at 126.  Supreme Court precedent demonstrates that the Reclamation Act does not confer upon appellants Federal water rights that exceed those created by state law.  *See California*, 438 U.S. at 653 (noting "the consistent thread of purposeful and continued deference to state water law by Congress.");  *id.* at 668-69 (explaining that "[a] principal motivating factor

behind Congress' decision to defer to state law was thus the legal confusion that would arise if federal water law and state water law reigned side by side in the same locality."). Appellants' reliance on the language from the Reclamation Act providing that "the right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated," and that "beneficial use shall be the basis, the measure, and the limit of the right," 43 U.S.C. § 372, fails to account for this Supreme Court precedent interpreting the Reclamation Act.

The precedent from this Court relied upon by appellants also provides no support for their position. In *H.F. Allen Orchards v. United States*, the Court did nothing more than acknowledge that property rights were "undisputed" in the litigation. 749 F.2d 1571, 1576 (Fed. Cir. 1984). *Klamath Irrigation District v. United States* is no more helpful to appellants. 635 F.3d 505, 519 (Fed. Cir. 2011). Contrary to appellants' characterization of the case, Pl.-App. Br. 53, this Court's decision in *Klamath Irrigation District* simply remanded for the trial court to determine, based upon a three-part test articulated by the Oregon Supreme Court, "whether plaintiffs have asserted cognizable property interests" under Oregon law. *Klamath Irr. Dist.*, 635 F.3d at 519.[11] The Oregon Supreme Court's interpretation

---

[11] On remand, the trial court, applying Oregon law, held that certain plaintiffs had a property interest in undelivered water, but there was no taking because those plaintiffs' rights were inferior to rights held by Indian tribes. *Baley*, 134 Fed. Cl. at 680. On appeal, the United States defended the trial court's ultimate conclusion that there was no taking without contesting the trial court's conclusion that certain

of Oregon law has no relevance to the putative water rights at issue here, which could arise only under California law.[12]  And appellants ignore the ultimate outcome of the *Klamath Irrigation District* litigation.  After decades of litigation and a change in the caption, the Federal Circuit concluded its final opinion in the litigation by holding that there was no taking because "appellants' water rights were subordinate to the Tribes' federal reserved water rights."  *Baley v. United States*, 942 F.3d 1312, 1341 (Fed. Cir. 2019).  Even if appellants had water rights under California law, they have the same problem as the *Baley* plaintiffs: their rights were subordinate to the superior rights of a third party (that is, the Exchange Contractors) in the relevant year.

For all these reasons, appellants cannot conjure from Federal law water rights that do not exist under California law.

## C.  Even If Appellants Had Water Rights To San Joaquin River-Sourced Water, The Friant Contracts Limited Those Rights

For the reasons explained above, appellants do not have water rights under either California or Federal law.  This defeats their takings claim.  Alternatively,

---

plaintiffs held a property interest under Oregon law.  *Baley*, 942 F.3d at 1331.

[12]  Appellants assert, without support, that the putative holding of *Klamath Irrigation District* "applied to owners of irrigated farmland in both Oregon and California."  Pl.-App. Br. 53.  It is not clear what they mean by this.  The decision appellants rely upon analyzed the effect of an Oregon Supreme Court decision interpreting Oregon law without considering California law.  *Klamath Irr. Dist.*, 635 F.3d at 516-20.

even if appellants did possess water rights, their takings claim would still fail for the independent reason that any such rights cannot exceed the rights created by the Friant Contracts.

As the trial court correctly held, the appellants "cannot assert property rights greater than those secured through their contracts, which give a priority to the Exchange Contractors." Appx19. The trial court's analysis is sound. "*Ickes* does not stand for the proposition that [] property rights require the government to continue to deliver water in contravention of the water delivery contract, which defines the extent of the water right." *Barcellos and Wolfsen, Inc. v. Westlands Water Dist.*, 849 F. Supp. 717, 731 (E.D. Cal. 1993); *see also id.* ("The United States, of course, is compelled by *Ickes* only to fulfill its contracts.") (quoting 4 Water and Water Rights (R. Beck, ed.) § 41.05(a) at 411 n. 214 (1991)). *Ickes* is consistent with this Court's precedent establishing that when "rights have been voluntarily created by contract . . . interference with such contractual rights generally gives rise to a breach claim not a taking claim." *See Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060, 1070 (Fed. Cir. 2001).

Appellants' opening brief does not respond to the trial court's holding that any property rights are limited to those rights secured through their contracts. Appellants' failure to develop any argument in response to this aspect of the trial

court's ruling means that they have forfeited any such challenge. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006).

Assuming that appellants take the position that they have rights greater than those secured in the Friant Contracts, and assuming further that they have not forfeited this argument, this position should be rejected. In addition to being undermined by the precedent described above, such a position would undermine Reclamation's ability to "operate the CVP as an integrated unit." *Westlands*, 153 F. Supp. 2d at 1149. The elaborate contingencies contained in the Friant Contracts condition the delivery of water to the Friant Contractors on its availability, Appx31-32, Appx355, Appx362, and the availability of water, in turn, depends upon Reclamation's ability to satisfy its numerous other obligations. Appx24, Appx44 n.21. An argument that the Friant Contracts are just so much wasted ink, imposing no limitations upon Reclamation's potential liability even in years when nature leaves Reclamation with no feasible options, cannot be squared with the role of the Friant Contracts (and other water supply contracts) in the Central Valley Project. *See Del Puerto Water Dist. v. U.S. Bureau of Reclamation*, 271 F.Supp.2d 1224, 1249 (E.D. Cal. 2003) (rejecting theory that contractor had appropriative rights to Central Valley Project water because "the recognition of a purported 'perpetual right' to CVP water service is a case of 'the tail seeking to wag the dog.'"); *United States v. State Water Resources Control Bd.,* 227 Cal. Rptr. 161,

61

199 (Ct. App. 1986) (explaining that "[t]he CVP's appropriated water rights are, by definition, conditional . . . .").

This reasoning applies both to the Friant Contractors and to the irrigators. Although the irrigators were not parties to the Friant Contracts, their right to water depended upon the Friant Contractors obtaining water under the Friant Contracts. *See* Appx2, Appx12; Appx216-219.  Because the irrigators are dependent upon the Friant Contracts to receive any water at all, any property right they have cannot be greater than the contractual rights possessed by the Friant Contractors. *See San Luis Unit Food Producers*, 772 F.Supp.2d at 1244 (rejecting argument that irrigators had "acquired some form of water 'right' that transcends their contracts").

The Court should not countenance appellants' attempt to use the takings doctrine as an end-run around the limitations contained in the Friant Contracts. Even if appellants had water rights, those water rights would not entitle them to water that the operative contracts did not.

## **CONCLUSION**

For these reasons, we respectfully request that the Court affirm the judgment of the trial court.

Respectfully submitted,

MICHAEL D. GRANSTON
Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/  Elizabeth M. Hosford
ELIZABETH M. HOSFORD
Assistant Director

/s/ Vincent D. Phillips, Jr.
VINCENT D. PHILLIPS, JR.
Senior Trial Counsel
MATTHEW J. CARHART
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Ben Franklin Station, P. O. Box 480
Washington, DC 20005
Telephone: (202) 305-4591
Email: Vincent.Phillips2@usdoj.gov

January 26, 2023                    *Attorneys for Defendant-Appellee*

## <u>CERTIFICATE OF COMPLIANCE</u>

Counsel for respondent certifies that this brief complies with the Court's type-volume limitation rules. *See* Fed. Cir. R. 32(a). According to the word-count calculated by the word processing system with which this brief was prepared, the brief contains a total of 13,988 words, which is within the 14,000 word limit.

/s/ Vincent D. Phillips, Jr.     
VINCENT D. PHILLIPS, JR.